759 F.2d 90
 245 U.S.App.D.C. 70, 53 USLW 2526, 11
Media L. Rep. 1777
 William P. TAVOULAREAS, Appellant,
Peter Tavoulareas
v.
Philip PIRO.
William P. TAVOULAREAS, Appellant,
Peter Tavoulareas
v.
The WASHINGTON POST COMPANY, d/b/a the Washington Post, a
Delaware Corporation, et al.
 Nos. 83-1604, 83-1605.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Feb. 10, 1984.
Decided April 9, 1985.
Rehearing Denied June 11, 1985.
 
 John J. Walsh, New York City, of the Bar of the Court of Appeals of N.Y., pro hac vice by special leave of Court, with whom Joseph A. Artabane, Washington, D.C. and Charles Alan Wright, Austin, Tex., were on brief, for appellant.
 David E. Kendall, Washington, D.C., with whom Irving Younger, Kevin T. Baine and Scott M. Matheson, Jr., Washington, D.C., were on brief, for appellees The Washington Post Co. and Patrick E. Tyler.
 H. Bartow Farr, III, Washington, D.C., with whom Paul M. Smith, Washington, D.C., was on brief, for appellee Sandy Golden.
 David Machanic, Washington, D.C., for appellee Philip Piro.
 Daniel J. Popeo, Washington, D.C., was on brief for amicus curiae, American Legal Foundation, urging reversal.
 Before WRIGHT and SCALIA, Circuit Judges, and MacKINNON, Senior Circuit Judge.
 Opinion for the Court filed by Senior Circuit Judge MacKINNON.
 Opinion concurring in part and dissenting in part filed by Circuit Judge J. SKELLY WRIGHT.
 TABLE OF CONTENTS
 Page
 I. BACKGROUND FACTS .................................................. 98
 II. THE LEGAL STANDARD ............................................... 103
III. DEFAMATION AND FALSITY ........................................... 109
 1. Defamatory Character of the November 30 Article .............. 109
 2. Falsity ...................................................... 111
 IV. RECKLESS DISREGARD OF TRUTH OR FALSITY--ACTUAL MALICE ............ 114
 1. The Christine Peterson Memorandum ............................ 114
 2. The Defendants' Motivation ................................... 117
 3. Resolution of Inferences Adverse to the Plaintiffs ........... 121
 4. Suppression of Information Favorable to the Plaintiffs ....... 123
 5. "Personally Dispatched": The Checket Conversation ............ 125
 6. The SEC Paragraphs ........................................... 126
 7. Reliability of Sources ....................................... 127
 A. Piro ...................................................... 128
 B. Comnas .................................................... 129
 8. Other Indicia of Actual Malice ............................... 131
 9. The Defendants' Evidence ..................................... 132
 10. Some of Defendants' Suggested Inferences from the Evidence ... 133
 11. Summary ...................................................... 134
 V. THE VERDICT AGAINST PIRO ......................................... 135
 VI. THE VERDICT AGAINST GOLDEN ....................................... 136
VII. CONCLUSION ....................................................... 137
APPENDIX ............................................................... 138
 MacKINNON, Senior Circuit Judge.
 
 
 1
 Plaintiffs William and Peter Tavoulareas brought suit against The Washington Post ("Post") and several other defendants for libel and against defendant Piro, a source for the story, for slander and its foreseeable republication. The Tavoulareases alleged that they were defamed by articles in the Post which stated, among other things, that William Tavoulareas, as President and Chief Executive Officer of Mobil Oil Corporation ("Mobil"), had used his influence to "set up" his son Peter in the shipping business, and then had diverted some of Mobil's shipping business to him. The basic theme of the article was that William Tavoulareas had misused his position and corporate assets to benefit his son. The case was submitted to the jury, which was instructed, in accordance with standards constitutionally required for public figures, that defendants could be held liable only if they published false matter with "actual malice"--i.e., with knowledge of its falsity or reckless disregard of whether it was false or not. The jury returned verdicts for the plaintiffs. The trial judge then ruled on motion that the evidence was insufficient to support such a verdict and entered judgment notwithstanding the verdict ("n.o.v.") for the defendants. Tavoulareas v. Washington Post Co., 567 F.Supp. 651 (D.D.C.1983). After a careful and independent review of the entire record in the case, we conclude that the evidence adduced by the plaintiffs was sufficient to "establish [ ] actual malice with convincing clarity," Bose Corp. v. Consumers Union of United States, --- U.S. ----, ----, 104 S.Ct. 1949, 1967, 80 L.Ed.2d 502 (1984), and accordingly reverse the grant of the judgments n.o.v. as to the Post defendants and defendant Piro, and remand the case to the district court for further proceedings. We affirm the trial court's judgment n.o.v. with respect to defendant Golden because of his lack of responsibility for the publication.
 
 I. BACKGROUND FACTS
 
 2
 The business relationships that gave rise to this case began in 1974, when Mobil bought a 30 percent interest in the Saudi Arabian Maritime Company ("Samarco"), a joint venture that had been formed a short time before by Fairfield Maxwell Ltd. and members of a powerful Saudi Arabian family, the Alirezas. The Alirezas were the majority shareholders in Samarco. Mobil bought a minority interest in Samarco because, at that time, Mobil believed the Saudi government was going to give strong oil shipping preferences to Saudi-owned shippers. Ultimately, however, these preferences were never adopted by the Saudi government.
 
 
 3
 The Samarco partners agreed to hire an outside firm to manage the ships that Samarco would operate. Mobil suggested Atlas Maritime Company, a new venture being formed by Greek shipping executive George Comnas. Comnas had previously worked for the Greek maritime firm of C.M. Lemos & Co., where Peter Tavoulareas, a 24-year-old graduate of the Master of Business Administration program at Columbia University, was also employed as a junior executive. Peter had first approached Lemos in August, 1972 with respect to employment and by January 1, 1973 had started working in the shipping business with C.M. Lemos & Co. (Trial Transcript (Tr.) 2385, 2387, 2451).
 
 
 4
 Mobil owned a fleet of oil tankers. It wanted some of those ships to be operated under Samarco's name in order to get the expected shipping preference. Mobil agreed to "bareboat charter" its ships (i.e., charter the ships empty and unmanned) to Samarco, which would in turn "time charter" them (i.e., charter the vessels complete with crews and provisions) back to Mobil.[1] Mobil thus in a sense was "chartering" its own ships to itself and essentially obtaining its crews and provisions through Samarco.[2] In admiralty law "for many, if not most, purposes the bareboat charterer is to be treated as the owner" of the chartered vessel. Reed v. The Yaka, 373 U.S. 410, 412, 83 S.Ct. 1349, 1352, 10 L.Ed.2d 448 (1963). Thus, the contractual arrangement placed considerable responsibility upon Samarco for Mobil's ships. Samarco, for its part, obtained crews and provisions through its management firm, Atlas.
 
 
 5
 Comnas, in setting up Atlas, asked two young coworkers at Lemos, Peter Tavoulareas and Ares Emmanuel, to join him as partners. When Peter joined Atlas in August 1974, his father William notified Mobil's Conflict of Interest Committee and formally removed himself from taking part in decisions regarding Atlas.[3] The Mobil Committee found no impropriety in the arrangement, which was fully disclosed to the Mobil Board of Directors.
 
 
 6
 Comnas was forced out of Atlas a year later, in 1975, ostensibly because of self-dealing, fraudulent practices, and dissatisfaction with his performance on the part of Mobil and the Saudis. He was placed on Mobil's payroll as a consultant, and Atlas reimbursed Mobil for his salary. Mobil sent Harmon Hoffmann,[4] a Mobil shipping executive, to act as interim head of Atlas. Hoffmann was offered Comnas' share of Atlas stock (Tr. 4151), but turned down the offer to become an equity partner, and after six months returned to Mobil. Peter Tavoulareas and Emmanuel then assumed the management duties of Atlas. Atlas prospered during the succeeding years; by 1979 it apparently was operating 17 ships, including 7 for Samarco, only 4 of which were Mobil's.
 
 
 7
 The Mobil-Samarco-Atlas relationship--and specifically the Tavoulareas-Atlas connection--was explained to Mobil shareholders in a 1976 letter. At about the same time, a party or parties sent anonymous letters to a number of newspapers, alleging that the arrangement violated the federal securities laws. One of those letters went to reporter Robert Woodward of the Post. Woodward, along with reporters for several other newspapers, investigated the anonymous charges; but none of them apparently found any wrongdoing, and no stories were published. The Securities and Exchange Commission, which obtained a copy of one of the letters, launched an informal investigation and called upon William Tavoulareas to testify in non-public proceedings. The SEC found no impropriety.
 
 
 8
 Evidence presented by the plaintiffs showed that Mobil did not exert control over Samarco, in which it was a minority shareholder, and that all of the decisions relating to Atlas were approved by the controlling Saudi partners. The arrangement was fully disclosed to Mobil's Conflicts of Interest Committee, Mobil's Board of Directors, and to the company's shareholders. Evidence indicated that Mobil and its shareholders had derived economic benefits from the Samarco-Atlas arrangement because Atlas operated the Mobil ships more cheaply than could Mobil.
 
 
 9
 The article at issue in this case had its genesis five years after the creation of Atlas and three years after disclosure to the shareholders. In October, 1979, Samuel "Sandy" Golden, a reporter for The Montgomery [Maryland] Journal, met Philip Piro, a physician who was married to William Tavoulareas' daughter. Piro was in the midst of a less than amicable divorce proceeding. Piro told Golden about the Atlas transactions. Golden testified that Piro told him that Mobil Oil president William Tavoulareas had set up his son Peter in the business, and that it had made Peter an "overnight millionaire" (Tr. 166). Piro mentioned that Woodward had previously investigated the story.
 
 
 10
 Golden, who had been angling for a job at the Post for some time, sensed a story. He unsuccessfully called Woodward several times and finally left a message that he "had a story about the president of Mobil setting up his son to become an overnight millionaire" (Joint Appendix (J.A.) 786). Woodward, by then an editor at the Post, assigned reporter Patrick Tyler to return Golden's call. Tyler called Golden. Golden told Tyler that he had a hot source for the Tavoulareas story. Tyler agreed that if Golden's source led to a big story they would share a Post byline. The two reporters met at The Owl restaurant in Baltimore, where they jointly interviewed Piro. Tyler apparently was pleased with Piro's evidence; on leaving the restaurant he remarked that it's "not every day you knock off one of the seven sisters."[5]
 
 
 11
 At this point, the two reporters began following separate trails. Golden concentrated on getting more information from Piro and conducted several telephone interviews with him. Although Golden repeatedly assured Piro that he was not recording them, he taped several of the conversations. Golden also began seeking "possible enemies" of Tavoulareas, i.e., those with a "motive for revenge" and "with a reason to say bad things about Mr. Tavoulareas" (J.A. 815). In his search, he met Peter Stockton, an investigator for Rep. John Dingell, Chairman of the House of Representatives Subcommittee on Energy and Power. Stockton moonlighted as an employee of CBS' "60 Minutes" television show. Golden believed that Stockton, who had something of a reputation as a crusader, "hate[d] people with money." Golden played the Piro tapes for Stockton, who at some point relayed Golden's information to Congressman Dingell. Stockton later contacted Tyler and passed other information to him. Dingell wrote to the SEC seeking an investigation.
 
 
 12
 Tyler, meanwhile, tracked down Comnas and met with him in New York. Comnas, who initially requested anonymity, allegedly told Tyler about the Atlas arrangements. The Post contends that Comnas was the major source for its stories. (Since Comnas did not testify at trial and Tyler is a reporter who does not use tape recorders, only Tyler's own account of the conversations is available.) Tyler also talked to John Kousi, an executive of Fairfield Maxwell, Ltd., one of the Samarco partners. Parts of Kousi's deposition were placed into evidence.
 
 
 13
 Tyler also tried to interview William Tavoulareas and other Mobil executives, but generally was rebuffed. Witnesses for the plaintiffs stated that they were wary of talking with Tyler because in an earlier story on the oil shortage he had misrepresented statements made by Mobil executives. Tavoulareas, however, agreed to give written answers to questions that Tyler would submit in writing, which was done.
 
 
 14
 Tyler wrote the story, and the Post submitted it to its editing process. During editing, several pieces of material were deleted that were favorable to Mobil and Tavoulareas, chiefly opinions of various persons in and out of Mobil (1) that the Atlas arrangement had benefitted the company, and (2) that William Tavoulareas had not been directly involved in Atlas. The Post copy editor assigned to the story, Christine Peterson, read it, considered its implications, and wrote a memorandum to other editors that she found it "impossible to believe" that William Tavoulareas had arranged the Atlas affair in order to benefit his son. Tyler responded with a memo in which he acknowledged that "a good editor might say that part of our case against Tavoulareas seems tenuous," and noted that a couple of "key points" were based on a single source--presumably Comnas. The Post editors did not alter the story in response to Peterson's memo, and the story, after clearance from the lawyers, was published.
 
 
 15
 When the article appeared, Tyler was given sole byline credit for it, but Golden received designation as a "Special Correspondent" who had "contributed" to the story.
 
 
 16
 The first article--which is reprinted as an Appendix to this opinion--appeared on November 30, 1979.[6] It bore the headline "Mobil Chief Sets Up Son in Venture," and its essential theme is made clear from its beginning:
 
 
 17
 Mobil Oil Corp. president William P. Tavoulareas set up his son five years ago as a partner in a London-based shipping management firm that has since done millions of dollars in business operating Mobil-owned ships under exclusive, no-bid contracts.
 
 
 18
 The article detailed the transactions that led to the creation of Samarco and Atlas. Although the article contained a great deal of innuendo,[7] the defamatory picture it conveyed is based upon certain factual allegations contained therein. Specifically, it alleged:
 
 
 19
 1. William Tavoulareas "set up his son ... as a partner" in Atlas, a company to which William and Mobil would divert a great deal of business.
 
 
 20
 2. "As the formation of Atlas was being planned in April 1974, [William] Tavoulareas personally urged [Comnas] that his son be included as an equity partner in Atlas."
 
 
 21
 3. Although he had told the Mobile board that he recognized the potential conflict of interest and would not personally be involved in dealings with Atlas, it was nevertheless "the elder Tavoulareas [who] dispatched one of his senior shipping executives, Herman F. Hoffmann, [sic ] to London to help run Atlas" after Comnas left the firm.
 
 
 22
 The core allegations--baldly stated as facts in the article--were that William Tavoulareas set up Peter in Atlas and then dispatched a Mobil employee and used Mobil resources to bail out Atlas when Comnas was forced out. Without these "facts," the story would be nothing more than a report that Mobil had business dealings with a small company in which its president's son had a part interest--hardly page 1 material.
 
 
 23
 These core "facts" formed the foundation on which the implications of the article rested. In a memo to his superiors at the Post (J.A. 2488-91), Tyler characterized the story as dealing with the "incredibly fancy corporate footwork" undertaken by Tavoulareas and Mobil to (1) "ingratiate itself with the Saudis," and (2) "set up the son of Mobil's president in a shipping business when business was bad and the business, therefore, stood little chance of prospering without Mobil's help." In the memo, he called it a "stor[y] of nepotism, reward without merit and favoritism by those who wield vast amounts of power." He continued:
 
 
 24
 ... Mobil--which originally turned down a chance to join Samarco--changed its mind after it dawned on Mobil's president that such a partnership would justify creation of a small management firm at a time when Tavoulareas' son was aspiring to such a career and was already at work with one of the Greek shippers.
 
 
 25
 The story showed, wrote Tyler, "that Mobil's decisions in this case were not made for the traditional business reasons, or for the reasons stated by Mobil." In specific response to Peterson's assertion that it was "impossible to believe that Tavoulareas alone could put together [the Samarco-Atlas] scheme for the sake of his son's business career, or that he would want to," he wrote:
 
 
 26
 Samarco can be seen as nothing more complicated than a slight diversion from Mobil in the way it moved its crude oil from point A to point B.
 
 
 27
 The question of "why" Mobil's president would want to orchestrate such a diversion when it would benefit his son's business career is begging things a little.
 
 
 28
 Tyler's interpretation of the article's implications was echoed by Peterson, who apparently read the story to suggest that "Tavoulareas alone ... put together [the Atlas-Samarco] scheme for the sake of his son's business career." As a whole, she wrote, the story was about the use of $680,000-a-year of Mobil's assets as a "plaything for an indulged son."
 
 
 29
 The interpretations of Tyler and Peterson reflect fairly accurately the defamatory implications that an average reader would draw from the story: (1) that William Tavoulareas, using his position as a principal officer of Mobil, "set up" his son in Atlas; (2) that a primary motive for Mobil's participation in the Atlas deal was to benefit Peter Tavoulareas;[8] (3) that William Tavoulareas, although claiming to have isolated himself from business dealings with Atlas, nevertheless directly participated in important matters and personally channelled a Mobil employee and resources to help Atlas; and (4) that Tavoulareas and Mobil may have violated the securities laws by failing to disclose Peter's involvement in Atlas.[9] Ultimately, the basic implication was that Tavoulareas improperly used his position and the resources of Mobil to benefit his undistinguished 24-year-old son. All of these defamatory implications are based on the statements of "fact" identified above.
 
 
 30
 After the first publication, William Tavoulareas denied the story and demanded a retraction. The Post has steadfastly refused to retract it and presently asserts that the "story was in fact true." Brief of Post at 18. Other publications picked up the story, which enjoyed a brief flurry in the press. It does not appear, however, that either the Mobil shareholders or the Securities and Exchange Commission ever found any impropriety in the transactions at issue.
 
 
 31
 William and Peter Tavoulareas brought two actions: one for libel against The Washington Post Company[10] and several individuals (collectively, the "Post defendants"), including Tyler, Golden, and Woodward (No. 83-1605),[11] and one for slander and its foreseeable republication against Piro (No. 83-1604). The two actions were consolidated. After trial, the jury returned verdicts in which they awarded damages that indicated they necessarily determined that:
 
 
 32
 1. In the November 30 article the Post defendants defamed William Tavoulareas. The premise of the article was false and was published with knowledge or reckless disregard of its falsity. The jury awarded Tavoulareas $250,000 in compensatory damages and $1,800,000 in punitive damages against the Post defendants.
 
 
 33
 2. The Post defendants did not defame Peter Tavoulareas.
 
 
 34
 3. Piro defamed both William and Peter Tavoulareas. The jury awarded compensatory damages of $5,000 to William and $1,000 to Peter.
 
 
 35
 After receipt of the verdicts, the district court granted judgments n.o.v. for Piro and for the Post defendants against William Tavoulareas. The trial court found that Tavoulareas was a public figure and that there was no proof that the defendants had acted with actual malice:
 
 
 36
 The article in question falls far short of being a model of fair, unbiased, investigative journalism. There is no evidence in the record, however, to show that it contained knowing lies or statements made in reckless disregard of the truth.
 
 
 37
 567 F.Supp. at 654. The district court affirmed the jury verdict in favor of Peter Tavoulareas against Piro.
 
 
 38
 On appeal, the parties have argued two issues. First, whether William Tavoulareas is a public figure, requiring application of the actual malice standard of New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)? And second, whether there is sufficient evidence in the record to support a finding of actual malice? On review, we consider the second of these issues and, in addition, inquire whether the charge that William Tavoulareas "set up" his son in the manner alleged, and certain implications reasonably flowing from the specifically pleaded defamatory allegations, were defamatory and false. Because we find, after review of the whole record, that the evidence was sufficient to demonstrate "clearly and convincingly" that the article was defamatory and false and that the defendants acted with actual malice--and hence to meet the New York Times standard--we do not reach the issue whether Tavoulareas was a "public figure."[12]
 
 II. THE LEGAL STANDARD
 
 39
 The constitutional standard of liability for public figures, as established by the Supreme Court in New York Times and restated in Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), is well settled. A public figure cannot recover for defamatory falsehoods, no matter how damaging and how utterly baseless, unless he can show "actual malice"--i.e., establish by "clear and convincing proof that the defamatory falsehood was made with knowledge of its falsity or with reckless disregard for the truth." Gertz, 418 U.S. at 342, 94 S.Ct. at 3008 (emphasis added). The Court consistently has refused to apply objective standards to determining actual malice; no matter how unreasonable the defamatory statement, the defendant cannot be held accountable unless he "in fact entertained serious doubts as to the truth of his publication." St. Amant v. Thompson, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968). At issue, then, is the state of mind of the defendants.[13]
 
 
 40
 Proof of mental state very often "depends ... on the credibility of the witnesses, which can best be determined by the trier of facts after observation of the demeanor of the witnesses during direct and cross-examination." Morrison v. Nissan Motor Co., 601 F.2d 139, 141 (4th Cir.1979) (cases cited); accord, Mutual Fund Investors, Inc. v. Putnam Management Co., 553 F.2d 620, 624 (9th Cir.1977). Thus, in the ordinary case, federal courts are reluctant to decide state of mind issues in summary fashion. See, e.g., Morrison, 601 F.2d at 141. It is not that summary disposition is disfavored when the issue is the mental state of the defendant; rather, the very nature of the inquiry is frequently so bound up with the weighing of credibility that courts, as a practical matter, will only infrequently find the facts regarding mental state so crystal-clear that a reasonable jury could reach only one conclusion.
 
 
 41
 A few courts have argued that the public interest in fostering free debate requires that summary disposition be used especially freely in defamation cases--that it should, in fact, be the "rule," rather than the "exception." See, e.g., Oliver v. Village Voice, Inc., 417 F.Supp. 235, 237 (S.D.N.Y.1976); Guitar v. Westinghouse Electric Corp., 396 F.Supp. 1042, 1053 (S.D.N.Y.), aff'd, 538 F.2d 309 (2d Cir.1976). Summary judgment, in particular, is said to be necessary because the suit itself, not merely the unfavorable verdict, could "chill" protected speech: Due to the possibly overwhelming expense of even a successfully defended defamation action, the threat of litigation itself may cause potential defendants to steer far wider of the unlawful zone and act as self-censors. See, e.g., New York Times Co. v. Sullivan, 376 U.S. 254, 279, 84 S.Ct. 710, 725, 11 L.Ed.2d 686 (1964) (quoting Speiser v. Randall, 357 U.S. 513, 526, 78 S.Ct. 1332, 1342, 2 L.Ed.2d 1460 (1958)) ("[Critics] tend to make only statements which 'steer far wider of the unlawful zone.' "). The theory is that frivolous suits should be ended quickly by summary proceedings. By analogy, it could be argued that "[t]he policies governing the propriety of summary judgment presumably apply to motions for directed verdict and for judgment n.o.v." R. Sack, Libel, Slander, and Related Problems 557 (1980). But that is not the case. Whatever value summary judgment has in sparing defamation defendants the expense of actually going to trial, there is no such value in judgments n.o.v., for they come into being after the trial is over and virtually all of the expense has been incurred. Strictly in terms of court costs and legal fees, the "chill" is the same whether judgment after trial is based on a jury verdict or a judgment n.o.v.
 
 
 42
 In any event, the general proposition that summary proceedings are favored in defamation law has been seriously undercut by recent Supreme Court pronouncements. The Court, recognizing the critical role credibility frequently plays in assessing mental state, has acknowledged that "proof of 'actual malice' ... does not readily lend itself to summary disposition," and expressed "some doubt" that summary judgment should be considered the "rule" rather than the "exception" in defamation cases. Hutchinson v. Proxmire, 443 U.S. 111, & 120 n. 9, 99 S.Ct. 2675, 2680 n. 9, 61 L.Ed.2d 411 (1979); see also Liberty Lobby, Inc. v. Anderson, 746 F.2d 1563, 1570 (D.C.Cir.1984). In the recent case of Calder v. Jones, --- U.S. ----, ----, 104 S.Ct. 1482, 1488, 79 L.Ed.2d 804 (1984), the unanimous Court remarked:
 
 
 43
 [T]he potential chill on protected First Amendment activity stemming from libel and defamation actions is already taken into account in the constitutional limitations on the substantive law governing such suits.... We have already declined in other contexts to grant special procedural protections to defendants in libel and defamation actions in addition to the constitutional protections embodied in the substantive laws.
 
 
 44
 The Calder Court cited Hutchinson for the proposition that "no special rules apply for summary judgment" in defamation cases. Id.
 
 
 45
 Under Fed.R.Civ.P. 50(b), a motion for judgment n.o.v. is essentially a motion for directed verdict made after the jury has returned its verdict. Consequently, "the standard for awarding a judgment n.o.v. is the same as that applied when ruling on a motion for a directed verdict." Vander Zee v. Karabatsos, 589 F.2d 723, 726 (D.C.Cir.1978), cert. denied, 441 U.S. 962, 99 S.Ct. 2407, 60 L.Ed.2d 1066 (1979); see Lester v. Dunn, 475 F.2d 983, 985 (D.C.Cir.1973); 5A Moore's Federal Practice p 50.07 (2d ed. 1982). The standard usually applied was elaborated by this court in Alden v. Providence Hospital, 382 F.2d 163, 165 (D.C.Cir.1967):
 
 
 46
 Unless the evidence, along with all inferences reasonably to be drawn therefrom, when viewed in the light most favorable to the plaintiff is such that reasonable jurors in fair and impartial exercise of their judgment could not reasonably disagree in finding for the defendant, the motion must be denied.
 
 
 47
 Accord, Vander Zee, supra, 589 F.2d at 726 (emphasis added) (footnote omitted). The Ninth Circuit aptly summed up the application of these rules in a defamation action:
 
 
 48
 [I]n a libel case, as in other cases, the party against whom ... a motion for a judgment notwithstanding the verdict is made is entitled to have the evidence viewed in the light most favorable to him and to all inferences that can properly be drawn in his favor by the trier of fact. We think, too, that in such cases it is not only not the duty of the judge, or this court of appeal, to weigh the credibility of the evidence, or to draw inferences in favor of the moving party (except, of course, when no contrary inference can legitimately be drawn) but that neither the judge nor this court on appeal has the authority to weigh credibility or to choose among legitimate inferences in such cases [emphasis added].[14]
 
 
 49
 The standard against which the evidence must be examined is that of New York Times and its progeny. But the manner in which the evidence is to be examined in the light of that standard is the same as in all other cases in which it is claimed that a case should not go to the jury. If the evidence, so considered, measures up to the New York Times standard, the case is one for the jury, and it is error to grant a directed verdict....
 
 
 50
 Guam Federation of Teachers, Local 1581 v. Ysrael, 492 F.2d 438, 441 (9th Cir.), cert. denied, 419 U.S. 872, 95 S.Ct. 132, 42 L.Ed.2d 111 (1974). As the Ninth Circuit held in Alioto v. Cowles Communications, Inc., 519 F.2d 777, 780 (9th Cir.), cert. denied, 423 U.S. 930, 96 S.Ct. 280, 46 L.Ed.2d 259 (1975):
 
 
 51
 A district judge on motion for judgment n.o.v., or an appellate judge on review, must examine the evidence to see whether, if all permissible inferences were drawn in the plaintiff's favor and all questions of credibility were resolved in his behalf, the evidence would then demonstrate by clear and convincing proof that the libelous material was published with actual malice.
 
 
 52
 See also Yiamouyiannis v. Consumers Union of the United States, Inc., 619 F.2d 932, 940 (2d Cir.) ("[d]efamation actions are, for procedural purposes, such as ... summary judgment, to be treated no differently from other actions"), cert. denied, 449 U.S 839, 101 S.Ct. 117, 66 L.Ed.2d 46 (1980); Maheu v. Hughes Tool Co., 569 F.2d 459, 464 (9th Cir.1977) ("traditional standard for appellate review of motions for a directed verdict and judgment n.o.v. should be applied in [a defamation] case"); Time, Inc. v. Ragano, 427 F.2d 219, 221 (5th Cir.1970) ("all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion for summary judgment"); Vandenburg v. Newsweek, Inc., 441 F.2d 378, 379 (5th Cir.) (same), cert. denied, 404 U.S. 864, 92 S.Ct. 49, 30 L.Ed.2d 108 (1971).
 
 
 53
 The district court correctly stated this legal standard, 567 F.Supp. at 652-53, and even the defendants concede that "the evidence must be construed most favorably to William Tavoulareas." Brief of Post at 29-30. The question thus is whether the evidence and the reasonable inferences derived from it, when examined in the light most favorable to the plaintiffs, establishes by clear and convincing evidence that the defendants acted with knowledge that the charge was false or with reckless disregard of its truth or falsity.
 
 
 54
 But a court evaluating a defamation verdict which significantly involves First Amendment considerations must be far less deferential to the verdict of the jury. The Supreme Court held in New York Times v. Sullivan that in public figure defamation cases courts "must 'make an independent examination of the whole record,' ... so as to assure [themselves] that the judgment does not constitute a forbidden intrusion on the field of free expression." 376 U.S. at 285, 84 S.Ct. at 729 (quoting Edwards v. South Carolina, 372 U.S. 229, 235, 83 S.Ct. 680, 683, 9 L.Ed.2d 697 (1963) (emphasis added). This principle has been consistently followed by the Court in subsequent cases. See, e.g., St. Amant v. Thompson, 390 U.S. 727, 732-33, 88 S.Ct. 1323, 1326, 20 L.Ed.2d 262 (1968); Greenbelt Cooperative Publishing Ass'n v. Bresler, 398 U.S. 6, 11, 90 S.Ct. 1537, 1540, 26 L.Ed.2d 6 (1970). The rule has been recognized and followed by the courts of appeals. See Guam Federation, supra, 492 F.2d at 442 (recognizing duty to "make an independent evaluation of the whole record") (quoting Edwards v. South Carolina, 372 U.S. 229, 235, 83 S.Ct. 680, 683, 9 L.Ed.2d 697 (1963)); Alioto, 519 F.2d at 780 (court must examine record and evaluate evidence itself on issue of actual malice).
 
 
 55
 The Supreme Court recently reaffirmed that rule in Bose Corp. v. Consumers Union of United States, --- U.S. ----, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984). The court held:
 
 
 56
 The question whether the evidence in the record in a defamation case is of the convincing clarity required to strip the utterance of First Amendment protection is not merely a question for the trier of fact. Judges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of "actual malice."
 
 
 57
 Id. 104 S.Ct. at 1965 (emphasis added). This is the standard that controls our review of the record in this case.
 
 
 58
 The issue Bose presents in the present context is whether we are to apply our independent judgment to each separate fact determination that forms the basis for the ultimate conclusion of "actual malice," or rather only to the ultimate conclusion of clear and convincing proof of "actual malice." For a number of reasons, we think the latter is the case.
 
 
 59
 First, the Court's expression of its holding in Bose is phrased only in terms of the ultimate issue; and certiorari had been granted only "to consider whether the Court of Appeals erred when it refused to apply the clearly erroneous standard of Rule 52(a) to the District Court's 'finding' of actual malice." Id. at 1955. Admittedly, independent review of the ultimate issue, of course, could be thought to subsume independent review of the preliminary factual issues on which it is based. But as detailed below, the Supreme Court discussed extensively the distinction between purely factual findings and so-called ultimate facts to repel such a conclusion.
 
 
 60
 Second, the court of appeals decision affirmed in Bose had not questioned the factfinder's preliminary factual determinations. The issue under review was whether it could properly be found defamatory, under an "actual malice" standard, for the defendant to print that the loudspeakers manufactured by the plaintiff caused musical instruments to sound as though they were wandering "about the room."[15] As the Supreme Court noted, the court of appeals had accepted all the district court's factual findings, observing "that it 'was in no position to consider the credibility of witnesses and must leave such questions of demeanor to the trier of fact.' " Id. at 1955 (quoting 692 F.2d at 195). The Supreme Court noted with approval this refusal of the court of appeals to second-guess credibility findings of the factfinder. Id. at 1958.[16] The Court likewise did not question them:
 
 
 61
 We may accept all of the purely factual findings of the District Court and nevertheless hold as a matter of law that the record does not contain clear and convincing evidence that Seligson or his employer prepared the loudspeaker article with knowledge that it contained a false statement, or with reckless disregard of the truth.
 
 
 62
 Id. at 1967. What both the court of appeals and the Supreme Court held was that in the reviewing court's own judgment, these accepted preliminary facts did not support the ultimate conclusion of clear and convincing proof of actual malice.
 
 
 63
 It is entirely clear, then, that Bose does not hold that any factual determination other than the ultimate conclusion may be independently reviewed. The only question is whether it suggests so. One indication that it does not is the following statement in the opinion:
 
 
 64
 Rule 52(a) commands that "due regard" shall be given to the trial judge's opportunity to observe the demeanor of the witnesses; the constitutionally-based rule of independent review permits this opportunity to be given its due.
 
 
 65
 Id. at 1959. Unless one attributes to this statement the unthinkable obfuscation that "permitting the opportunity to be given its due" includes ignoring the factfinder's credibility determination and making an independent judgment, this must mean that de novo review does not apply to those preliminary factual determinations based on credibility. Since this typically includes most preliminary factual determinations, there would be little sense in preserving the "independent judgment" rule for the remainder.[17]
 
 
 66
 That Bose addresses only the ultimate question of actual malice is shown, thirdly, by its reliance upon the distinction between questions of fact (which are governed by Rule 52(a)) and questions of law (which are for the court). "At some point," the Court says, "the reasoning by which a fact is 'found' crosses the line between application of those ordinary principles of logic and common experience which are ordinarily entrusted to the finder of fact into the realm of a legal rule upon which the reviewing court must exercise its own independent judgment." Id. at 1960 n. 17. And again: "When the standard governing the decision of a particular case is provided by the Constitution, this Court's role in marking out the limits of the standard through the process of case-by-case adjudication is of special importance." Id. at 1961 (emphasis added). Such descriptions, and such reliance upon the law-fact distinction, makes sense as applied to the ultimate issue of whether, given certain facts, the constitutional standard of "actual malice" has been met. The Court's statements in Bose would make little sense if applied to such preliminary issues as whether the reporter was told thus-and-so by a particular source.
 
 
 67
 In sum, if the Court's statement in Bose that "First Amendment questions of 'constitutional fact' compel this Court's de novo review," id. at 1964 n. 27, is not limited to the ultimate constitutional fact (e.g., whether the writing was "obscene," whether there was a "clear and present danger," or, in the context of the present case, whether there was "actual malice"), then we see no rational stopping point short of holding that all factual issues in a First Amendment case are for the court. To embrace that kind of de novo review, as advocated by the dissent, would eviscerate the role of the jury and, in effect, vest appellate courts with original jurisdiction in libel actions. There is no indication that Bose was meant to set forth such a sweeping proposition. Indeed, its frequent references to the continuing applicability of Rule 52(a) would be incomprehensible on that basis.
 
 
 68
 This searching review of the evidence is fully harmonious with the established rule that in evaluating such evidence, all reasonable inferences must be granted to the plaintiff. The Guam Federation-Alioto line of cases correctly applied the New York Times requirement of review of the entire record, and nothing in Bose indicates that they are no longer good law.[18] Moreover, neither New York Times nor Bose suggests that a district court or a court of appeals is to substitute its assessment of credibility or its general appraisal of the evidence for that of the jury. Courts reviewing the determinations of a factfinder--be it judge or jury--are not to examine the evidence of the plaintiffs and that of the defendants and decide which to believe. That is the function of the factfinder. Rather, they must carefully examine the evidence, draw all reasonable inferences in favor of the verdict of the jury, and then determine whether that evidence demonstrates clearly and convincingly that the defendant acted with actual malice.[19]
 
 
 69
 With the Supreme Court's admonitions in mind, and cognizant of our duty to "exercise [our] independent judgment and determine whether the record establishes actual malice with convincing clarity," Bose, at 1967, we turn to the required extended examination of the evidence as it relates to that issue. Such independent inquiry convinces us that the evidence is sufficient to clearly and convincingly establish actual malice, which the jury found existed on the part of the defendants.
 
 
 70
 Before we begin our actual malice discussion, though, we first consider two issues necessary to reinstating the jury verdict, namely the defamatory character of the article and proof of falsity.
 
 III. DEFAMATION AND FALSITY
 
 71
 1. Defamatory Character of the November 30 Article
 
 
 72
 Statements do not constitute actionable defamation merely because they are false. They must be demonstrated to be defamatory to the plaintiff. As the district court instructed the jury, consistent with the standard in the District of Columbia, a publication is defamatory if it "tends to injure plaintiff in his trade, profession, or community standing, or lower him in the estimation of the community or subject him to scorn, ridicule, shame, contempt or embarrassment" (Tr. 4548). See Afro-American Publishing Co. v. Jaffee, 366 F.2d 649, 654 (D.C.Cir.1966). The Supreme Court has instructed us that "[a] publication claimed to be defamatory must be read and construed in the sense in which the readers to whom it is addressed would ordinarily understand it." Washington Post Co. v. Chaloner, 250 U.S. 290, 293, 39 S.Ct. 448, 448, 63 L.Ed. 987 (1919). It is clear that while we must consider each portion of the article specified in the complaint, the words should not be considered in isolation; they must be ascribed their plain and natural meaning in the context of the article as a whole. In addition to the plain text, we consider what the article conveys through its structure, implications, and connotations.
 
 
 73
 The theme of the Post article here is expressed in its headline--"Mobil Chief Sets Up Son In Venture" and in the lead paragraph--"Mobil Oil Corp. president William P. Tavoulareas set up his son five years ago as a partner in a London-based shipping management firm that has since done millions of dollars in business operating Mobil-owned ships under exclusive, no-bid contracts." See Appendix. William Tavoulareas maintains that the article reasonably implies that he breached his fiduciary duties to Mobil, that he wasted and misused Mobil assets, and that he wrongfully directed those assets to his son Peter for his benefit (Tr. 4550). The Post attempts to trivialize the import of the phrase "set up" and argues that it was "just a simple way of describing how something came to be." Brief of Post at 39.
 
 
 74
 The district court, in ruling on the motion for judgment n.o.v., concluded that the term "set up" "may not be the most felicitous choice of vocabulary that could have been used to describe the situation but ... it cannot be said that it was a lie or a reckless untruth." 567 F.Supp. at 659. The court similarly rejected, as unreasonable as a matter of law, the conclusion that the article implied that William Tavoulareas put together the whole Mobil-Atlas-Samarco arrangement solely for the sake of his son. Id. at 660. The November 30 article, the court said, also does not impliedly accuse Tavoulareas of misusing Mobil assets. Id.
 
 
 75
 We conclude that the district court was in error and hold that both the phrase "set up," in the context used, and the article in general, defame William Tavoulareas.[20] Notwithstanding the fact that some statements in the article may imply that Mobil's involvement with Atlas was purportedly justified on legitimate business grounds, the article could reasonably be read to suggest that William Tavoulareas became involved with Atlas-Samarco primarily to benefit his son. Certainly, this was the interpretation that Post editors Peterson and Tyler gave the article.[21] Such interpretation by the jury would be wholly justified since in this case the article would have little or no news value if it merely intended to report a legitimate business act. At a minimum, the article implies that, irrespective of the motivation for creating the Mobil-Atlas-Samarco relationship, William misused Mobil assets and his position as president to advance his allegedly undeserving son--an act of corporate nepotism. Indeed, this interpretation of alleged nepotism was recognized by the district court as the basic theme of the article. 567 F.Supp. at 660. The caption and lead paragraph clearly connote this. This lead material sets the tone of the article which is not diminished by subsequent statements. On the contrary, the body of the story lends further support to such conclusion. While portions of the article are true, "the defamer may be the more successful when he baits the hook with truth." Afro-American, 366 F.2d at 655. The article's seemingly detailed support, which gives the impression that it states facts, lends apparent truth to its accusations. The other statements specifically challenged as false, see falsity discussion infra, in similar fashion contribute to the defamatory premise of alleged nepotism.
 
 
 76
 We thus conclude that the November 30 article, in its headline and considered as a whole, would reasonably be understood by the average reader in the community as being defamatory in its implication that William Tavoulareas was guilty of corporate nepotism, breached his fiduciary duty to Mobil, and misused Mobil assets.
 
 2. Falsity
 
 77
 As the district court properly instructed the jury, liability for defamation requires, as part of the plaintiff's case and prior to a finding of actual malice, proof of falsity. Garrison v. Louisiana, 379 U.S. 64, 74, 85 S.Ct. 209, 215, 13 L.Ed.2d 125 (1964); New York Times v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Because the jury returned verdicts against the Post, Golden, and Piro in favor of William Tavoulareas, it necessarily found that the challenged statements in the November 30 article were false. In granting judgment n.o.v., the trial court found that there was insufficient proof of actual malice and thus did not consider it necessary to address directly the issue of falsity. 567 F.Supp. at 654 n. 9. Tavoulareas maintains that the jury's finding of falsity "remains undisturbed" on appeal. Brief of Tavoulareas at 17a-17b. The defendants, while on appeal concentrating principally on the actual malice issue, rest on a general statement "that the story was in fact true." Brief of Post at 18.
 
 
 78
 In the circumstances of this case, the issue of actual malice, which is the major point on appeal, is intertwined with the issue of falsity of the defamatory allegations, since the evidence establishing falsity, and the degree of that evidence, overlaps with and constitutes much of the proof of actual malice. The issue of falsity was briefed and argued before the trial court, and constitutes part of the record that we have reviewed.[22] The procedural posture of this case, reviewing a grant of judgment n.o.v., makes the question of proof of falsity one of law. We accordingly address the falsity issue, and our subsequent discussion of the issue in connection with malice will implicitly expand upon the same point. For purposes of our review we assume, without deciding, that a showing of falsity requires clear and convincing proof.
 
 
 79
 Conclusions to be drawn from the evidence in this case, particularly with respect to the issues of falsity and actual malice, depend in large part on the determination of the credibility of the principal witnesses.[23] As previously detailed, we must view the evidence, with all inferences reasonably to be drawn therefrom, in the light most favorable to the party against whom the judgment n.o.v. was ordered, i.e., the plaintiff. Guam Federation of Teachers, Local 1581 v. Ysrael, 492 F.2d 438, 439-41 (9th Cir.), cert. denied, 419 U.S. 872, 95 S.Ct. 132, 42 L.Ed.2d 111 (1974); see discussion and cases cited in Section II supra.
 
 
 80
 On the key charge that William Tavoulareas "set up" his son in the shipping business, the evidence of truth is (1) Comnas' alleged statement--as testified by Tyler--that Comnas had taken Peter into the firm only because William suggested it and (2) Piro's assertion that William had once said that he had given Peter a "nudge" to get him into the shipping business. As to the first, William Tavoulareas' testimony flatly contradicted Comnas' alleged accusation (Tr. 1425), as did William's prior testimony before the SEC (J.A. 2398-2459). The defendants at trial did not produce Comnas' deposition testimony, though he was their principal source relied upon for the charges made in the article. Nothing uncovered in the Post's massive pretrial discovery and none of the Post's witnesses except defendants Piro and Tyler, provides any basis for the charge that William "set up" Peter. As to Piro, Golden testified that at his first meeting with him, Piro told him that "William Tavoulareas had set up his son in a shipping company that made him an overnight millionaire," or "words to that effect" (Tr. 164-65). Piro never denied he said this at that meeting, but only denied using the words "set up" at the subsequent meeting at The Owl restaurant (Tr. 2897). As to defendant Tyler he is discussed below regarding the "second allegation."
 
 
 81
 As to the "nudge" statement, even if it can be considered a reference to Peter's landing the job at Atlas instead of his first shipping-related job at Lemos, the jury had only Piro's unsupported recollection of the statement. William flatly denied ever making such a remark to Piro (Tr. 1349). The jury in weighing credibility obviously could accept William's testimony over Piro's.
 
 
 82
 The second allegation William Tavoulareas challenges as false is that he "personally urged" that Peter be included as an equity partner in Atlas. The statement is unattributed in the article. William Tavoulareas testified that he never urged that his son be included in Atlas (Tr. 1293-94, 1296-97, 1433).[24] Defendants rely on a statement allegedly made in a conversation between Tyler and Comnas for the truth of the statement, but the defendants never introduced Comnas' deposition at trial.[25] The conversation was received through Tyler's testimony (J.A. 979, 981, 1150, 2054, 2074-75, 2498, 2674, 3141, 3143, 3157), which the jury was entitled to weigh and to credit or discredit as it deemed appropriate.[26] When pressed to relay what Comnas purportedly said to him, Tyler testified that "I don't recall" whether Comnas said specifically that "William personally urged him [Comnas] to take his son into the [Atlas] operation," but stated only that he used "words to that effect" (J.A. 981). Piro admitted that he had told Tyler he had "no knowledge" of whether William Tavoulareas had requested or urged that his son be included in Atlas (Tr. 292-93).
 
 
 83
 The district court, in discussing "actual malice," indicated that Kousi's "nepotistic act" comment could be interpreted to support the "personally urged-set-up" allegation, 567 F.Supp. at 659. However, as to the issue of falsity, there was no evidence that this comment was based on personal knowledge. See note 45 infra. If the testimony of Tavoulareas is believed and that of the defendants and their witnesses disbelieved, as would have been reasonable for the jury to have found, the allegations are clearly false.
 
 
 84
 The third allegation in the article was that "the elder [William] Tavoulareas [personally] dispatched ... Herman [sic] F. Hoffmann ... to help run Atlas." The defendants rely on three sources for the truth of this statement: (1) Paul Wolfe's testimony that William Tavoulareas "participated" in discussions where it was decided that Hoffmann would replace Comnas (Tr. 1193); (2) Mobil's November 20, 1979 letter to Tyler stating that William Tavoulareas was involved in Comnas' departure (J.A. 2345 (Plaintiffs' Ex. 23)) (presumably, as defendants urge, "to open the door" for Hoffmann's arrival); and (3) Piro's testimony that he had overheard Tavoulareas state to Mobil Vice-President Checket "that he [Tavoulareas] had sent Harmon Hoffmann over to Atlas after Comnas had left" (Tr. 3720-21). The first two of these do not represent a clear assertion that Tavoulareas had any personal hand in deciding that Hoffmann would be dispatched, and are at best very weak circumstantial evidence to that effect. William Tavoulareas testified that he did not personally send Hoffmann to Atlas (Tr. 1440). Paul Wolfe testified that it was he who recommended to Mobil Chairman Rawleigh Warner (in the presence of William Tavoulareas) that Comnas be replaced (Tr. 1069, 1070, 1098, 1186).[27] Checket denied that the alleged conversation between himself and Tavoulareas ever took place (J.A. 1844-48). Again, if the testimony of Tavoulareas, Wolfe, or Checket is believed, which we conclude reasonable inferences from the record permitted the jury to find, the statement that Tavoulareas personally dispatched Hoffmann is false.[28]
 
 
 85
 In conclusion, our review of the record reveals evidence that, when resolved in the light most favorable to the jury verdict, as it must be, demonstrates convincingly that the alleged defamatory statements in the November 30 article are clearly false.[29] Additionally, our succeeding examination of the record on the "actual malice" question discloses further evidence which, under our prescribed standard of review, demonstrates that the challenged statements are clearly and convincingly false. Rather than to duplicate that discussion here, we refer to our actual malice discussion, infra.IV. RECKLESS DISREGARD OF TRUTH OR FALSITY--ACTUAL MALICE
 
 
 86
 We first note that the defendants have uniformly denied that they knew what they wrote was false or that they had serious doubts about its truthfulness. They have testified that they honestly believed the stories were true. The defendants argue that "[t]his unimpeached testimony as to the mental elements of actual malice is 'dispositive.' " Brief of Post at 32. The defendants' apparent claim is that actual malice can be proved only if the reporter or editor confesses to having had actual doubts regarding the truthfulness of the defamatory articles.
 
 
 87
 But courts do not labor under such unreasonable rules regarding evidence. As the Supreme Court has noted:
 
 
 88
 The defendant in a defamation action ... cannot ... automatically insure a favorable verdict by testifying that he published with a belief that the statements were true. The finder of fact must determine whether the publication was indeed made in good faith.
 
 
 89
 St. Amant, supra, 390 U.S. at 732, 88 S.Ct. at 1326 (emphasis added). Hence, a defamation plaintiff is not required to accept the word of the defendant as to his state of mind any more than the government or a jury is required to take the word of a criminal defendant that he lacked the intent required for a criminal conviction. In any case where the mental state of the actor is at issue, it can be proved by the cumulation of circumstantial evidence:
 
 
 90
 [I]n attempting to meet the test the plaintiff may rely upon "evidence of negligence, of motive and of intent ... for the purpose of establishing, by cumulation and by appropriate inferences," the requisite degree of culpability. Mere statements by the defendant of his belief in the truth of a publication will carry the day only if they are not overridden by evidence establishing knowing or "reckless" falsity.
 
 
 91
 R. Sack, supra, at 214 (footnotes omitted) (emphasis added) (quoting Goldwater v. Ginzburg, 414 F.2d 324, 342 (2d Cir.1969), cert. denied, 396 U.S. 1049, 90 S.Ct. 701, 24 L.Ed.2d 695 (1970)). Although recklessness in the defamation arena requires a showing of subjective doubts, see St. Amant, supra, 390 U.S. at 731, 88 S.Ct. at 1325, it "is ordinarily inferred from objective facts." Washington Post Co. v. Keogh, 365 F.2d 965, 968 (D.C.Cir.1966), cert. denied, 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548 (1967). As the First Circuit has noted:
 
 
 92
 The subjective determination of whether [a defendant] in fact entertained serious doubts as to the truth of the statement may be proved by inference, as it would be rare for a defendant to admit such doubts .... A court typically will infer actual malice from objective facts .... These facts should provide evidence of negligence, motive, and intent such that an accumulation of the evidence and appropriate inferences supports the existence of actual malice.
 
 
 93
 Bose Corp. v. Consumers Union of United States, 692 F.2d 189, 196 (1st Cir.1982), aff'd, --- U.S. ----, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) (emphasis added) (citations omitted).
 
 
 94
 The plaintiffs here attempted to demonstrate by a web of circumstantial evidence that the defendants acted with actual malice. Each of the major categories of evidence will be discussed in turn, though their order of appearance is not meant to reflect their relative importance.
 
 1. The Christine Peterson Memorandum
 
 95
 After Tyler wrote his first story, it entered into the Post's editing process. During the course of that process it was given to copy editor Christine Peterson for editing. After reviewing the article, and prior to publication, Peterson sent a memorandum to assignment editor Peter Milius. The memorandum stated, in part:
 
 
 96
 I've read the Mobil story several times, and while I'm impressed with the amount of work the reporter obviously did, I'm still left with an overwhelming sense of So What? Is there any way to give this story of high-level nepotism a dollars-and-cents angle? Did Mobil's shareholders lose anything? Mobil's customers?
 
 
 97
 Parts of Tyler's case against Tavoulareas seem tenuous, and the whole--a $680,00-a-year [sic] plaything for an indulged son, at worst--just seems like a withered peanut in an 84"' gilded shell.
 
 
 98
 A far more interesting angle, it seems to me, is Mobil's concern about Saudi preference shipping--a concern so profound that it led to the formation of an entire dummy corporation. It's impossible to believe that Tavoulareas alone could put together such a scheme for the sake of his son's business career, or that he would want to.
 
 
 99
 (J.A. 2486) (emphasis added). Peterson, who at the time was still in the employ of the Post, testified at trial that when she used the phrase "impossible to believe" she did not really mean that the story was "impossible to believe"--only that she felt that "the focus of the story should have been the formation of the company Samarco in anticipation of preference shipping" (J.A. 1837). Peterson, as a Post employee, was an interested witness, and the jury was entitled to evaluate her testimony accordingly. It was not obliged to credit her subsequent protestations that she did not really mean what she wrote.[30]
 
 
 100
 Not surprisingly, the district court found the interpretation offered by the defendants to be "strained." 567 F.Supp. at 655. A reasonable reading of the memorandum is that (1) Peterson read the article as saying that William Tavoulareas led Mobil into the Samarco-Atlas venture substantially as a means of benefitting his son, and (2) she found the charges in the article, as she wrote, "impossible to believe." This is the district court's independent evaluation of the facts as set forth in the article.
 
 
 101
 The district court, relying heavily on what it felt to be Peterson's relatively minor role in the editing process[31] and the fact that she testified that she had done no independent research on the story, found that she was merely "expressing her uninformed opinion that she found the story hard to believe." (Her actual appraisal was that the article was "impossible to believe.") The district court continued:
 
 
 102
 If Ms. Peterson had investigated the article's substance and sources and thereafter had expressed a similar statement of doubt as to the article's veracity, plaintiff's argument might prevail. Plaintiff, however, has offered no evidence to this effect. The actual malice test focuses on the state of mind of the author and publisher of the allegedly libelous statements. Ms. Peterson's memorandum does not show that those who were responsible for the article's substance entertained any doubts whatsoever about its accuracy.
 
 
 103
 567 F.2d at 655 (emphasis added).
 
 
 104
 The district court's conclusion, however, depends entirely upon the court's finding that copy editors at the Post have no responsible role in preparing articles for publication. The court's opinion implicitly credited the defendants' testimony and its reasonable inferences. Yet, the character of the Peterson memorandum and the responses it evoked within the Post organization indicate that her job involved more than mere proofreading. It is undisputed that copy editors are responsible for so-called "style" editing (which involves control over the exact language that will be used in the article) and for checking at least some of the facts in a story. See note 31 supra. Although at trial she described her position as having a very limited role, Peterson in her memorandum apparently felt free to question the substance of an article, indicate the direction it should take, and suggest substantive changes--the sort of things that persons who did have responsibility would do. Moreover, as we shall see, those Post employees who unquestionably had final responsibility for the article's content took her comments seriously and did not treat them as the remarks of someone poking in where she did not belong. Thus, it is not clear that even Peterson's ordinary duties gave her no responsibility for the article's content, and a jury reasonably could infer from Peterson's memorandum and the responses it evoked that her job was more responsible than she claimed.[32]
 
 
 105
 But exclusive concentration on Peterson's ordinary responsibilities is in any event misplaced. The Post cannot avoid liability merely by pointing to responsibilities assigned in the newspaper's organizational chart. That an employee's or agent's job duties are so limited is relevant but not dispositive. Peterson's memorandum to Milius, and the reaction of other editors to it, permitted the jury to find that at least one Post editor who exercised some responsibility for the story had a serious doubt about the accuracy of the charge made in the article that William Tavoulareas, as president of Mobil Oil Corporation, improperly used his office to "set up" his son in Atlas.[33]
 
 
 106
 But even if the district court was correct, and Peterson had only a minor role in the process, her memorandum is still relevant because of the objections it raised. The issue is not whether the memorandum alone proves clearly and convincingly that the article was published with actual malice; it is whether it is evidence that, taken in conjunction with other evidence, tends to prove that fact clearly and convincingly. It does. Peterson's appraisal of the story gains force from the reasonableness of its interpretation and conclusion. Thus, looked at in the light most favorable to the plaintiffs, the memorandum indicates that, prior to publication, serious doubts about the accuracy of the article had been voiced within the Post's editorial staff and communicated to those who prepared the article. The memorandum was written to Milius, an editor who apparently did have responsibility for the substantive aspects of the story. Milius apparently gave the Peterson memorandum enough credence to send it to Tyler for his response. Tyler thus learned that at least one editor doubted the correctness of his central premise. Tyler wrote a memorandum responding to Peterson's which was directed to yet another Post editor, Bill Greider, who also had authority over the substance of the article. Though alerted to the "sensitive" nature of the story, Greider testified that he had no "specific recollection" of reviewing with Tyler any of his documents or notes (J.A. 1887-88, 1895-97). Thus, at the very least, reporter Tyler and editors Milius and Greider were aware of Peterson's misgivings and may have recognized the merit in her analysis.
 
 
 107
 Tyler's memorandum to Greider responded specifically to Peterson's statement that the story was "impossible to believe." He acknowledged that "[b]ecause we base a couple of key points in the story on one source, I can see why a good editor might say that part of our case against Tavoulareas seems tenuous." (Emphasis added.) But he defended his reliance on that single source--presumably Comnas--because of the source's "background, position in the company and overall credibility" (J.A. 2489-90). (As anyone with passing familiarity with the matters here at issue would have known, Comnas' background was in fact checkered and his credibility highly suspect. See section IV.7.B. infra.) Tyler was far more concerned with Peterson's statement that the article was "uninteresting" than her assertion that it was "impossible to believe."
 
 
 108
 In our opinion it is clear that a jury reasonably could infer from the Peterson memorandum and its surrounding circumstances that (1) serious doubts were circulating within the Post's newsroom while the article was being prepared, (2) at least three responsible individuals who participated in reviewing the substance of the article (four, if Peterson's participation is found to have been sufficiently responsible) were aware of such doubts, and (3) the article was published without apparent additional investigation and without substantial change. This evidence supports the conclusion that the defendants had reason to believe that the story was false and that they acted recklessly in publishing it.
 
 2. The Defendants' Motivation
 
 109
 The plaintiffs in this case produced evidence which, they argue, demonstrates that (1) one defendant, Piro, had strong personal ill-will toward the plaintiffs; (2) enthusiastic reporters Tyler and Golden were out to "get" the elder Tavoulareas; and (3) the Post had a policy favoring sensational exposes. The plaintiffs argue that this evidence--the first two elements of which demonstrate common law malice--provides a motive to publish derogatory information without regard to falsity, and hence is evidence that the defendants acted knowingly or recklessly in publishing their falsehoods. The defendants argue that actual malice, not common law malice, is required in defamation cases and that the evidence of motive is therefore irrelevant. The district court did not address this issue specifically in its opinion.
 
 
 110
 It is clear, as the defendants argue, that common law malice is not the equivalent of actual malice in the defamation context, and that common law malice alone will not support a finding of actual malice. Beckley Newspapers Corp. v. Hanks, 389 U.S. 81, 82, 88 S.Ct. 197, 198, 19 L.Ed.2d 248 (1967) (per curiam); Henry v. Collins, 380 U.S. 356, 357, 85 S.Ct. 992, 993, 13 L.Ed.2d 892 (1965) (per curiam). Similarly, the mere fact that a newspaper has a general policy favoring sensational or even muckraking stories does not, in itself, prove that a defendant acted with actual malice. Martin Marietta Corp. v. Evening Star Newspaper Co., 417 F.Supp. 947, 959 (D.D.C.1976). But, contrary to the assertions of the defendants, it is equally well settled that the presence of common law malice or evidence that a newspaper followed a sensationalistic policy, because it provides a motive for knowing or reckless falsehood, is evidence of actual malice. See, e.g., Curtis Publishing Co. v. Butts, 388 U.S. 130, 169, 87 S.Ct. 1975, 1999, 18 L.Ed.2d 1094 (1967) (Warren, C.J., concurring) (defendant had adopted a "program of 'sophisticated muckraking,' designed to 'provoke people, make them mad' ") (footnote omitted); Goldwater v. Ginzburg, 414 F.2d 324, 342 (2d Cir.1969) ("evidence of ... motive and intent" may help establish actual malice), cert. denied, 396 U.S. 1049, 90 S.Ct. 701, 24 L.Ed.2d 695 (1970); Bose Corp. v. Consumers Union of United States, 692 F.2d 189, 196 (1st Cir.1982) (same), aff'd, --- U.S. ----, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984); Cochran v. Indianapolis Newspapers, Inc., 175 Ind.App. 548, 560, 372 N.E.2d 1211, 1220 (1978) (desire to "get" plaintiff is "relevant and admissible as evidence in the determination of whether defendant possessed a state of mind highly conducive to reckless disregard of falsity"); R. Sack, supra, at 214 n. 168 ("Although common law actual malice--spite or ill-will--is not equivalent to or sufficient to prove constitutional 'actual malice,' evidence as to the former is admissible to prove the latter."). As the Supreme Court of West Virginia explained:
 
 
 111
 [W]hen [Associated Press v. Walker, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) ] and Curtis are read together, they still stand for the proposition that personal motives on the part of a newspaper, or participation by a newspaper in a plan or scheme to injure, is evidence of recklessness and willful disregard for truth which may be considered along with other evidence on the question of actual malice.
 
 
 112
 Sprouse v. Clay Communication, Inc., 158 W.Va. 427, 211 S.E.2d 674, 688, cert. denied, 423 U.S. 882, 96 S.Ct. 145, 46 L.Ed.2d 107 (1975) (emphasis added).
 
 
 113
 Indeed, a contrary position would appear to be wholly irrational. The mere existence of a preconceived plan to "get" the subject of a defamatory story does not prove that the publisher acted knowingly or recklessly in publishing false information. But it is beyond question that one who is seeking to harm the subject of a story--whether motivated by simple ill will (Cochran ), or partisan political considerations (Sprouse ), or otherwise laudable concern for the safety of the nation (Ginzburg ), or a mere desire to attract attention and boost circulation (Butts )--is more likely to publish recklessly than one without such motive.[34] We turn, then, to the evidence of the defendants' motive to "get" the plaintiffs.
 
 
 114
 Philip Piro. Piro, who had gone through a very difficult divorce from William Tavoulareas' daughter, harbored strong feelings against his father-in-law. The district court in fact found that Piro
 
 
 115
 was openly hostile to the Tavoulareas family and undoubtedly harbored a considerable amount of ill will towards them. In addition, Tyler testified that he was very skeptical about Piro's reliability because much of the information he supplied was inaccurate.
 
 
 116
 567 F.Supp. at 657. That finding is eminently supported by the record.[35] Knowledge by the Post of Piro's evident personal animosity against the Tavoulareases was a circumstance, which in combination with other evidence, was probative of a mental state conducive to the reckless disregard of falsity.
 
 
 117
 Patrick Tyler. Reporter Tyler, unlike Piro, had little reason for personal animus against the Tavoulareases. The plaintiffs' evidence purports to demonstrate that Tyler wanted to "get" Mobil and the Tavoulareases, not for reasons of ill will but simply for the sake of a big story and because of Tyler's general bias against the oil industry. The plaintiffs rely on the following evidence:
 
 
 118
 1. Tyler, in a previous front-page story on the 1979 oil shortage (co-written with another reporter, Neumann) allegedly had seriously misstated the response of at least one Mobil official to Tyler's questions. That official wrote a letter to the editor, published a month later by the Post, in which he claimed he was "astounded" at the reporters' implication that he had been unable to offer an explanation of the reason for the shortage, an implication he called "outrageous."[36] He wrote that he "expect[ed] more responsible reporting" than that reflected in the story.
 
 
 119
 2. Golden's notes show that after the initial joint interview of Piro, Tyler remarked that "[i]t is not every day you knock off one of the seven sisters" (J.A. 789).
 
 
 120
 3. During the Piro interview, Tyler asked Piro whether "he knew of a family member who would rifle [Tavoulareas'] safe and [x]erox doc[uments]" (Tr. 179). The question was referred to during one of Golden's conversations with Piro; from the tape that was played to the jury, it appears that Piro believed that Tyler was joking, but Golden seemed to consider that the question was serious. Indeed, Golden later reminded Piro that Tyler had asked him (Piro) "to commit a crime." Ex. 308-034801 (Side 2); (J.A. 821). Even the dissent is struck by the "troubling" nature of this evidence. Dissent at 156. If made seriously, which a reasonable jury could conclude it was, this indicates that Tyler was so interested in getting Tavoulareas or Mobil that he would risk arranging a burglary and safe cracking, i.e., committing a felony to secure evidence. This is indicative of a very reckless state of mind and constitutes evidence of a plan to "get" Tavoulareas; the evaluation of this testimony was for the jury, who could reasonably infer the same.
 
 
 121
 4. After Tyler saw the Peterson memorandum, which referred to "Tyler's case against Tavoulareas," he wrote his own memo to the editors, acknowledging that he could "see why a good editor might say that part of our case against Tavoulareas seems tenuous" (J.A. 2489) (emphasis added). The plaintiffs interpret this as an indication that Tyler conceived of himself as a sort of journalistic prosecutor, building a case against Tavoulareas, not a reporter attempting to accurately report facts.
 
 
 122
 5. After the article appeared, Mobil issued a statement denying the allegations in the story. Tavoulareas went to the Post's office to protest and requested a retraction, which was refused (J.A. 1439-42). A few days after the story appeared, Tyler talked to Golden on the telephone; Tyler told Golden that "[t]he Post laughed at the Mobil statement"; the Post, said Tyler, "blew [Tavoulareas] out of the water," and sent him "home with his tail between his legs" (J.A. 857-58).
 
 
 123
 The evidence produced by the plaintiffs paints a picture of a reporter who, in developing and writing what he described as his "stor[y] of nepotism, reward without merit and favoritism by those who wield vast amounts of power" (J.A. 2488), knowingly adopted an adversarial stance toward Tavoulareas. Such a mind-set, which the jury could reasonably have found, is highly probative of whether he acted knowingly or recklessly in writing his falsehoods.
 
 
 124
 Sandy Golden. Golden, like Tyler, had no apparent personal animosity toward the plaintiffs. He was then working for a small suburban newspaper, and the evidence shows that he badly wanted a job at the Post. In a telephone interview with Piro--Golden tape-recorded it although he expressly told Piro that he was not doing so--he explained his motivation for the Tavoulareas story:
 
 
 125
 Obviously, I'm trying to work myself into a job at the Post through this story, and that's all well and good.
 
 
 126
 Ex. 308-034805 (Side 1). Golden expected to get some compensation from the Post--$50 or $100--but immediate money was not his chief motivation. Id. Rather, the Tavoulareas story was to be his ticket to at least a Post byline, and perhaps a Post job offer.
 
 
 127
 The Golden-Piro tapes, relevant to the issue of intent, were played for the jury. The jury thus heard Piro and Golden speculating about what Mobil Chairman Rawleigh Warner would do when the story broke, and Piro's obvious pleasure at Golden's suggestion that the elder Tavoulareas would be fired.[37] The jury also heard Golden's reference to a United States Senator whom Tavoulareas had offended as a "possible enemy" who would be willing to "talk":
 
 
 128
 Q Now, on this tape that we have just listened to a U.S. Senator was identified as a possible enemy. Those were your words with the words "possible enemy"; is that right?
 
 
 129
 A That's correct.
 
 
 130
 Q Did you mean by that a person who had a motive for revenge against the plaintiff, William Tavoulareas?
 
 
 131
 A I meant somebody would have a reason to talk about Mr. Tavoulareas, yes.
 
 
 132
 Q A reason to say bad things about Mr. Tavoulareas?
 
 
 133
 A Yes.
 
 
 134
 (J.A. 815.)
 
 
 135
 In sum, the evidence showed that Golden was an ambitious young reporter looking for his big break. He was anxious to take part in a "major" investigative story and to earn a Post byline. His willingness to engage in activities that are, at best, highly questionable (e.g., surreptitiously recording Piro's conversations and playing them back to third parties) and the almost exclusive focus of his investigation on "enemies" (e.g., Piro and Stockton) who would tend to be biased sources for the story, is evidence that his primary motive in working on the story was to get a byline on a Post story. As discussed above, such evidence of motive has considerable bearing on whether or not he acted with actual malice.
 
 
 136
 The Post. The Post is a newspaper which seeks, among other things, hard-hitting investigative stories. Robert Woodward, its Assistant Managing Editor at all times relevant to this case, testified that he regularly conducted staff meetings at which he "describe[d] the kind of stories [he] was looking for":
 
 
 137
 Q. Did you tell them you were looking for stories that would go on the front page, big, significant stories?
 
 
 138
 A. Not all significant stories go on the front page. I tried to describe the kind of coverage we should have and how we should direct our efforts, yes, sir.
 
 
 139
 Q. Did you tell them you were looking for stories with impact?
 
 
 140
 A. Not precisely that word.
 
 
 141
 Q. In any of these discussions did you ever use a term such as "I'm looking for something called a holy shit story"?
 
 
 142
 A. Yes, I did....
 
 
 143
 (J.A. 2176.) What Woodward meant in exhorting his reporters to come up with the "holy shit" stories is not exactly clear, but a reasonable inference is that Woodward, as editor, wanted from his reporters the same kind of stories on which he built his own reputation: high-impact investigative stories of wrongdoing.[38] During these meetings with reporters, Woodward also tried to imbue them with the same spirit to which he attributed his success:
 
 
 144
 Q. ... Have you attempted to communicate some of the experiences and perhaps values that you had in your years as a reporter to those working for you after you became assistant managing editor?
 
 
 145
 A. I try.
 
 
 146
 Q. Did you once describe your approach to being a reporter with words like, "I guess you have to have a compulsive need to succeed. You have to be insecure and to want desperately to please your boss"?
 
 
 147
 A. Yes, I did.
 
 
 148
 (J.A. 2178.) From Woodward's testimony it was proper for the jurors to infer that the Post put some pressure on its reporters to come up with "holy shit" stories--a category into which the Tavoulareas story (described by Peterson as one of "high-level nepotism" in the corporate context) presumably fit. Regardless of whether one chooses to characterize this policy as conducive to "hard hitting investigative journalism," or (to borrow Chief Justice Warren's description of the policy of The Saturday Evening Post in Butts ) "sophisticated muckraking," it certainly is relevant to the inquiry of whether a newspaper's employees acted in reckless disregard of whether a statement is false or not.[39]
 
 
 149
 3. Resolution of Inferences Adverse to the Plaintiffs
 
 
 150
 It is settled that in a situation where the facts are ambiguous, the mere selection of the most damaging inference by the reporter does not, alone, indicate actual malice. In Time, Inc. v. Pape, 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971), the Court held that Time magazine's resolution of one such ambiguity in the light most damaging to the plaintiff did not amount to actual malice:
 
 
 151
 Time's omission of the word "alleged" amounted to the adoption of one of a number of possible rational interpretations of a document that bristled with ambiguities. The deliberate choice of such an interpretation, though arguably reflecting a misconception, was not enough to create a jury issue of "malice" under New York Times.
 
 
 152
 Id. at 290, 91 S.Ct. at 639 (emphasis added). As stated by the Court, this holding makes obvious sense; since the focus of the malice inquiry is subjective, not objective, the mere selection of a single damaging inference is ordinarily not sufficient to prove actual malice. The question is whether the reporter believed that the selected inference was true.
 
 
 153
 The defendants argue from Pape that the consistent selection of the inferences most damaging to the Tavoulareases would be irrelevant to the issue of actual malice. Brief of Post at 62. Such an assertion, however, is entirely inconsistent with the subjective nature of the malice inquiry. One who publishes a story containing a damaging inference which he knows or seriously suspects is false is not shielded by the fact that what he wrote was objectively a reasonable inference. Certainly, a defendant's selection of a reasonable inference from among a number of ambiguities, whether damaging or not, may be evidence that he acted without malice. But a defendant's selection of the most damaging inference--an inference which is, in fact, false--may be probative of a determination to incorrectly describe the plaintiff, place him in the most damaging light, and thereby with other evidence demonstrate a state of mind that is probative of a reckless disregard for truth.
 
 
 154
 Pape offers no support for the defendants' analysis of the editorial conduct here. The Supreme Court explicitly stated only that choices made by reporters in the face of ambiguities were not enough to prove actual malice--it did not say that they were entirely irrelevant to the issue.
 
 
 155
 This conclusion is buttressed by the Fifth Circuit's holding in Rebozo v. Washington Post Co., 637 F.2d 375 (5th Cir.), cert. denied, 454 U.S. 964, 102 S.Ct. 504, 70 L.Ed.2d 379 (1981). In Rebozo, the defendant reporter (Kessler) had written that the plaintiff (Rebozo) had "cashed $91,500 in stolen stocks ... after he was told by an insurance investigator it was stolen." 637 F.2d at 377. A memorandum written by the reporter acknowledged that it was not entirely clear who had actually cashed the stocks, but that one inference was that it was Rebozo, a close friend and associate of President Nixon. The charge that it was Rebozo who had cashed the stocks made it a front page story. In passing on whether summary judgment was proper for the defendants, the court stated:
 
 
 156
 This memorandum, plus the fact that Kessler resolved the uncertainty expressed in it in such a way as to cast plaintiff Rebozo in the worst possible light and to make for Kessler a front-page story of an episode which otherwise might not have commanded any significant attention, when taken in a light most favorable to Rebozo, could amount to evidence of the reporter's reckless disregard for the truth or falsity of the assertion....
 
 
 157
 Id. at 382 (emphasis added).
 
 
 158
 The defendants call Rebozo "anomalous," and argue that its holding is "utterly inconsistent with Pape." The district court considered that Rebozo "is arguably inconsistent" with Pape, and stated that "[i]n the absence of any further guidance on the issue from this Circuit or the Supreme Court, this Court is not prepared to consider saving the verdict in this case on the basis of the holding in Rebozo." 567 F.Supp. at 658. This reasoning appears rooted in two misconceptions. The first--implicit in the opinions of the district court here and the dissent, infra, and the briefs of the defendants--is that the plaintiff must have at least one piece of evidence which, by itself, proves actual malice. This has been refuted previously. The plaintiff may clearly and convincing prove actual malice by a cumulation of many pieces of evidence, no one of which, by itself, is clear and convincing. Though "[a] brick is not a wall," E. Cleary, McCormick's Handbook on the Law of Evidence Sec. 185 (2d ed. 1972), many bricks are.
 
 
 159
 The second misconception, which perhaps follows naturally from the first, is the contention that Rebezo must have held that deliberate slanting or consistent selection of damaging inferences was a piece of evidence which in and of itself would prove actual malice. But Rebozo merely held that resolution of ambiguities in the most damaging light "could amount to evidence of the reporter's reckless disregard for the truth or falsity of the assertion," id. (emphasis added)--i.e., some evidence of actual malice. Since Pape simply held it was not enough evidence to demonstrate actual malice, the two cases are fully consistent. There is thus no question of "saving" the verdict solely through the logic expressed in Rebozo. Evidence of deliberate slanting and consistent selection of damaging inferences may constitute probative evidence of actual malice and must be examined and evaluated, not ignored, in conjunction with all of the other circumstantial evidence produced by the plaintiffs.[40]
 
 
 160
 In sum, to the extent that the facts known to the defendants, like those in Rebozo, were susceptible of more than one possible interpretation, the numerous instances in which the defendants selected the most damaging--and most sensational--alternative is some evidence which a jury, and an appellate court on review, can evaluate in determining whether publication was made with reckless disregard of whether it was false or not.
 
 
 161
 4. Suppression of Information Favorable to the Plaintiffs
 
 
 162
 The plaintiffs also presented evidence that the defendants had information which put the transactions involved in a light more favorable to the plaintiffs and Mobil, and which was deliberately excised or suppressed during the writing and the editing of the story in order to strengthen the "case against" the Tavoulareases. The district court examined several of these pieces of information which were known to Tyler but were not included in the story:
 
 
 163
 1. Lewis Lapham, an outside director of Mobil, told Tyler that the Mobil board had "consistently reviewed the relationship between Mobil and Atlas and ... was completely satisfied with all aspects of it." 567 F.Supp. at 658 (emphasis added).
 
 
 164
 2. Lapham told Tyler "that he did not believe that plaintiff [William Tavoulareas] played a personal role in Atlas and that at key board meetings plaintiff would leave the room to facilitate the opportunity for more open discussion of the subject." Id.
 
 
 165
 3. There was considerable evidence that "Mobil profited significantly from [the Samarco-Atlas] relationship and that Atlas was not merely a fly-by-night organization set up solely for Peter's benefit." Id. at 659. Both John Kousi, a Samarco director, and Comnas, the defendants' main source for the Post article told Tyler that Atlas could run Mobil's ships more cheaply than the oil company could.
 
 
 166
 Early drafts of the story did contain some of this information, but it was eliminated from the final version during the editing process. One early draft, for example, stated:
 
 
 167
 During these briefings [on Atlas-Samarco dealings] by Warner, Lapham said, Tavoulareas would leave the room. Lapham said he still believes Warner's account of events and rejects any suggestion that Tavoulareas took a personal role in Atlas.
 
 
 168
 "There's nothing to any of that," Lapham said. "It was explained to the satisfaction of the board."
 
 
 169
 (J.A. 2528). The defendants argue that while Lapham's specific words were cut out, the point he made was not. But proof of the point was placed on weaker grounds. As a substitute for Lapham's specific statement that Tavoulareas went so far as to leave the room during board discussions of Atlas, and that there was "nothing to [the suggestion that Tavoulareas took a personal role in Atlas]," the defendants point to the following passage from the article:Mobil chairman Warner says he assured directors in board meetings that Tavoulareas "does not participate in any decisions regarding Mobil's business with Atlas."
 
 
 170
 Thus, the article substituted an "assurance" by Warner (an inside director) for a concrete statement by Lapham (an outside director)--a substitution that considerably weakens the point, particularly when an underlying theme of the Post article was that Tavoulareas' mere position as president constituted internal corporate influence that implicitly affected the Atlas operation.
 
 
 171
 Next, in place of Lapham's direct statement that the Mobil board "was completely satisfied" with the Samarco-Atlas relationship, the article stated:
 
 
 172
 The Mobil board of directors was told from the outset about the Atlas arrangement but was assured that company president Tavoulareas was not involved in his son's venture in any way.
 
 
 173
 Thus, instead of a direct assertion of an unimpeached outside director that the board had investigated and were "completely satisfied," the article states merely that the director was simply "assured" by an unidentified "some one" that there was no impropriety. This clearly understates the force of the information provided by Lapham.
 
 
 174
 Lapham's statements that the board had "consistently reviewed" the Atlas arrangements and that he was convinced that William Tavoulareas had played no personal role in Atlas were simply ignored.
 
 
 175
 The Post article also disregarded other evidence that tended to describe the arrangement in a light more favorable to the plaintiffs and to Mobil. In evaluating the economic impact of the arrangement, for example, the defendants ignored the information from Kousi (whose favorable comments were deleted during the editing process) and even the comment furnished by their principal source, Comnas, that the Atlas arrangement saved Mobil money (J.A. 2501). The defendants contented themselves with allusion to "millions of dollars in business" and "exclusive, no-bid contracts," which strongly implied that Mobil was being exploited and gouged by an irregular arrangement in which Tavoulareas had "set up" his son. Similarly, the story failed to include or refer to two internal Mobil memoranda which were prepared at the time the Samarco-Atlas arrangement was created and which Tyler had in his possession. One memorandum instructed Mobil personnel that all business dealings with Atlas were to be conducted at "arm's length"; the other, written by William Tavoulareas himself, specifically directed Vice President Wolfe to bypass Tavoulareas and report directly to Chairman Warner on any Samarco-Atlas matters.
 
 
 176
 Thus, it is apparent that the district court had a firm basis for stating that Tyler "attempted to understate" the plaintiffs' side of the story, i.e., slanted the story against the plaintiffs.[41] The court, however, concluded that such slanting did not "show that [Tyler] acted in reckless disregard of the truth" 567 F.Supp. at 659 (footnote omitted). Tavoulareas, wrote the district court, "cannot force The Post to include facts that he believes to be important." Id. This is true. But the issue here is whether evidence of selective reporting of particular facts in order to slant the story, to present an essentially untruthful and highly damaging picture, is relevant to the defendants' state of mind at the time the article was published. Unquestionably, a writer of an article who knowingly suppresses the facts that would prove its falsity is more likely to have doubts about the accuracy of his defamatory story than one who either has no such knowledge or has endeavored to present the facts fairly. The writer who suppresses favorable facts is more likely to suspect that his version is not substantially true. Hence, courts have held repeatedly that the choices of which facts to report is relevant to the question of actual malice. See, e.g., Time, Inc. v. Ragano, 427 F.2d 219, 221 (5th Cir.1970) (failure to include fact that plaintiff was attorney when implication of article would lead people to believe he was organized crime figure); Wasserman v. Time, Inc., 424 F.2d 920, 922 (D.C.Cir.) (same), cert. denied, 398 U.S. 940, 90 S.Ct. 1844, 26 L.Ed.2d 273 (1970); Montandon v. Triangle Publications, Inc., 45 Cal.App.3d 938, 943-44, 120 Cal.Rptr. 186, 189 (omission of key fact in otherwise truthful statement held evidence of reckless disregard of truth), cert. denied, 423 U.S. 893, 96 S.Ct. 193, 46 L.Ed.2d 126 (1975); Indianapolis Newspapers, Inc. v. Fields, 254 Ind. 219, 259 N.E.2d 651, 662 (time discrepancy known to reporter and witnesses' repudiation of key fact mentioned only once during series of articles held evidence of actual malice), cert. denied, 400 U.S. 930, 91 S.Ct. 187, 27 L.Ed.2d 190 (1970).
 
 
 177
 Similarly, deliberate slanting is further evidence of a purpose to "get" the plaintiff and is thus probative of actual malice. The desire to place a plaintiff in a bad (and sensational) light is indicative of a state of mind conducive to acting in reckless disregard of the truth. This evidence of motive, without more, does not prove actual malice. But, as demonstrated previously, it defies logic to argue that it is not relevant. See Butts, supra, 388 U.S. at 169, 87 S.Ct. at 1999 (Warren, C.J., concurring); Goldwater v. Ginzburg, supra, 414 F.2d at 336-37; Airlie Foundation, Inc. v. Evening Star Newspaper Co., 337 F.Supp. 421, 424 n.9 (D.D.C.1972).
 
 
 178
 The editorial process by which the defendants selected which facts they would print, and which they would suppress, was a factor the jury could take into account in reaching its conclusion as to actual malice.
 
 
 179
 5. "Personally Dispatched": The Checket Conversation
 
 
 180
 One of the allegations made in the article was that William Tavoulareas had personally "dispatched" Mobil shipping executive Harmon Hoffmann to Atlas following the resignation of Comnas. It is undisputed that Mobil made Hoffmann available to serve as interim head of Atlas, but Tavoulareas asserts that he personally did not send Hoffmann. The article's claim that Tavoulareas participated personally obviously undercuts the statements of Mobil officials that he removed himself from dealing with Atlas. The assertion in the article hence is a key point in the "case against" Tavoulareas that the defendants attempted to make in the article.
 
 
 181
 Tyler, in his testimony, claimed that he based this assertion on (1) Piro's statement that he overheard a conversation on an airplane between Tavoulareas and Mobil Vice President Everett Checket in which Tavoulareas said that "he had sent" Hoffmann to Atlas, and (2) Checket's "confirmation" of that conversation (J.A. 2089-90). The district court, in evaluating this point, ignored Piro's evidence (it had already found him to be unreliable) and cited as the basis of the statement only Tyler's "note of a conversation he had with ... Checket that confirmed that the plaintiff had stated that he sent Hoffmann to Atlas." 567 F.Supp. at 661 (footnote omitted) (emphasis added).[42]
 
 
 182
 According to Checket, however, he never "confirmed" this point. In his deposition, read to the jury, he stated that he did not "recall ... any conversations in that regard having taken place on an airplane" (J.A. 1844). He was asked, "What did William Tavoulareas say to you, if anything, on the subject of Harmon Hoffman[n]'s departure for Atlas?; he replied, "He did not say anything to me about it" (J.A. 1846) (emphasis added).
 
 
 183
 "QUESTION: Do you recall if Mr. Tyler asked you if on that plane trip William Tavoulareas told you that Hoffmann had been sent to London to get things in shape? That was the nature of Tyler's question to you?
 
 
 184
 "ANSWER: No, that was not the nature.
 
 
 185
 "QUESTION: He did not ask you a question about a plane ride with Mister--
 
 
 186
 "ANSWER: He did ask about the plane ride. He did ask about the conversation with reference to Mr. Hoffmann going to London to be with Atlas.
 
 
 187
 "QUESTION: Did you say to Mr. Tyler that you were somewhat familiar with that conversation?
 
 
 188
 "ANSWER: No.
 
 
 189
 (J.A. 1847-48) (emphasis added). In other words, Tyler's notes stated that Checket had confirmed a point which Checket had in fact denied. The district court recognized the discrepancy. It stated, however:
 
 
 190
 Tyler may, therefore, have been negligent in transcribing Checket's statement but plaintiff introduced no evidence that would show that Tyler deliberately falsified this document.
 
 
 191
 567 F.Supp. at 661 n. 18.
 
 
 192
 This observation erroneously adopts the inference from the evidence that defeats rather than supports the jury's verdict--and the less plausible inference to boot. The defendants argue that the only possible inference that can be drawn from this conflict is that Tyler acted in good faith but was negligent. But the record does not contain any support for the suggestion of negligence. One of Tyler's specific purposes in calling Checket on the telephone was to inquire about the conversation on the airplane. It seems difficult to believe that a reporter could accidentally note that a source had confirmed a key point when, in fact, he had denied it. It is more plausible that either Tyler or Checket was being less than truthful about their conversation. Looking at the conflict in the light most favorable to the plaintiffs, as we must, it is clearly possible that Tyler deliberately falsified his notes. The jury observed Tyler's demeanor on the stand, and it heard Checket's deposition. Under such circumstances credibility was a factor for the trier of fact. It was inappropriate for the district court to resolve the credibility factor against the plaintiffs in granting a judgment n.o.v. See note 14 supra. Our evaluation of the entire record does not compel us to discredit Checket's testimony.
 
 6. The SEC Paragraphs
 
 193
 Plaintiff William Tavoulareas contends on appeal that the defendants' "case against" him included further defamations in the November 30 article, i.e., that as part of the article Tyler, through statements of purported "fact," implied that "Mobil officials" violated federal securities laws by failing to report Atlas activities to the SEC and Mobil shareholders:
 
 
 194
 That [Mobile-Atlas-Samarco] relationship [involving father and son] is not illegal, but securities law requires that Mobil officials report it fully to their stockholders. Mobil claims it did, but that is in dispute.
 
 
 195
 ....
 
 
 196
 Mobil officials did not tell their stockholders about the son's involvement in Atlas until two years later.
 
 
 197
 ....
 
 
 198
 U.S. securities law requires that corporate officials disclose the details of business transactions between companies and relatives of the companies' executives. The law was designed to protect shareholders from business decisions based on favoritism.
 
 
 199
 In recent days, the SEC has reopened its investigation into the role Mobil's president played in his son's partnership in Atlas.
 
 
 200
 See Appendix. The district court instructed the jury as follows:
 
 
 201
 Among the general, non-specific allegations of the first article which you may consider in connection with your evaluation of the specific charges the [Post] defendants stated that federal securities law requires Mobil officials to report the relationship of William and Peter Tavoulareas as father and son to Mobil Corporation's shareholders....
 
 
 202
 ... This [SEC] regulation requires a corporation to report transactions involving the son of an officer or director only if the son lives in the same household as the officer or director.
 
 
 203
 It is for you to determine whether the Post accurately reported that the regulation had been violated.
 
 
 204
 (Tr. 4557-58) (emphasis added). The district court instructed the jury that
 
 
 205
 in determin[ing] whether the [Post ] articles are libelous, you are to consider each portion of the article, which plaintiffs have specified as libelous in the context of the articles as a whole.
 
 
 206
 (Tr. 4548) (emphasis added).
 
 
 207
 William Tavoulareas' original complaints did not specifically allege these SEC paragraphs as libelous. Prior to trial he moved the district court, on the basis of evidence adduced during discovery, to amend his complaints to include the specific SEC paragraphs mentioned above. The district court denied the motion, and the plaintiff was thus limited to those specific allegations pleaded in the original complaints (J.A. 707-08). Thus, contrary to Tavoulareas' contentions, it is clear that these paragraphs cannot serve as the basis of liability, and that was the effect of the court's instruction--such "non-specific allegations" could only be considered in connection with "the evaluation of the specific charges" (Tr. 4557-58). The defendants therefore correctly argue that these statements of alleged SEC violations are not properly before this court as a basis of liability. Brief of Post at 44-45.
 
 
 208
 But as the district court ruled in a pretrial order to plaintiffs' motion to amend the complaints, evidence of libels not specifically pleaded in the complaints are nonetheless admissible as to issues such as "the state of mind of defendants or as to some other issue related to those defamations pleaded specifically in the original complaints" (J.A. 708) (emphasis added). We note that during trial both parties introduced evidence relating to these alleged SEC violations, though some dealt with allegations regarding the December 1, 1979 article. Both parties also argued the relevance of this evidence to the jury.
 
 
 209
 In sum, we decline to hold--as the trial judge declined to permit the jury to find--that the allegations regarding SEC violations could be a basis for recovery; but these allegations could properly be considered by the jury as evidence of the malice of the defendants with regard to those specific allegations that were the basis for recovery.
 
 7. Reliability of Sources
 
 210
 Plaintiffs next argue that the defendants' heavy reliance on two sources--Comnas and Piro--whom the defendants knew or should have known were biased and unreliable, in itself demonstrated reckless disregard for the truth. It is settled that "recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." St. Amant v. Thompson, supra, 390 U.S. at 732, 88 S.Ct. at 1326. If the defendants had reason to doubt the truthfulness and accuracy of Comnas and Piro, and still relied on their representations, that fact may be taken into consideration by the jury in determining actual malice.
 
 A. Piro
 
 211
 Defendants do not attempt to argue that they could properly have relied on Piro for key allegations. His willingness to speak from ignorance and his obvious bias against the Tavoulareases are self-evident. Instead, the defendants argue that they really didn't rely on him, although he was quoted and cited several times in the article. The district court, in granting the judgment n.o.v., stated:
 
 
 212
 The fact that Dr. Piro may have been an unreliable informant is irrelevant, however, because he was not a primary, or even a secondary, source for the November 30 article. He may have been the person who rekindled The Post's interest in the Atlas story but, because of Tyler's skepticism, The Post relied on other sources as authority for many of Piro's remarks.
 
 
 213
 567 F.Supp. at 657 (emphasis added). This seems an over generous evaluation of the reliance on Piro that is self-evident in the article.
 
 
 214
 It appears from the record and from the story that at least two very significant allegations of "fact" in the story are based entirely on Piro. First:
 
 
 215
 Philip Piro, a Baltimore eye surgeon and former son-in-law to the elder Tavoulareas, who is now estranged from the family, said Tavoulareas expressed his interest at the time [Atlas was being created] as "giving Peter a little nudge to get him along."
 
 
 216
 The obvious import of this paragraph is that William Tavoulareas had admitted he had "set up" his son. In its context, it is used to support the allegation, made several paragraphs earlier, that Tavoulareas had "personally urged" that Peter be included as a partner in Atlas; it is used almost as an admission on the part of Tavoulareas. And the sole basis for this statement is Piro. The Post and the district court are therefore in error in asserting that Piro was not relied on for very substantial portions of the defamatory allegations. In fact, the direct implication of Piro's statement formed the underlying theme for the entire article and was set out in the headline because it represented the basic charge in the article. The tremendous importance of a headline, as acknowledged by the Post editors at trial, was argued to the jury (Tr. 4348).
 
 
 217
 In addition, it is clear from the preceding discussion in section IV.5. that Piro was the only source Tyler had for the charge that Tavoulareas "personally dispatched" Hoffmann to Atlas. This charge similarly acts as an alleged admission by William Tavoulareas that he played a very substantial role in Atlas. Tyler thus relied on Piro's unsupported word even in the face of what the jury could find to be directly contradictory evidence from Checket.
 
 
 218
 Even the "personally urged" allegation on which the whole story turns is based in part on Piro. It is among a list of "facts" attributed to "a source close to the Tavoulareas family [i.e., Piro] and those familiar with the formation of Atlas [i.e., Comnas]." The defendants now assert that while these facts in the article were specifically attributed to Piro, he was in reality not their source.[43]
 
 
 219
 On the contrary, the jury was entitled to find from the assertions made in the stories themselves that the defendants relied wholly on Piro for the "little nudge" comment and partially on him for the "personally urged" statement. They could find that they relied on him entirely for the "personally dispatched" allegation. The jury was not, nor are we, required to credit Tyler's post hoc assertions that he did not rely on a source that he actually quoted in the story as the basis for the statement. Given Piro's ignorance of the Mobil-Samarco-Atlas relationship and personal animus against William--which Tyler and the Post acknowledge and with which they were familiar (Brief of Post at 57 n. 47)--reliance on him for crucial facts could be probative of actual malice.
 
 B. Comnas
 
 220
 According to Tyler, the key source for the story was Comnas.[44] Since (1) the Post did not introduce Comnas' deposition at trial, (2) Tyler did not record his conversations, and (3) Tyler's notes, as demonstrated by the Checket incident, are not particularly reliable, it is difficult to tell exactly what he told Tyler. Assuming that he did tell Tyler that it was pressure from William Tavoulareas which led him to include Peter, the plaintiffs argue that reliance on Comnas as a source was itself evidence of actual malice.
 
 
 221
 According to the defendants, Comnas was the chief source for the allegation that Tavoulareas "set up" Peter by "personally urging" his inclusion in Atlas. It does not appear that Tyler and Golden had any other source (except Piro, whom they vigorously disclaim for this allegation); it is not supported by Tavoulareas' SEC testimony, or by Kousi,[45] or by anyone else within or without the companies involved. In the absence of such corroboration, the absence and credibility of Comnas become crucial.
 
 
 222
 The plaintiffs argue that Tyler and Golden knew from their investigations that Comnas had been thrown out of Atlas for fraudulent practices. At trial, Piro testified that he told Tyler and Golden that "George Comnas had been caught in some fraud involving Atlas, that he was forced to withdraw and that if Comnas ever gave Peter and Atlas any trouble Comnas would be reported to the tax authorities" (J.A. 1857-58). Kousi had heard talk that Comnas was "corrupt," had been "discharged" from Exxon after he was "involved in a scandal in Italy," and that the Samarco directors did not oppose his removal from Atlas (J.A. 1990-91).[46] Kousi's deposition does not specifically indicate whether or not he passed this information along to Tyler. Tyler testified that he had specifically asked Kousi about Piro's suggestion that Comnas had been involved in fraud, and that Kousi "said he knew of no allegations of wrongdoing as to George Comnas" (J.A. 2121-22). But Kousi, on the other hand, stated that he answered Tyler's questions at the time "truthfully and accurately, to the best of my recollection" (J.A. 1926). This is another instance where Tyler's testimony varies from that of his alleged informant.
 
 
 223
 The defendants apparently do not dispute they had been told by Piro that Comnas had been engaged in some fraud at Atlas (J.A. 1857-1858). Tyler was aware of this in November 1979, and hence, even by the defendant's standards, infra, this was sufficient knowledge to require Tyler to make an adequate investigation of Comnas' credibility. Brief of Post at 53. The defendants argue that they checked on Comnas through other sources, and had good reason to believe that he was credible. Specifically, they point to (1) Comnas' "Who's Who" listing, which indicated that he was an experienced shipping executive; (2) William Tavoulareas' SEC testimony, at which Tavoulareas "never hinted at any improprieties," and stated "that Mobil 'had every confidence in the world' in Comnas"; (3) Mobil Vice President Paul Wolfe's failure to say anything bad about Comnas when interviewed by Tyler; and (4) the alleged statement of Kousi (offered by Tyler) that they knew nothing discreditable about Comnas. Tavoulareas' testimony and the statements of Wolfe and Kousi (if Tyler's recounting of his conversation with Kousi is believed) certainly might provide some basis for finding that reliance on Comnas' essentially uncorroborated statement about the "set up" charge was reasonable. But the issue is what the reporters knew or suspected. Piro's statements alerted them to the possibility that Comnas had been engaged in illegal activities. Even without confirmation by Kousi, these statements certainly provide a basis for finding that the defendants knew Comnas had been involved in unsavory business practices and his credibility accordingly was suspect. Tyler's memorandum in response to Peterson's stated, with obvious reference to Comnas, "a couple of key points [were based on this] one source." (Emphasis added.) However, after Tyler learned of allegations of dishonesty, Comnas' credibility could hardly be supported by relying on no more than a "Who's Who" listing, a failure of Paul Wolfe in his interview with Tyler to volunteer anything bad about Comnas (though not specifically asked), and William Tavoulareas' failure (again when not specifically asked) to charge Comnas with fraud and his statement in SEC hearings of "having every confidence" in Comnas. The only other alleged verification was Tyler's version of the statement by Kousi, which the jury was entitled to discredit by Kousi's own testimony.
 
 
 224
 Moreover, there is other evidence in the record which provides a basis for finding personal animus on the part of Comnas known to the reporters. It is undisputed that Tyler knew that Comnas was forced out of Atlas. The plaintiffs claim it was due to fraud and dissatisfaction with his performance; the defendants imply that it was to give Peter Tavoulareas a bigger share of the business. Under either scenario, Comnas could not be expected to be fair and impartial regarding those who had forced him to leave Atlas. It appears undisputed that Comnas did not have good relations with any of the Samarco partners.[47]
 
 
 225
 The district court in its opinion found specifically that "Tyler was fully aware of the allegations of Mobil's and/or Samarco's dissatisfaction with Comnas' business prowess." 567 F.Supp. at 657 n. 12. The court discounted this knowledge entirely, on the ground that lack of business acumen "would not appear to reflect poorly on [Comnas'] credibility as a source." Id. But while inability to manage a business effectively is not exactly a crime of moral turpitude, the question is whether Comnas had a readily apparent motive to lie. In this case it is not difficult to discern that he had such motive, and such motive could be considered by the jury in determining whether Tyler recklessly relied upon his assertions.
 
 
 226
 The defendants assert that even if they knew of facts that would impeach Comnas' veracity, his "possible animus toward appellant does not preclude the Post from reporting what Comnas said." Brief of Post at 56. As stated, this is a truism, for "even if ... [spoken] out of hatred, utterances honestly believed contribute to the free interchange of ideas and the ascertainment of truth." Garrison v. Louisiana, 379 U.S. 64, 73, 85 S.Ct. 209, 215, 13 L.Ed.2d 125 (1964). But it assuredly does not follow that, as the defendants maintain, "reliance on such a source cannot as a matter of law permit an inference of actual malice." The defendants, curiously enough, cite for this proposition St. Amant v. Thompson, supra, a case in which the Supreme Court held specifically that reliance on questionable sources would be evidence of actual malice, although it found the evidence in that case insufficient. St. Amant plainly does not support the defendants' position.
 
 
 227
 Reliance on the unsupported word of obviously biased sources for key allegations is evidence which a jury is entitled to consider in evaluating the existence of actual malice.[48] This court on review is similarly entitled to consider this evidence. There was evidence in this case from which a jury could determine that Comnas was ousted from Atlas for engaging in irregular business activities, that Tyler was aware of such activities, and that Tyler had doubts about his veracity. Yet Tyler disregarded these doubts in giving vent to Comnas' allegations.
 
 8. Other Indicia of Actual Malice
 
 228
 There is other evidence present in this case which has been held in other cases to constitute evidence relevant to the issue of actual malice, and in our review of the record we give such evidence the same probative value.
 
 
 229
 First, the article clearly charged William Tavoulareas with corporate nepotism, strongly hinted that the Samarco-Atlas arrangement involved misuse of corporate assets and that Tavoulareas and Mobil had been less than candid with Mobil shareholders. The defendants certainly were aware that such charges would have a serious impact on the reputation of William Tavoulareas and might accomplish their expressed intent, in effect, to "get" him.[49] Knowledge of the harm likely to follow publication of a story is relevant to whether it was published with actual malice. Curtis Publishing Co. v. Butts, 388 U.S. 130, 170, 87 S.Ct. 1975, 1999, 18 L.Ed.2d 1094 (1967) (Warren, C.J., concurring) ("knowledge of the harm that would likely result from publication of the article" is relevant to actual malice determination); see Mahnke v. Northwest Publications, Inc., 280 Minn. 328, 160 N.W.2d 1, 9-10 (1968) ("gravity of the charges in this story was a factor to be considered by the jury in assessing the conduct of the defendant" on the issue of "actual malice").
 
 
 230
 Second, the defendants were under no time constraint in preparing their story. This was not a fast-breaking news story; the events at issue had occurred years earlier. There was no significant deadline pressure.[50] The defendants had ample time to search for corroboration of Comnas' statements. Actual malice may be more difficult to prove when a defamatory falsehood is published under heavy deadline pressure. The converse is equally true. Falsehoods uttered at leisure are more likely to be deliberate than those published in haste. Absence of time pressure in this case is evidence that the jury could fairly consider. See Carson v. Allied News Co., 529 F.2d 206, 211 (7th Cir.1976) (grant of summary judgment reversed; story was not "hot news" and "defendants were not bedeviled by an early deadline"); Goldwater v. Ginzburg, supra, 414 F.2d at 339; R. Sack, supra, at 215-16. See also Vandenburg v. Newsweek, Inc., 507 F.2d 1024, 1026 (5th Cir.1975) ("when the story is not 'hot news,' as is the case here, the investigation must be more thorough").
 
 
 231
 Third, after the story had been published, the Post steadfastly refused to retract the story, and refused to print a letter from Tavoulareas setting forth his position. The Supreme Court held in New York Times that "failure to retract upon [the plaintiff's] demand ... is ... not adequate evidence of [actual] malice for constitutional purposes." 376 U.S. at 286, 84 S.Ct. at 729 (emphasis added). This is unquestionably true. The mere refusal to retract is not sufficient evidence, by itself, to prove actual malice. The defendants then take the next giant step and argue that it is entirely irrelevant. But the very language used by the Court--"is not adequate evidence"--flatly refutes the assertion that refusal to retract may not be some evidence of actual malice. The Court's language makes no sense under the defendants' construction of the law. The correct view, as stated by the Fifth Circuit, is that "[u]nder certain circumstances evidence [of a refusal by a publisher to retract a statement after it has been demonstrated to him to be both false and defamatory] ... might be relevant in showing recklessness at the time the statement was published." Golden Bear Distributing Systems of Texas v. Chase Revel, Inc., 708 F.2d 944, 950 (5th Cir.1983) (quoting Restatement (Second) of Torts Sec. 580A comment d (1977)).[51]
 
 9. The Defendants' Evidence
 
 232
 The defendants place a great deal of emphasis on three factors which were presented to the jury and to which the jury evidently did not give controlling significance: the defendants had (1) "done exhaustive research," (2) "given William and Peter Tavoulareas and Mobil ample opportunity to comment," and (3) "reported the Tavoulareases' and Mobil's viewpoint at great length" in the story. Brief of Post at 18.
 
 
 233
 The Reporters' "Exhaustive" Work. Tyler worked on the story over a 30-day period. It is clear from the record that both he and Golden expended at least a fair amount of time on research. The details of his investigation were presented at some length to the jury. But the amount of effort put into a story is only one piece of evidence on the issue of actual malice. As the district court recognized, "[a] reporter cannot shield himself from a charge of reckless disregard merely by showing that he invested a large amount of time and effort on an article's preparation." 567 F.Supp. at 654. The expenditure of considerable time and effort on a story may be evidence of a reporter's good faith belief in what he writes. It may, on the other hand, merely be evidence of a dogged and thorough attempt to "get" the subject. Its evaluation is a matter for the trier of fact, and what the reporters did and did not investigate assume critical importance. When obviously biased sources are involved, obtaining reliable corroboration is the name of the game.
 
 
 234
 The Plaintiffs' Refusal to Cooperate with Interviews. The defendants repeatedly attempted to interview the plaintiffs and Mobil officials. They were repeatedly rebuffed. The defendants correctly point to these attempts as some evidence of their lack of actual malice. But this evidence obviously is not dispositive, for even one who wrote what he knew or suspected to be false may have sought to interview the subject of his story.
 
 
 235
 Implicit in this argument by the defendant is the apparent belief that plaintiffs should not be heard to complain about a publication when they have refused the opportunity to be interviewed. But individuals cannot be compelled to speak with reporters; their decision to exercise their right to remain silent does not strip them of their remedies for defamatory falsehoods. William Tavoulareas cannot force a newspaper to publish his views. No more can that newspaper force Tavoulareas to speak by holding the sword of defamatory falsehood over his head.[52]
 
 
 236
 Inclusion of Denials. The defendants also stress that denials by Mobil and Tavoulareas were included in the story. Inclusion of such denials is evidence tending to show the absence of actual malice. The jury and this court on review are entitled to evaluate it. But mere publication of a denial by the defamed subject does not absolve a defendant from liability for publishing knowing or reckless falsehoods. As the Supreme Court of Pennsylvania has noted, "an astonishing number of people are convicted of charges they deny, and the denial does not set them right in the public mind. A denial often leads piquancy to the story, and printing one would be an easy escape from liability, if that were all there was to it." Morgan v. Bulletin Co., 369 Pa. 349, 353, 85 A.2d 869, 872 (1952). See also Dempsey v. Time, Inc., 43 Misc.2d 754, 252 N.Y.S.2d 186, 189, aff'd, 22 A.D.2d 854, 254 N.Y.S.2d 80 (1964); Cobbs v. Chicago Defender, 308 Ill.App. 55, 31 N.E.2d 323 (1941).
 
 
 237
 10. Some of Defendants' Suggested Inferences from the Evidence
 
 
 238
 From the foregoing analysis we think it is clear that the evidence, together with all inferences favorable to the plaintiffs that can reasonably be drawn therefrom, establishes by clear and convincing proof that the defendants acted in reckless disregard of whether the charges were false or not, i.e., with actual malice. In evaluating the possible inferences to be drawn from the evidence, we have necessarily been required to pass upon their reasonableness. We are not required, though, to evaluate the defendants' inferences and accordingly prove them false. Our review commands only that we evaluate the inferences most favorable to the plaintiff, examine them for their reasonableness, and determine whether they support a finding that the plaintiffs have clearly and convincingly demonstrated actual malice. This we have done.
 
 
 239
 The dissent nonetheless charges that our review does not consider relevant interpretations of the evidence. See Dissent at 158. To the extent the dissent suggests that we should accept or discredit evidentiary inferences advanced by the defendants, we note the following inferences--central to the defendants' case--which the defendants in argument submitted to the jury but which the jury obviously did not believe.
 
 
 240
 First: that after admitting "we don't know the words back and forth," the defense suggested that William Tavoulareas told Comnas "If you want the [Mobil] business, take Peter in with you" (Tr. 4424). This inference is based on no more than mere speculation.
 
 
 241
 Second: that William Tavoulareas used $100,000 of Mobil funds to "[g]et George Comnas out of Atlas, because once you have George Comnas out of Atlas, it is there for Peter Tavoulareas to take over with his partner, Ares Emmanuel " (Tr. 4441) (emphasis added). This is equivalent to arguing that William Tavoulareas purposely used $100,000 of Mobil funds to force Comnas out of Atlas to permit Peter to "take over." However, Comnas' shares were offered to Hoffmann, not Peter (Tr. 4151).
 
 
 242
 Third: that Tyler's suggestion to Piro, "Hey, maybe we should get somebody to rifle Tavoulareas' safe" was a joke and not a serious suggestion (Tr. 4461). Yet Golden, who was present at The Owl restaurant when Tyler made this suggestion, testified that he believed Tyler was asking Piro "to commit a crime" (Tr. 216).
 
 
 243
 Fourth: that "the Peterson memorandum adds up to ... precisely nothing in this case" (Tr. 4474) (emphasis added). Suggesting that the jury draw this inference from the Peterson memorandum represents a refusal to otherwise meet this important issue and left the jury free to weigh this evidence in the plaintiff's favor.
 
 
 244
 Fifth: that defendants also asked the jury to rely on the credibility of Comnas and conclude "that Tavoulareas, personally, urged Comnas to take Peter on as a partner" (Tr. 4490). On Comnas' credibility, Tyler and Woodward, particularly Tyler, testified that they did not have to check on George Comnas' credibility because they relied on statements William Tavoulareas and Paul Wolfe had made about Comnas and his career before he went into Atlas. In response, William Tavoulareas testified:
 
 
 245
 To use me as a basis for saying Comnas was a man of credibility and competence I think is just unbelievable.
 
 
 246
 Now, exactly the same situation happens with Paul Wolfe. Paul Wolfe says when we first hired him [Comnas] we thought he was good. We found out he couldn't perform.
 
 
 247
 And you people yourselves have heard what Paul Wolfe has said. And what about Kousi? What did Kousi say? Kousi said he was bad, he was over his head. He increasingly got disillusioned with him and he said he solicited a bribe on the Japanese deal and he was mixed up in the Italian Exxon scandal.
 
 
 248
 Could you read that testimony as saying it's an endorsement? If his other sources are as good as those three sources, I'm amazed.
 
 
 249
 (Tr. 4152-53) (emphasis added). The foregoing testimony greatly weakens the inferences that can reasonably be drawn by the defendants to rebut the plaintiff's case. When the principal reliance for the story was Comnas, the refusal of the defendants to introduce Comnas' deposition left the jury free to discount the truthfulness of the statement.
 
 
 250
 In sum, on final argument the defense suggested a number of inferences to be drawn from the evidence which the jury obviously did not consider to be reasonable in the face of clear and convincing evidence to the contrary. Our review sees no error in that conclusion.
 
 11. Summary
 
 251
 In sum, then, the jury clearly could find that the article was both false and defamatory. As to the defendants' state of mind with which they published the story, the jury was faced with the following evidence:
 
 
 252
 * The story on its face alerted the defendants to the fact that its potential harm to William Tavoulareas' reputation was great.
 
 
 253
 * The article was not "hot news," and the defendants were under no significant time constraints in publishing it, yet it contained misstatements of fact and law and defamatory implications.
 
 
 254
 * The defendants were motivated by a plan to "get" the plaintiffs, and deliberately slanted, rejected and ignored evidence contrary to the false premise of the story, generally resolving ambiguities in the light most damaging to Tavoulareas.
 
 
 255
 * The Post defendants relied on sources of questionable credibility for major portions of the defamatory allegations; and the defendants possessed information which should have alerted them to the credibility problems.
 
 
 256
 * Tyler's notes of interviews on some points reflect exactly the opposite of what he was told by the interviewees, and in the case of Checket, at least, he cited as a "corroborating" source one who had in fact flatly denied the statement.
 
 
 257
 * During the editing phase of the article, substantial doubts regarding the accuracy of the article's central theme were voiced by at least one editor (Peterson) who worked on the article; the Peterson memorandum was circulated to Tyler and to the editors directly responsible for the article. There is no claim or any evidence that any effort was made to address those doubts, and no substantial changes were made in response to them.
 
 
 258
 * The defendants have steadfastly refused to retract their story or even to print the plaintiff's letter in their letters to the editors column.
 
 
 259
 From our review of the entire record we conclude that the direct and circumstantial evidence, taken as a whole, supports a finding that the plaintiffs have demonstrated, clearly and convincingly, that the falsehoods contained in the article were published not merely through negligence or inadvertence, but with reckless disregard of whether they were false or not, i.e., with actual malice. A judgment n.o.v. was inappropriate.
 
 V. THE VERDICT AGAINST PIRO
 
 260
 Plaintiffs William and Peter Tavoulareas sued defendant Dr. Piro for slander and its foreseeable republication. Piro was charged with making the following slanderous statements concerning William Tavoulareas: (1) William had arranged for Peter's first job with C.M. Lemos & Co.; (2) William (as President of Mobil) had set up his son Peter as a partner in Atlas Maritime Co.; (3) William had described his interest at the time as "giving Peter a little nudge to get along"; and (4) after the departure of Comnas, William dispatched one of his senior shipping executives to London to help run Atlas. Complaint, Tavoulareas v. Piro, Civ. No. 80-2387 (D.D.C. Sept. 19, 1980); J.A. 89, 90.[53] The jury returned verdicts in favor of both plaintiffs. The district court then granted the judgment n.o.v. in favor of Piro against Tavoulareas (although it affirmed the jury verdict for Peter). The court found that although Piro had little or no idea how Atlas and Samarco came about and what role the Tavoulareases played in them, his false and defamatory statements were not uttered with actual malice (J.A. 766-67).[54] From the legal analysis set forth previously, it is apparent that this conclusion with respect to actual malice is incorrect.
 
 
 261
 Piro's position seems to be that ignorance of truth or falsity, far from amounting to actual malice, actually negates such a finding. He claims that he knew little about Atlas and did not comprehend the complexities of the transactions (Brief of Piro at 10), hence his false and defamatory statements were not uttered with actual malice. Thus, he posits that only a known falsehood is actionable.
 
 
 262
 This position is wholly untenable. The uttering of reckless falsehoods may support a finding of actual malice. Uttering defamatory statements with no idea whether they are true or false is by definition acting with reckless disregard of truth or falsity. See Varnish v. Best Medium Publishing Co., 405 F.2d 608, 612 (2d Cir.1968), cert. denied, 394 U.S. 987, 89 S.Ct. 1465, 22 L.Ed.2d 762 (1969).[55] Piro's admission that he had little or no knowledge of the Atlas-Samarco-Mobil relationship (Tr. 2899-2928), taken in conjunction with all the circumstantial evidence of his state of mind, entitled the jury to find that he acted with reckless disregard of whether the charges were false or not, and supports our conclusion on review that the jury verdict was based on clear and convincing evidence. Thus, the judgment n.o.v. must be set aside and the jury verdict for William Tavoulareas reinstated against defendant Piro.[56]
 
 VI. THE VERDICT AGAINST GOLDEN
 
 263
 To be liable for defamation, defendant Golden, in addition to the actual malice and falsity requirements, must have published or knowingly participated in publishing the defamation. The plaintiffs do not seriously argue that Golden himself took any part in the actual writing or editing of the Tavoulareas article, or that he exercised any influence or control over the Post defendants' handling of the material. There is, moreover, no evidence that Golden read the article before publication or knew what its final contents would be. While he participated in the investigation, his participation was limited to initially sparking the Post's investigation, furnishing such initial information as he had received, conferring with Tyler on the course of the investigation, and supplying one source for the article. He played no role in the actual preparation of the story. Hence, his liability, if any, depends upon whether his participation in the story was significant enough, and was rendered with sufficient knowledge, to make him liable for the Post defendants' defamation.
 
 
 264
 Responsibility for publication is a factual question which is normally for the jury to resolve. Skeoch v. Ottley, 377 F.2d 804, 808 (3rd Cir.1967). It is an infrequent issue in defamation cases, because normally it is fairly clear who wrote, edited, or published the statement in question. The courts of the District of Columbia have had little occasion to discuss the issue and have not adopted a formal test for determining the quantum of participation in a defamatory article necessary for liability. Yet, whatever that quantum may be, we think the First Amendment precludes its descending to the level of Golden's demonstrated participation in this case.
 
 
 265
 As our earlier discussion shows, it was available for the jury to find that the elements of information which Golden contributed to the story were so flimsily substantiated that reliance upon them evidenced reckless disregard of whether they were false or not. What made the final publication reckless, however, was not simply use of that information, but also use of that information in the face of known substantial contradicting evidence exonerating Tavoulareas, which gave rise to serious doubts about the truthfulness of the story. Since Golden had no editorial authority on the Post, it was not his responsibility to know of the contradictory evidence, nor did the testimony establish how much of it, if any, he in fact knew. It cannot be considered "reckless disregard" to gather and bring to a newspaper's attention allegations of wrongdoing made by others (even by incredible witnesses, so long as their statements are not affirmatively known to be false) to form part of a story that is to be investigated in full by the newspaper's large and skilled investigative staff. As far as appears, that was the extent of Golden's participation here. To hold Golden responsible as a principal for the final publication would have the effect of drying up sources of information, no single one of which may be adequate to support a responsible story.
 
 
 266
 The same conclusion obtains if we treat Golden's liability as that of an aider or abettor--assuming, without deciding, that such an analysis applies to a tort that is not "intentional" in the strictest meaning of that word, but is based upon "reckless disregard" as defined for purposes of libel law. In our recent decision in Halberstam v. Welch, 705 F.2d 472, 477 (D.C.Cir.1983), we set forth the following analysis to be used in civil aiding-abetting cases:
 
 
 267
 Aiding-abetting includes the following elements: (1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; [and] (3) the defendant must knowingly and substantially assist the principal violation.
 
 
 268
 We used a similar approach in Investors Research Corp. v. SEC, 628 F.2d 168, 178 (D.C.Cir.), cert. denied, 449 U.S. 919, 101 S.Ct. 317, 66 L.Ed.2d 146 (1980). Without applying all the factors of this analysis, we note immediately that there is no evidence that the second of these factors (the defendant's "aware[ness] of his role as part of an overall illegal or tortious activity") was satisfied with regard to Golden. That is so even if "reckless disregard" is an adequate substitute for "awareness," since, as we have just discussed in connection with Golden's liability as a principal tort-feasor, there is inadequate evidence of reckless disregard on his part as well. There is in this record no evidence that Golden knew of the defects in the Post's investigation and of the in-house handling of the additional material that was collected. He never knew what the Post's article would say before he read it in the newspaper. There is no evidence that Golden and Tyler talked in advance about what premise or theme the article would take. Because of these insufficiencies of evidence, liability cannot be imposed upon Golden as an aider or abettor. For the foregoing reasons, the judgment n.o.v. entered in his favor by the district court must therefore be affirmed.
 
 VII. CONCLUSION
 
 269
 Since it is apparent from a review of the entire record that the evidence was sufficient to demonstrate that the article was published in reckless disregard of its falsity, the judgments n.o.v. entered for Piro and the Post defendants are reversed. In our opinion this is a case where the record demonstrates that a properly instructed jury found liability, that clear and convincing evidence supports its verdict so far as liability is concerned, and that it was improper for the trial court to reweigh the jury's findings on credibility and arrive at a judgment n.o.v. The judgment n.o.v. for Golden is affirmed for reasons set forth above.
 
 
 270
 The jury awarded William Tavoulareas $250,000 in compensatory damages and $1,800,000 in punitive damages against the Post. Post trial motions were made by the defendants in the district court, including motions for a new trial and motions to have the amount of compensatory damages reduced and the award of punitive damages set aside, or in the alternative, reduced. These motions were denied without prejudice when the judgments n.o.v. were granted. Those rulings are not before this court, and we have no occasion to pass on them at this time. However, because we reinstate the jury verdict with respect to the Post defendants and Dr. Piro, the district court on remand must reconsider these related motions. At this time we express no opinion on the issues raised by these motions.
 
 
 271
 The case is remanded to the district court for further proceedings not inconsistent with the foregoing opinion.
 
 Judgment accordingly.APPENDIX
 
 272
 Washington Post, November 30, 1979, Page A-1
 
 MOBIL CHIEF SETS UP SON IN VENTURE
 
 273
 Management Firm is Used to Operate Oil Company Ships
 
 By Patrick Tyler
 Washington Post Staff Writer
 
 274
 Mobil Oil Corp. president William P. Tavoulareas set up his son five years ago as a partner in a London-based shipping management firm that has since done millions of dollars in business operating Mobil-owned ships under exclusive, no-bid contracts.
 
 
 275
 Tavoulareas' son, Peter, was a 24-year-old shipping clerk in 1974, making $14,000 a year. Today, with the help of Mobil, he owns 45 percent of Atlas Maritime Co., which operates 17 ships worldwide.
 
 
 276
 Mobil, the second largest oil company, provided Atlas with some of these ships--among them Mobil-owned supertankers--under management agreements that allowed Atlas to go into business with a minimal amount of capital.
 
 
 277
 Mobil also initially provided Atlas with office space in Mobil's corporate offices in London and loaned Atlas a Mobil shipping vice president when Atlas' own top shipping executive resigned in 1975.
 
 
 278
 Mobil leased back the ships it provided Atlas, thus creating work for Atlas at a time when the shipping industry was severely depressed.
 
 
 279
 The leasing was handled through an intermediary company, Samarco, of which Mobil owns 45 percent.
 
 
 280
 According to one source, Peter Tavoulareas put up no investment capital for his initial 25 percent share of Atlas. Moreover, the lucrative Mobil contracts, along with other managerial assistance, provided by Mobil, helped make Atlas an overnight success. Peter Tavoulareas, now 30, maintains a highly affluent life style, including a home in one of London's most fashionable districts, a Rolls Royce and a summer home on Long Island.
 
 
 281
 The creation of Atlas was a marked departure from Mobil's historical practice of managing its own fleet of crude oil tankers through its shipping and transportation division.
 
 
 282
 Atlas was created to handle the day-to-day management work for Samarco, a complex shipping partnership that Mobil negotiated in 1974. The other partners included a prominent Saudi Arabian merchant family and a member of the Saudi royal family.
 
 
 283
 Samarco--Saudi Maritime Co.--was set up as a way to share shipping revenues among the partners, but the company existed largely on paper, according to one of its original directors, John D. Kousi.
 
 
 284
 The complicated transactions between Mobil and Atlas and Samarco are not especially unusual in the intricate world of international oil--except perhaps for the presence of father and son. That relationship is not illegal, but securities law requires that Mobil officials report it fully to their stockholders. Mobil claims it did, but that is in dispute.
 
 
 285
 Beyond the legal questions, however, the story of Mobil's president and his son offers a rare glimpse into corporate behavior at the top of one of the largest publicly held international oil companies.
 
 
 286
 The Mobil board of directors was told from the outset about the Atlas arrangement but was assured that company president Tavoulareas was not involved in his son's venture in any way.
 
 
 287
 Mobil officials did not tell their stockholders about the son's involvement in Atlas until two years later.
 
 
 288
 After initial press inquiries in the fall of 1976, Mobil board chairman Rawleigh Warner, Jr. disclosed in a special letter to stockholders that Peter Tavoulareas "is one of the principals" of Atlas.
 
 
 289
 That disclosure prompted an investigation by the Securities and Exchange Commission (SEC) in early 1977, but the inquiry was dropped after confidential sworn testimony was taken from the elder Tavoulareas.
 
 
 290
 U.S. securities law requires that corporate officials disclose the details of business transactions between companies and relatives of the companies' executives. The law was designed to protect shareholders from business decisions based on favoritism.
 
 
 291
 In recent days, the SEC has reopened its investigation into the role Mobil's president played in his son's partnership in Atlas.
 
 
 292
 Mobil chairman Warner says he assured directors in board meetings that Tavoulareas "does not participate in any decisions" relating to Mobil's business with Atlas.
 
 
 293
 But a source close to the Tavoulareas family and those familiar with the formation of Atlas said Mobil's president was involved personally in several key decisions and actions relating to Atlas, among them:
 
 
 294
 . Tavoulareas personally recruited two shipping executives, one an outside consultant and the other a Mobil vice president, for Atlas. One of them set up and ran Atlas for more than a year. The other managed it for a time.
 
 
 295
 . The Mobil president helped negotiate the arrangement whereby the Saudi shipping partnership, Samarco, would turn over all of its management business to Atlas. Mobil officials acknowledged this in a statement last week to The Post.
 
 
 296
 . As the formation of Atlas was being planned in April 1974, Tavoulareas personally urged that his son be included as an equity partner in Atlas. However, in the Mobil statement, Tavoulareas denies this. "Mr. Tavoulareas asserts that he did not initiate this arrangement," the statement said.
 
 
 297
 . The elder Tavoulareas played a personal role in forcing the resignation in 1975 of Greek shipping executive George D. Comnas, who had been recruited a year earlier by Tavoulareas to set up Atlas. The resignation followed several personal disputes between Comnas and Tavoulareas' son. Mobil's statement said "Mr. Tavoulareas played a minor role ... in the arrangements made when Comnas departed from Atlas. Since it was on Mobil's recommendation--including Mr. Tavoulareas' ... [that Comnas set up Atlas], it was logical that Mr. Tavoulareas participate."
 
 
 298
 The elder Tavoulareas was not available for an interview, but through a spokesman acknowledged that the basic idea to set up Atlas was his and that he recommended Comnas set it up. But he denied that he urged that his son be accepted as a partner and stated that he divorced himself from Mobil's business with Atlas after his son joined the company.
 
 
 299
 Comnas, according to Marquis Who's Who, completed a 30-year career with Exxon in 1968 and was president of Mediterranean and African subsidiaries for Exxon during his last years there. In the five years before he formed Atlas, Comnas, 66, was managing director and chairman of the board of C.M. Lemos & Co. Ltd. of London, reportedly the largest of the Greek shipping firms.
 
 
 300
 One of Mobil's partners in Samarco said that the involvement of Peter Tavoulareas was accepted without objection because it was assumed that other Atlas managers were competent to run the business.
 
 
 301
 "Clearly it was a nepotistic act," said Kousi, one of the original directors of Samarco. "At his age [Peter was 24 in 1974] he wasn't a genius, nor was he terribly experienced in shipping. You couldn't expect a lot from someone with that level of experience."
 
 
 302
 Philip Piro, a Baltimore eye surgeon and former son-in-law to the elder Tavoulareas, who is now estranged from the family, said Tavoulareas expressed his interest at the time as "giving Peter a little nudge to get him along." Tavoulareas, through a spokesman, said he does not recall making the remark.
 
 
 303
 In 1973, a year before young Tavoulareas became a partner in Atlas, he was making $14,000 a year as a clerk in the London office of Greek shipping magnate Lemos. Sources said that job also was arranged by his father.
 
 
 304
 Before that, the Mobil president's son was graduated from St. Johns University in New York, where his father sits on the board of trustees, and later received a master's in business administration from Columbia University.
 
 
 305
 In an early interview, Peter Tavoulareas said that his partnership in Atlas did not represent "overt favoritism" and that his responsibilities in the company revolved around "financing." Peter Tavoulareas said that he was asked by Comnas to join Atlas and was offered an equity interest.
 
 
 306
 In a later interview, Peter Tavoulareas would not comment further. "I've answered all of the questions you're going to get from me. Atlas has nothing to do with Mobil [in some early editions 'Saudis'], it has nothing to do with Samarco and it has nothing to do with the Saudis. Atlas is none of your damn business." He then hung up.
 
 
 307
 In recent weeks, Mobil has not responded to Washington Post requests for interviews with company officials familiar with Atlas and its operations. The first such request was made Nov. 8. Mobil's vice president for public affairs, Hebert Schmertz, said Nov. 16. "We're not saying no and we're not saying yes." Still later, Schmertz said the request was "under consideration." In a letter to The Post Nov. 12, another Mobil spokesman, John Flint, said, "We understand that you have been advised that this matter has been examined by several reporters for The Washington Post and New York Times, and apparently they found no basis to do a story."
 
 
 308
 The Post did make a brief inquiry into Atlas in 1976, but received assurances from Mobil executives that Mobil's president had maintained a completely "hands off" attitude toward Atlas. The Post began a new inquiry two months ago, based on new information about Atlas.
 
 
 309
 Mobil's Schmertz eventually requested that questions be dictated so that Mobil could respond in writing. This was done and Mobil responded to these questions Nov. 20.
 
 
 310
 Several sources who agreed to discuss the details of this episode if their identities were protected were intimately familiar either with Mobil's shipping operations or with the attempts by Mobil's president to secure a position for his son in the upper strata of the business world.
 
 
 311
 The story of international finance, shipping and oil politics begins with the 1973 Arab oil embargo.
 
 
 312
 In the wake of the oil cutoff, Mobil officials learned that a prominent Saudi merchant company, Haji Abdullah Alireza & Co., was interested in extending Saudi influence from the production of oil to its transportation.
 
 
 313
 Mobil officials believed at the time that a shipping partnership with the Saudis might yield preferential treatment in the loading of crude oil at Saudi ports.
 
 
 314
 In his 1976 message to stockholders, Mobil's Warner said, "Samarco was formed in anticipation ... of [Saudi] flag preference regulations applicable to exports of petroleum from that country and, also, in anticipation of ... favorable financing from Saudi Arabian sources."
 
 
 315
 Mobil and its partners in the venture acknowledge now that neither the preference laws nor the financing for ships materialized.
 
 
 316
 "The business reasons were wrong, they didn't prove out," says Kousi, whose company sold out its interest in Samarco to Mobil two years ago. "We just didn't see the anticipated benefits," he said.
 
 
 317
 But at the time Samarco was formed, Mobil officials felt "preference shipping was much more a threat," according to the Mobil statement. Samarco, however, in which Mobil initially held a 30 percent interest and now holds a 45 percent interest, existed mostly on paper. The real work of the partnership would be performed by the management company, Atlas.
 
 
 318
 "There was no staff or offices for Samarco," said Kousi. "It needed no real offices."
 
 
 319
 The negotiations between Mobil executives and the Saudi partners in Samarco took all of 1974. After the partnership agreement was struck in December, Mobil issued a brief press release saying, "Samarco has engaged the services of Atlas Maritime ... to manage the operation of Samarco's fleet."
 
 
 320
 In its statement last week, Mobil acknowledged that "Atlas was created in anticipation of managing Samarco's business." Atlas was created in July 1974.
 
 
 321
 Mobil president Tavoulareas, the statement continues, was involved in the "policy aspects of participating in Samarco and the concept of Atlas" during those negotiations.
 
 
 322
 Mobil's first goal when it entered the talks in January 1974 was to steer the Saudis away from the partnership they had formed with a New York-based shipping concern, Fairfield-Maxwell Ltd. The Saudis had approached Fairfield-Maxwell after Mobil initially rejected the joint venture idea.
 
 
 323
 "The initial invitation from the Saudis was turned down ... consistent with our normal policy of providing our own transportation and not permitting preference shipping," Mobil said last week.
 
 
 324
 But Mobil officials said they subsequently perceived a greater threat from preference shipping. Sources said Mobil then dispatched two negotiators to Jeddah in Saudi Arabia to push Mobil as a partner. One of the negotiators was Mobil's Mideast agent, W. Jack Butler, and the other was the Greek shipping executive, Comnas, who was recruited personally by Tavoulareas to advise Mobil on how to set up an independent shipping concern.
 
 
 325
 By April, the talks on Samarco had progressed far enough that the management arm of the partnership was being planned by Tavoulareas, who recommended to the partners that Comnas be tapped for the job. Late in April, according to one knowledgable source, Tavoulareas personally urged that his son become a partner in Atlas. Sources said that shortly thereafter, the issue of young Peter's involvement was raised with Mobil chairman Warner, who said he raised the issue with the directors and won their approval.
 
 
 326
 In its statement, Mobil said, "It was George Comnas who asserted that he would like Peter Tavoulareas and one other associate at Lemos, a major shipping company, to join him in the management of Atlas. Mr. Tavoulareas asserts that he did not initiate this arrangement."
 
 
 327
 Nevertheless, the other Lemos employe who came to Atlas with young Tavoulareas, an experienced insurance clerk named Ares D. Emmanuel, was given only employe status while Peter Tavoulareas was made a 25 percent partner. Within a year, Tavoulareas would become a 45 percent partner.
 
 
 328
 After Atlas became fully operable in late 1974, the time came for Samarco to begin acquiring ships for Atlas to manage. However, contrary to Mobil's hopes when it formed the partnership, the Saudis were unwilling to provide any investment funds or financing for ships.
 
 
 329
 Mobil said in its statement that an unspecified amount of "capital contribution" was made by each partner when Samarco was formed. One of the partners, the son of Crown Prince Fahd, heir to the Saudi throne, apparently had a special arrangement. Said Mobil: "The prince's share was financed by loan, which he must repay before he receives any financial benefits in the company."
 
 
 330
 As a result, in early 1975, Mobil provided Samarco's first vessel from its own fleet. The ship, a supertanker, had been launched as the Mobil Mariner, but was renamed the Saudi Glory, presumably to reflect the interests of the Saudi partnership.
 
 
 331
 The Saudi Glory was turned over to Atlas by Mobil under a "bareboat" lease through Samarco, meaning the structure of the tanker, without crew, fuel or stores, was rented to the Saudi partnership and its management arm. However, because Samarco and Atlas had no funds with which to pay such a rental fee, the ship was leased back to Mobil simultaneously.
 
 
 332
 Under this arrangement, Atlas agreed to operate the vessel for Mobil, hire crews, arrange for fueling and handle small maintenance chores. All major repairs were Mobil's responsibility. Thus Mobil paid Atlas the cost of operating the ship plus an unspecified margin of profit.
 
 
 333
 Mobil's executive vice president for Mideast transportation, Paul J. Wolfe, said in an early interview that Atlas' basic management fee was $600,000 a year and included an escalation clause. Other sources said the fee would escalate with the cost-of-living index and also after Atlas acquired more than 10 ships.
 
 
 334
 Peter Tavoulareas said the management fee was $680,000 for 1976, when Atlas was operating six ships.
 
 
 335
 The firm's income for subsequent years is not known, but one knowledgeable source said that Atlas was structured so that profits would increase dramatically as more ships were acquired, because overhead costs for staff and office space were relatively fixed.
 
 
 336
 Because Mobil operates its own ship management arm within the Mobil organization, it could have managed the Samarco fleet itself, company officials acknowledged.
 
 
 337
 But Mobil officials claim that there could have been a conflict of interest for any one of the Samarco partners to manage the ships owned by all of the partners. Mobil's statement said:
 
 
 338
 "Mobil did not want to manage Samarco or to set up a Samarco management company, as there could be a conflict of interest between Mobil and Samarco when chartering ships in or out for either company. Neither of the Saudi partners had experience to qualify them to manage. Fairfield-Maxwell could have had a similar conflict. Accordingly, it was prudent to have an independent third-party managing company."
 
 
 339
 Mobil officials said a study was done of management fees in the shipping industry as a guide to setting Atlas' fees. But the company acknowledged that there were no bids.
 
 
 340
 "Ship management arrangements are difficult to assess on a bid basis ... From Mobil's experience, the overriding selection criteria for such operations is the prospect of good, safe performance and access to low-cost dependable crews," the company's statement said.
 
 
 341
 (Atlas has lost one ship, the Atlas Titan, which exploded and burned last May at Setubal, Portugal, during a tank-cleaning operation, according to Lloyd's of London. The ship was sold for scrap in July.)
 
 
 342
 According to Mobil's statement, one advantage derived from using Atlas as a management company came from Atlas' "ability to use low-cost Greek crews unavailable to Mobil or to other, similar non-Greek companies."
 
 
 343
 Kousi, Mobil's partner at the time, reacted to that statement by saying, "Who didn't [have access to low-cost Greek crews]? That's a phony argument." Kousi said that virtually all companies who have international subsidiaries, such as Mobil, have access to low-cost crews of Greek and other nationalities.
 
 
 344
 It is not clear from maritime records how many ships Mobil supplied to Atlas under the contract arrangement. The records show that in March 1978, Mobil was the registered owner of an oil tanker named the Yanbu that was under Atlas' control. And, last October, Mobil supplied to Atlas another tanker named the Solon, records show.
 
 
 345
 The second of the ships that were turned over to Atlas in 1975 was also a Mobil ship. The 250,000-ton supertanker, launched as the Mobil Supplier, according to Federal Maritime Commission records, was renamed the Al Haramain.
 
 
 346
 The third ship, also Mobil's, was launched as the Elena and became the Al Rowdah.
 
 
 347
 Presently, Mobil officials said in their statement that they have chartered "certain tankers" to Samarco "and chartered most of these back from Samarco on a time charter basis."
 
 
 348
 Of the 17 ships Atlas reportedly operates worldwide, Mobil said seven are run for Samarco and four of those ships are owned by Mobil.
 
 
 349
 Less than a year after this corporation was set up to manage the fleet assembled by Mobil with the Saudis, Atlas underwent an internal struggle in which Peter Tavoulareas and one of his employes, Emmanuel, took over control of the company.
 
 
 350
 Comnas, who had been recruited by Mobil to set up Atlas and run it, resigned in mid-1975. Mobil's Wolfe explained the Greek shipping executive's departure by saying that Samarco's directors had grown dissatisfied with his performance.
 
 
 351
 Kousi, who was on the Samarco board at the time, declined to discuss Comnas' departure in detail. He did say that it was not Samarco's board that was dissatisfied, but rather, "Mobil basically was dissatisfied."
 
 
 352
 Sources familiar with the situation said that Peter Tavoulareas had several personal disputes with Comnas and shortly thereafter, his father, William Tavoulareas, intervened, Mobil acknowledged that Tavoulareas played a minor role by "assuring a settlement that was fair and equitable to both parties."
 
 
 353
 That settlement reportedly included Mobil paying Comnas a substantial retainer as an independent marine consultant for several years.
 
 
 354
 The relationship between the Mobil president and Atlas also was exemplified by his response when Atlas was left without a seasoned shipping executive in control after Comnas departed.
 
 
 355
 Almost immediately, according to Piro and other sources, the elder Tavoulareas dispatched one of his senior shipping executives, Herman F. Hoffmann, to London to help run Atlas.
 
 
 356
 Said Kousi: "Mobil had suggested Comnas so it was natural for Mobil to step forward and to feel an obligation to meet whatever vacuum they thought existed."
 
 
 357
 Mobil gave this account in its statement: "Since Mobil had originally recommended G. Comnas to Samarco, we felt an obligation to Samarco to maintain quality management of their operations. We made Hoffmann ... available as an interim manager of Atlas."
 
 
 358
 During this period, Hoffmann was given the opportunity to take over Atlas permanently, but he declined. While he remained at Atlas, Mobil officials said, Hoffmann's salary "was pro-rated in proportion to his time. Atlas reimbursed Mobil for that portion relating to Atlas duties, plus all related expenses."
 
 
 359
 Special correspondent Sandy Golden contributed to this report.
 
 
 360
 J. SKELLY WRIGHT, Circuit Judge, concurring in part and dissenting in part:
 
 
 361
 TABLE OF CONTENTS
 Page
 I. BACKGROUND ...................................................... 144
 II. LEGAL STANDARD .................................................. 145
 A. Overview ..................................................... 145
 B. The Constitutional Responsibility of Independent Review ...... 146
III. ACTUAL MALICE ................................................... 150
 A. The Challenged Statements .................................... 150
 B. Factors Lacking Any Probative Weight ......................... 152
 1. Defendants' motivation .................................... 152
 (a) The Post .............................................. 154
 (b) Tyler ................................................. 155
 (c) Golden ................................................ 156
 (d) Piro .................................................. 156
 2. The Post's editorial decisions ............................ 156
 (a) Failure to include certain information ................ 156
 (b) Resolution of ambiguities ............................. 157
 3. The Checket conversation and the"dispatch" of Hoffmann .... 158
 4. Other indicia of actual malice ............................ 159
 C. Potentially Probative Factors ................................ 160
 1. The Peterson memorandum ................................... 160
 2. Reliability of sources .................................... 161
 (a) Comnas ................................................ 161
 (b) Piro .................................................. 162
 IV. TAVOULAREAS' STATUS AS A LIMITED PURPOSE PUBLIC FIGURE .......... 162
 V. GOLDEN .......................................................... 165
 VI. PIRO ............................................................ 165
VII. CONCLUSION ...................................................... 166
 
 
 362
 "[W]e consider this case against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open * * *." New York Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964). In my judgment, the majority opinion strays far from this fundamental commitment, vastly increases journalistic liability, and mistakenly rejects the carefully reasoned opinion of Judge Gasch. I dissent from almost all of the majority opinion; I concur only in the judgment affirming the judgment notwithstanding the verdict for defendant Golden.
 
 I. BACKGROUND
 
 363
 It is helpful to review the salient facts that are not in dispute. In 1974 Mobil became a substantial partner with prominent Saudis and another company in a joint venture called SAMARCO, a shipping concern. William Tavoulareas, Mobil's president and the advocate of close cooperation with the Saudis, played a major role in conceiving and preparing Mobil's participation in SAMARCO. Mobil and its partners agreed that Atlas Trading Company, which had been formed, according to Mobil, "in anticipation of managing SAMARCO's business," Record Excerpts (RE) 2344, would manage SAMARCO's ships; many of those ships would be leased from Mobil. In the spring of 1974 William Tavoulareas personally recruited George Comnas to manage SAMARCO's ships through Atlas. At the time Tavoulareas knew that his son, Peter, worked for Comnas. Soon after Comnas took control at Atlas, Peter left his $14,000 a year job to become a major partner at Atlas. All of these facts are undisputed.
 
 
 364
 After researching the story for a month, Washington Post reporter Patrick Tyler wrote an 85-paragraph article about the Mobil-SAMARCO-Atlas relationship and Tavoulareas' role in it. More than 20 paragraphs of the article reported Mobil's version of the events in question. Tavoulareas challenges three statements and one implication in the article: the statement that he "set up" his son and "personally urged" his inclusion as a partner, the statement that he "personally dispatched" an executive to Atlas after Comnas' departure, the statement that Mobil "provided" ships to Atlas, and the possible implication that Tavoulareas engineered the transaction solely to benefit his son.
 
 
 365
 Assuming that Tavoulareas is a public figure, see discussion in text at 162-165 infra, the question before this court is whether these statements and the claimed implication are stripped of their First Amendment protection because they were false, defamatory, and published with knowledge or reckless disregard of their falsity. Since I find that the evidence in the record falls far short of establishing clear and convincing proof of knowledge or reckless disregard of falsity, I view that question as dispositive. For, even if the statements are false and defamatory, without such clear and convincing proof of knowledge or recklessness, the First Amendment unquestionably protects the challenged expression.
 
 II. LEGAL STANDARD
 A. Overview
 
 366
 The majority opinion achieves no less than an ambitious, wide-ranging revision of libel jurisprudence. The majority accomplishes this revision in two ways. First, it counts, as elements of actual malice, factors that are completely impermissible considerations in reaching the daunting conclusion that the First Amendment does not apply to the challenged expression. These factors include criticism of a newspaper's emphasis on attention-getting stories, majority opinion (maj. op.) at 120-121; condemnation of the career ambitions of young journalists, id. at 119-120; challenges to a newspaper's resolution of reasonable ambiguities, id. at 121-123; and rejection of editorial judgments about the information to be included in an article that clearly reports both sides of a disputed story, id. at 123-125. Indeed, the majority appears to criticize what it takes to be the general climate in journalism today. It goes so far as to attach some opprobrium to a newspaper's policy of " 'hard-hitting investigative journalism,' " maj. op. at 121, and, too, emphasizes the need to deter "the least responsible journalists" who might "scoop their more careful colleagues." Id. at 131 n. 50.
 
 
 367
 In my judgment, we do not sit, even in reviewing a libel verdict, as some kind of journalism review seminar, offering our observations on contemporary journalism and journalists. Our mission is to see that the First Amendment is vigorously protected and that libel verdicts not supported by clear and convincing evidence do not stand. The majority's use of these impermissible factors as evidence of actual malice seriously undermines that mission. The majority stresses that we should suspend judgment on each of its factors because, after all, " 'a brick is not a wall.' " Maj. op. at 122 (citation omitted). But when a particular factor is so insubstantial and so inappropriate to the weighty First Amendment matters before us, it clearly is not even a brick.
 
 
 368
 Second, the majority dramatically narrows our well-established constitutional responsibility to conduct an independent review of the record in these First Amendment cases. The nature of that review is critically important, and the majority seeks to reduce it to a pro forma, mechanical ratification to be undertaken only after the pieces of evidence have already been uncritically labelled "indicia of actual malice" and "cumulated." The majority's determined effort to constrict our constitutionally mandated inquiry will be discussed in detail below.
 
 
 369
 Through these two devices, the majority manages to reinstitute a jury verdict of libel in this case. In a brief aside at the last moment, the majority dangles the possibility that this excessive $2.05 million verdict may ultimately be reduced in further proceedings. Maj. op. at 137. And that is at least some comfort, given that these damages seem clearly disproportionate to any possible rendering of the Post 's conduct and Tavoulareas' injury. But it is, of course, the libel verdict itself, not merely the amount of damages, that chills First Amendment expression. Indeed, a majority of this court recently recognized that a libel suit itself has the potential to chill. See Ollman v. Evans, 750 F.2d 970, 991 n. 44 (D.C.Cir.1984) (en banc ); id. at 993 (Bork, J., concurring). And in a statement that aptly summarizes the problems with the majority's approach in this case, three members of the Ollman court joined Judge Bork's statement that "[i]t is not merely the size of damage awards but an entire shift in the application of libel laws that raises problems for press freedom." Id. at 996-997. In short, our central inquiry is whether there is clear and convincing evidence of reckless falsity; the possibility of reduced damages does not remedy the problems in the majority's decision, or the distortion that it works on our constitutionally mandated independent inquiry.
 
 
 370
 This is not a case that lends itself to easy capsulization. The record--which we are constitutionally charged to review--includes some nine volumes and 3400 pages in the Joint Appendix submitted to us, and that appendix contains only record excerpts. The issues are many and varied, touching on countless subdoctrines in the often baroque field of libel jurisprudence. But despite the vastness of the record and the number and complexity of the issues, our responsibility is fundamental, all-important, and inescapable: we must determine whether the First Amendment protects the challenged expression.
 
 
 371
 To discharge this responsibility, it is necessary for the court--and this dissent--to examine the varied issues and the complex record with extreme care. With respect to the majority's use of impermissible factors, I will discuss each impermissible factor in turn as part of a systematic analysis of the elements that, in the majority's view, are sufficient to reinstate the verdicts. However, the nature of the independent review that is our constitutional responsibility--and that the majority transforms into a pale imitation of its former self--must be considered in detail at the outset.
 
 
 372
 B. The Constitutional Responsibility of Independent Review
 
 
 373
 In Bose Corp. v. Consumers Union of United States, Inc., --- U.S. ----, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984) (hereinafter cited only to 104 S.Ct.), the Supreme Court vigorously reaffirmed the New York Times requirement of independent appellate review for determinations of actual malice. The Court stated unequivocally, "Judges, as expositors of the Constitution, must independently decide whether the evidence in the record is sufficient to cross the constitutional threshold that bars the entry of any judgment that is not supported by clear and convincing proof of 'actual malice.' " Id. at 1965. Specifically, the Court noted that this responsibility extends to "an independent assessment * * * of the evidence germane to the actual malice determination." Id. at 1967 n. 31.
 
 
 374
 This case concerns the exercise of that independent review in considering a challenge to a trial judge's decision to grant a j.n.o.v. In the majority's rendering, our review in this situation becomes a process in which we resolve all inferences in favor of the plaintiff, reject conflicting evidence supporting the defendant, reflexively label inferences "indicia of actual malice," "cumulate" these malice-laden inferences, and then ask whether actual malice has been clearly and convincingly established. In my judgment, this approach assumes its conclusion, narrowly cabins our review, and deprives the media of the protection that New York Times and Bose sought to confer--a vigorous judicial review to ensure that verdicts based on less than clear and convincing evidence of actual malice will not stand. It thus reduces the safeguards for the "journalistic independence" that this court has stressed. McBride v. Merrell Dow & Pharmaceuticals, Inc., 717 F.2d 1460, 1466 (D.C.Cir.1983).[1]
 
 
 375
 According to the majority, New York Times and Bose create some kind of distinction between the "manner" and "standard" of evaluating evidence. This distinction, articulated in two Ninth Circuit decisions, is, of course, nowhere to be found in the Supreme Court's frequent admonitions to "make an independent examination of the whole record," see, e.g., Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin, 418 U.S. 264, 282, 94 S.Ct. 2770, 2780, 41 L.Ed.2d 745 (1972). Since the majority seeks to enthrone it as the law of the circuit, however, the distinction bears some attention.
 
 
 376
 In the majority's view, " '[t]he standard against which the evidence must be examined is that of New York Times and its progeny. But the manner in which the evidence is to be examined in the light of that standard is the same' " as in all other challenges to j.n.o.v. determinations. Maj. op. at 105 (quoting Guam Federation of Teachers, Local 1581 v. Ysrael, 492 F.2d 438, 441 (9th Cir.), cert. denied, 441 U.S. 962, 95 S.Ct. 132, 42 L.Ed.2d 111 (1974) (emphasis by the Guam court)). Thus the majority concludes that "the evidence and the reasonable inferences derived from it" should be "examined in the light most favorable to the plaintiffs," id. at 106, and that the j.n.o.v. posture of the case requires that "all reasonable inferences must be granted to the plaintiff." Id. at 108. Critically, this presumption in granting inferences even applies to inferences that the majority has determined are "indicia of actual malice"--reliance on unreliable sources, resolution of ambiguities against the plaintiff, and so forth. These inferences are then "cumulated." Only after these inferences have been granted in favor of the plaintiff and cumulated, the majority reasons, does the New York Times/Bose responsibility of independent review come into play, and the question is whether these cumulated inferences prove actual malice by clear and convincing evidence.
 
 
 377
 This approach renders the independent appellate review promised by Bose a mirage. Independent review of the record devolves into review of the pool of pre-selected inferences that cut against the defendant. It comes as no surprise, then, that, at the point for the majority's exercise of independent review, the outcome has already been largely decided against the defendant. This is far from the independent review envisioned by Bose "to preserve the precious liberties established and ordained by the Constitution." 104 S.Ct. at 1965.
 
 
 378
 The majority's method of analyzing the evidence and permissible inferences conflicts with Supreme Court decisions requiring an independent review of the record. In Bose itself the decision turned on the inference to be drawn from the finding that a witness was not telling the truth in failing to understand the difference between two phrases: the Supreme Court rejected the inference, drawn by the trier of fact, that the witness recognized the difference at the time of publication, and the Court drew its own inference that the testimony was part of the witness' "capacity for rationalization." 104 S.Ct. at 1966. As the majority notes, maj. op. at 107, the Bose Court relied on the "purely factual findings" of the trial judge, 104 S.Ct. at 1967; as the majority fails to note, the Court rejected, as part of its independent inquiry, an inference drawn by the trial judge that was freighted with actual malice implications.
 
 
 379
 Bose was far from the first case in which the Court emphasized that the constitutional responsibility of independent review encompasses far more than the majority's exercise in ritualistic inference granting. In Time v. Pape, 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971), the Court drew its own inference about the character of a government report described by the defendant. Id. at 286-290, 91 S.Ct. at 637-639. Though reviewing a directed verdict--which has the same standard as a j.n.o.v., Vander Zee v. Karabatsos, 589 F.2d 723, 726 (D.C.Cir.1978)--the Court never suggested that its independent review of the evidence in the record should be structured by automatic resolution of malice-laden inferences against the moving party. In its independent evaluation of actual malice determinations, moreover, the Supreme Court has repeatedly stressed that its review is "an independent examination of the record as a whole," Beckley Newspapers Corp. v. Hanks, 389 U.S. 81, 82, 88 S.Ct. 197, 198, 19 L.Ed.2d 248 (1967) (emphasis added), not merely the bits and pieces which support "indicia of actual malice." Finally, in other constitutional areas in which the Supreme Court has exercised independent review the Court has not undertaken the kind of selective reading of the record and automatic inference assumption that the majority employs.[2]
 
 
 380
 Nor has the Court relied on a purported distinction between the "manner" and "standard" of evaluating evidence in reviewing the record. In Bose the question before the Court was the very similar question of whether Fed.R.Civ.P. 52(a)--which provides that findings of the trial court[3] may only be set aside if "clearly erroneous"--governed a determination of actual malice. The Court did not turn to some manner/standard distinction. Rather, in emphasizing the differences between questions of fact and questions of mixed fact and law the Bose Court emphasized the delicate judgments involved and the necessity of giving a narrow reading to the realm of pure fact in certain circumstances. "Where the line [between fact and law] is drawn varies according to the nature of the substantive law at issue. Regarding certain largely factual questions in some areas of the law, the stakes--in terms of impact on future cases and future conduct--are too great to entrust them finally to the judgment of the trier of fact." 104 S.Ct. at 1960 n. 17.[4] Instead of relying on a supposed distinction between the manner and standard of evaluating evidence, the Court framed the judicial responsibility more forthrightly--"an independent assessment * * * of the evidence germane to the actual malice determination." Id. at 1967 n. 31.[5]
 
 
 381
 Similarly, the majority's emphasis on some great divide between "each separate fact determination that forms the basis for the ultimate conclusion of 'actual malice' " and "the ultimate conclusion of clear and convincing proof of 'actual malice,' " maj. op. at 107, also distorts Bose. The majority's central contention is that the Bose emphasis on the difference between the scope of Rule 52(a) and the scope of our independent, constitutional review corresponds to the majority's own distinction between "preliminary factual determinations" and "ultimate" facts. Maj. op. at 108. But that is simply not how Bose delineates the difference between Rule 52(a) (which applies to factual questions) and our independent review (which applies to constitutionally mixed questions of fact and law). The Court emphasized that Rule 52(a) applies to the "many findings of fact [in a libel case] that are irrelevant to the constitutional standard of New York Times v. Sullivan," 104 S.Ct. at 1967 n. 31 (emphasis added). Our independent review, in contrast, extends to "the evidence germane to the actual malice determination." Id. Clearly, the inferences labelled "indicia of actual malice" are relevant and germane to the constitutional inquiry; indeed, they are essential to it. Thus they are appropriately within the scope of our independent appellate review, rather than within the scope of Rule 52(a). Far from "vest[ing] appellate courts with original jurisdiction in libel actions," maj. op. at 108, that Supreme Court-identified "rational stopping point," id., ensures that we may discharge our constitutional responsibility and see that the decision not to extend the First Amendment to challenged expression is limited, in these cases, to those instances in which there is clear and convincing evidence supporting the verdict.
 
 
 382
 I believe that the Bose Court meant what it said, and that we must undertake an independent assessment of the evidence germane to the actual malice determination--not merely a ratification of the preselected inferences supporting an actual malice conclusion. To be sure, we must recognize that "the presumption that attaches to factual findings is stronger in some cases than others." 104 S.Ct. at 1959. Credibility of a witness may be the most compelling case for deferring to the factfinder; applying inferences that are labelled "indicia of actual malice," however, may be the least, for it directly affects the independent assessment of the evidence germane to actual malice that Bose requires.
 
 
 383
 In my judgment, Judge Gasch's well-reasoned opinion, see Tavoulareas v. Washington Post Co., 567 F.Supp. 651 (D.D.C.1983), decided before Bose, is far closer to Bose 's conception of independent review and sensitivity to First Amendment values than the majority's opinion.[6] For it seems clear to me that if evidence in the record is to be considered probative of actual malice, the judge must answer two questions. First, can this be the type of evidence which the Supreme Court has found may be probative of actual malice? Second, if so, does the evidence in this case contribute to a finding of knowledge of falsity or reckless disregard of truth or falsity? Failing to address these two questions seems to me to shirk this court's responsibility to undertake an independent examination and assessment of the record.[7]
 
 
 384
 With these principles in mind, and without the blinders of automatic assumption of malice-laden inferences and their consequent cumulation, I review the evidence in the record to determine if it contains clear and convincing evidence of actual malice.
 
 III. ACTUAL MALICE
 
 385
 As noted, our constitutional responsibility requires a careful evaluation of "the evidence germane to actual malice." Bose, supra, 104 S.Ct. at 1967 n. 31. In this case, and in view of the majority's opinion, that obligation requires an unusually extended discussion. Nonetheless, an independent examination of the record reveals that most of the factors cited by the majority fail to raise even a substantial question about knowledge of falsity or reckless disregard of truth or falsity. Two factors do pose a more substantial question--the Peterson memorandum and the reliability of sources. Even those factors, however, do not, in my mind, rise to the level of clear and convincing evidence of knowledge of falsity, or reckless disregard of truth or falsity.
 
 
 386
 Before considering the lengthy list of factors that comprises the majority's actual malice analysis, it is helpful to focus on the statements that are the putative basis for Tavoulareas' lawsuit and the $2.05 million verdict, and on the materials that were before the Post defendants at the time of the article. For the majority's list of factors is only relevant insofar as it contributes to an understanding of whether the defendants published those statements with knowledge or reckless disregard of their falsity.
 
 A. The Challenged Statements
 
 387
 For each of the three statements and the implication that Tavoulareas challenges, I will briefly review the statement and the Post 's supporting materials.[8] This relationship, never adequately explored by the majority, is an important backdrop for the majority's wide-ranging conclusions about the reportage at issue. The ultimate question for purposes of this actual malice analysis, it should be remembered, is the Post defendants' state of mind in reviewing this material--the degree to which the defendants acted with knowledge or reckless disregard of falsity--not the accuracy of the statements themselves.[9]
 
 
 388
 1. Tavoulareas "set up" his son and "personally urged" his inclusion in Atlas. Tavoulareas challenges two descriptions of his role in establishing the Mobil-SAMARCO-Atlas relationship: in the headline and the first paragraph the Post reported that Tavoulareas "set up his son"; in the 23rd and 52nd paragraphs it reported that Tavoulareas "personally urged" his son's inclusion as a partner in Atlas.
 
 
 389
 In support of the first characterization Tyler and the Post had various information before them at the time of publication. As Judge Gasch observed, "[W]hile [Tavoulareas] may contest the ultimate truth of some of this information, he does not dispute the fact that Tyler had this material in his possession at the time he wrote the story." 567 F.Supp. at 659.[10] Tyler had obtained a copy of Tavoulareas' 1977 SEC testimony in which Tavoulareas testified (1) that, in early 1974, he knew that his son worked as an assistant to George Comnas, (2) that he played a major role in the creation of Mobil's role in SAMARCO, (3) that he went to London in the spring of 1974 to interest Comnas in managing SAMARCO's ships through Atlas, and (4) that his son soon became a major partner in Atlas. RE 2051-2053, 2398-2460. Judge Gasch was so impressed with the significance of this information that he concluded, "[Tavoulareas'] own 1977 SEC testimony provided Tyler with a sufficient basis for this allegation." 567 F.Supp. at 659. In addition to the SEC testimony, former SAMARCO director John Kousi, whose credibility is not in dispute, told Tyler that the hiring of Peter Tavoulareas was "clearly a nepotistic act." RE 1163-1166, 1237, 1927-1928. Mobil executive vice president Paul Wolfe also confirmed in response to Tyler's questions that Tavoulareas was involved in planning SAMARCO and Atlas and in recruiting Comnas. RE 2344-2345. Finally, George Comnas, whose credibility is fiercely disputed, told Tyler that Tavoulareas asked him to bring Peter Tavoulareas into Atlas and that Tavoulareas later asked him to resign in return for a consultant's position with Mobil. RE 981, 989.
 
 
 390
 In support of the second characterization Tyler had Comnas' statement and the contextual corroboration provided by Tavoulareas, Kousi, and Wolfe about Tavoulareas' deep involvement in the formation of the Mobil-SAMARCO-Atlas relationship, as well as his personal recruitment of Comnas at a time when he knew Comnas was in business with his son. The Tavoulareas SEC testimony and the Wolfe letter did deny that Tavoulareas personally urged Peter's inclusion; the Post reported this denial four times, including both points at which the "personally urged" statement was made. paragraphs 23, 25, 32, 53.
 
 
 391
 2. Tavoulareas "dispatched" Hoffmann to run Atlas. In the 82nd paragraph the Post reported that, after Comnas' departure from Atlas, "the elder Tavoulareas dispatched one of his senior shipping executives, Herman F. Hoffmann to London to help run Atlas." As Judge Gasch found, Tavoulareas "apparently participated to some extent in the discussion that led to Hoffmann's temporary assignment at Atlas." 567 F.Supp. at 661. Mobil had informed Tyler of this participation. Wolfe wrote that Tavoulareas personally negotiated the settlement for Comnas' departure, that Tavoulareas played a role, which Wolfe described as "minor," in the arrangements after Comnas' departure, and that an unspecified "[w]e" sent Hoffman to Atlas. RE 2345. In its discussion of the "dispatched" statement as part of its list of factors, the majority dismisses this evidence. See text at 158-159 infra. In addition to the Wolfe letter, Tyler had Piro's comments and his own version of the Checket conversation, the credibility of both of which is vigorously disputed.
 
 
 392
 3. Mobil "provided" ships to Atlas. Tavoulareas claims that the Post 's reference to ships "provided" by Mobil to Atlas was published with reckless disregard or knowledge of its falsity. His objection is apparently rooted in the view that use of the word "provided" suggested a direct relationship between Mobil and Atlas instead of the actual relationship--that Mobil bareboat-chartered vessels to SAMARCO and time-chartered them back and that Atlas managed the vessels. However, the Post article did describe the full, complex transaction. paragraphs 6, 58-59, 74. Furthermore, Kousi had emphasized to Tyler that control of ships effectively passed from Mobil to Atlas. RE 1940. Finally, Wolfe wrote that "Atlas was created in anticipation of managing SAMARCO's business" and that Mobil beneficially owned four of the seven ships operated by Atlas on behalf of SAMARCO. RE 2344-2346.
 
 
 393
 4. The implication that Tavoulareas engineered the entire Mobil-SAMARCO-Atlas arrangement for the benefit of his son. Tavoulareas also argues that "the article's primary implication was * * * that plaintiff misused Mobil assets by engineering the entire Mobil-Samarco-Atlas arrangement for the benefit of his son." Brief for appellant at 25-26. Judge Gasch rejected this contention because "[t]he article * * * did not say that William Tavoulareas put together the Mobil-Atlas-Samarco arrangement solely for the sake of his son. * * * [T]he article specifically stated * * * that Samarco and Atlas were created for certain political and economic reasons. The nepotism discussed in the article clearly had its origin in a legitimate business opportunity." 567 F.Supp. at 660 (footnote omitted). It is undisputed that the article reported Mobil's business reasons for entering into the SAMARCO-Atlas relationship--its belief that "a shipping partnership with the Saudis might yield preferential treatment * * * [and] 'favorable financing from Saudi Arabian sources.' " paragraphs 40-41 (quoting 1976 Mobil message to stockholders).
 
 
 394
 These, then, are the statements and supporting materials that form the core of the $2.05 million verdict and the majority's determination that the First Amendment does not protect the Post 's article.
 
 B. Factors Lacking Any Probative Weight
 
 395
 With these challenged statements and their supporting materials in mind, we can turn to the numerous factors that constitute the majority's actual malice analysis. Most of the factors cited by the majority completely lack probative weight for a finding of knowledge or reckless disregard of falsity. These insubstantial factors include the majority's comments about the defendants' motivation, the defendants' editorial process (the claimed omission of information and resolution of ambiguities), the disputed Checket conversation, and sundry "other indicia of actual malice" (the defendants' refusal to retract, the lack of deadline pressure, and the knowledge of harm).
 
 
 396
 It is important to consider these factors in detail, for they are so insubstantial and inappropriate that they should not receive any weight. The time and effort required to analyze them, by the majority and by this dissent, should not give them a weight that they lack on their merits. These factors simply fail to amount to bricks for the wall that the majority seeks to build.
 
 
 397
 1. Defendants' motivation. The majority recognizes that "common law malice is not the equivalent of actual malice in the defamation context," but argues that "the presence of common law malice or evidence that a newspaper followed a sensationalistic policy, because it provides a motive for knowing or reckless falsehood, is evidence of actual malice." Maj. op. at 117 (emphasis in original). The majority elaborates that a journalistic policy of " 'hard hitting investigative journalism,' or * * * 'sophisticated muckraking,' * * * certainly is relevant to the inquiry of whether a newspaper's employees acted in reckless disregard of whether a statement is false or not." Maj. op. at 121-22.
 
 
 398
 The notion that a policy of muckraking and hard-hitting investigative journalism is somehow evidence of actual malice is deeply troubling, contrary to the nation's tradition of a free and aggressive press, and entirely unsupported by precedent. I will address this startling revision of the actual malice notion in connection with the majority's use of it in its analysis of the Post.
 
 
 399
 A more fundamental problem, however, is whether ill will may be considered evidence of actual malice. The Supreme Court has emphasized that relying on the ill will of the speaker to establish actual malice in a libel case has a chilling effect on vibrant discussion in a free society. "Debate on public issues will not be uninhibited if the speaker must run the risk that it will be proved in court that he spoke out of hatred; even if he did speak out of hatred, utterances honestly believed contribute to the free interchange of ideas and the ascertainment of truth." Garrison v. Louisiana, 379 U.S. 64, 73, 85 S.Ct. 209, 215, 13 L.Ed.2d 125 (1964). See also Greenbelt Cooperative Publishing Ass'n, 398 U.S. 6, 10-11, 90 S.Ct. 1537, 1540, 26 L.Ed.2d 6 (1970) (same). On numerous occasions the Supreme Court has also emphasized that "ill will toward the plaintiff, or bad motives, are not elements of the New York Times standard," Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 52 n. 18, 91 S.Ct. 1811, 1824 n. 18, 29 L.Ed.2d 296 (1971) (Brennan, J., plurality opinion); Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin, supra, 418 U.S. at 281, 94 S.Ct. at 2779, and that jury instructions that include ill will as an element of actual malice are "constitutionally insufficient." Rosenblatt v. Baer, 383 U.S. 75, 84, 86 S.Ct. 669, 675, 15 L.Ed.2d 597 (1966). See Beckley Newspapers Corp. v. Hanks, supra, 389 U.S. at 82, 88 S.Ct. at 198; Henry v. Collins, 380 U.S. 356, 357, 85 S.Ct. 992, 993, 13 L.Ed.2d 892 (1965).
 
 
 400
 In the majority's view, the force and reach of these emphatic holdings are limited to establishing that, although ill will alone does not establish actual malice, it is nonetheless probative of actual malice. In my judgment, such a view conflicts with the important principle articulated in Garrison--that debate will be inhibited if trials and liability may turn on the extent to which the speaker's feelings toward the subject of the speech may have strayed from a fiercely guarded neutrality. The difference between the recognized chilling effect of the speaker's "risk that it will be proved in court that he spoke out of hatred," Garrison, supra, when the proof is equivalent to actual malice, and the effect of such risk when the proof is merely evidence of actual malice seems to me insubstantial. The powerful insight underlying Garrison and subsequent decisions suggests that ill will should not, in any circumstances, be considered probative of actual malice. See Ryan v. Brooks, 634 F.2d 726, 731 n. 4 (4th Cir.1980) ("malevolence, ill-will or spite * * * is irrelevant in First Amendment cases").[11]
 
 
 401
 Even if ill will may be probative of actual malice in certain circumstances, however, I am convinced that the evidence which the majority claims to rely on in this case is utterly unable to provide any probative force for a finding of knowledge of falsity or reckless disregard of truth or falsity.
 
 
 402
 (a) The Post. The majority describes the Post as "a newspaper which seeks, among other things, hard-hitting investigative stories." Maj. op. at 121. For the majority, this journalistic concern becomes the beginning of evidence of actual malice: "Regardless of whether one chooses to characterize this policy as conducive to 'hard-hitting investigative journalism,' or * * * 'sophisticated muckraking,' it certainly is relevant to the inquiry of whether a newspaper's employees acted in reckless disregard of whether a statement is false or not." Id. at 121.
 
 
 403
 This conclusion represents a sharp departure from the principles of free and vigorous discussion that have been the touchstone of First Amendment jurisprudence. It is a conclusion fraught with the potential to shrink the First Amendment's "majestic protection," Bose, supra, 104 S.Ct. at 1961. In our society speech may be controversial and contentious; words may be intended to arouse, disturb, provoke, and upset. For a primary "function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." Terminiello v. Chicago, 337 U.S. 1, 4, 69 S.Ct. 894, 896, 93 L.Ed. 1131 (1949).
 
 
 404
 Muckraking--a term developed when writers like Lincoln Steffens, Ida Tarbell, and Upton Sinclair relentlessly exposed pervasive corruption[12]--may be seen to serve that high purpose even if it offends and startles; so, too, hoping that readers will react in colorful terms to front page stories fits comfortably within the traditions of a free press and a nation that has nothing to fear from an aroused citizenry. As Justice Brandeis observed, "Like the course of the heavenly bodies, harmony in national life is a resultant of the struggle between contending forces." Gilbert v. Minnesota, 254 U.S. 325, 338, 41 S.Ct. 125, 129, 65 L.Ed. 287 (1920) (Brandeis, J., dissenting).
 
 
 405
 Scant authority supports the majority's remarkable innovation in First Amendment jurisprudence. The majority cites Chief Justice Warren's concurring opinion in Curtis Publishing Co. v. Butts, 388 U.S. 130, 162, 87 S.Ct. 1975, 1995, 18 L.Ed.2d 1094 (1967) (Warren, C.J., concurring in result), and his reference to " 'sophisticated muckraking,' " id. at 169, 87 S.Ct. at 1999 (quoting Saturday Evening Post announcement). This is a slim reed indeed to support the majority's expansive construction. Chief Justice Warren's comment is ambiguous and of dubious precedential value.[13] No federal court has ever relied on muckraking as an indication of actual malice, and the Supreme Court has not even mentioned it since Butts.
 
 
 406
 In stark contrast to fundamental First Amendment principles and the clear and convincing evidence of actual malice required by Supreme Court cases from New York Times to Bose, the majority is prepared to give at least some probative weight to a newspaper's emphasis on attention-getting stories. "Woodward, as editor, wanted from his reporters the same kind of stories in which he built his own reputation: high-impact investigative stories on wrongdoing. * * * From Woodward's testimony it was proper for the jury to infer that the Post put some pressure on its reporters to come up with 'holy * * * ' stories." Maj. op. at 120-21. Such is the basis for the majority's arresting conclusion that the Post's policy contributes to a finding that its "employees acted with reckless disregard of whether a statement is false or not." Id. at 122. This deep hostility to an aggressive press is directly contrary to the mandates of the Supreme Court and the spirit of a free press. Indeed, the majority itself acknowledges that a central objective of New York Times is served by a newspaper "acting as watchdog for the public." Maj. op. at 122 n. 39. Yet that recognition is flatly inconsistent with the majority's holding that the Post's policy of "hard-hitting investigative journalism" somehow helps to establish recklessness. Id. at 121. In my judgment, neither a newspaper's muckraking policy nor its hard-hitting investigative journalism should ever be considered probative of actual malice.
 
 
 407
 (b) Tyler. Similarly, even if motive may be probative of actual malice, the facts in the record do not support the majority's finding that Tyler revealed a motive that would represent an indication of actual malice.
 
 
 408
 Conceding that Tyler "had little reason for personal animus," the majority concludes that Tyler wanted "to 'get' Mobil and the Tavoulareases * * * for the sake of a big story and because of [his] general bias against the oil industry." Maj. op. at 118 (emphasis in original). The majority relies on four statements of Tyler and the fact that Mobil had publicly taken issue with a story Tyler had previously written. None of these bits of evidence is substantial enough to suggest a motive indicative of actual malice. Three of the four statements seem well within the scope of a working journalist's vernacular. He speculated that the impact of the story might be to "knock off one of the seven sisters," RE 789, he referred to his article in part as a "case against Tavoulareas," RE 2489, and he characterized a session between Tavoulareas and Post editors as one in which the Post "blew [Tavoulareas] out of the water." RE 857-858. These statements do reveal that Tyler, in conversation and in a memorandum, sometimes betrayed a less than Diogenes-like demeanor, but that is hardly sufficient to find the statements probative of actual malice. The fourth statement--that Tyler asked Piro about a source who could gain access to Tavoulareas' safe--is more troubling. But however reprehensible a journalistic practice, such a request is in no sense indicative of a motive suggesting a knowledge of falsity or a reckless disregard of truth or falsity; indeed, if he was not joking it is evidence that Tyler sought documentary support, however objectionably. Finally, to hold that objections by a major company to a reporter's coverage of it is probative of a motive suggesting actual malice serves to chill the kind of aggressive journalism that the First Amendment should foster and that the majority itself recognizes as "a vital service * * * protected by the New York Times actual malice standard." Maj. op. at 121 n. 39. The record contains evidence that Tyler's assignment to the piece was rooted in the fact that his area of expertise was the energy business, rather than any motive to "get" Tavoulareas and Mobil. RE 2157-2158.
 
 
 409
 (c) Golden. The majority also found that evidence indicating Golden's "primary motive in working on the story was to get a byline on a Post story," represents "evidence of motive [that] has considerable bearing on whether or not he acted with actual malice." Maj. op. at 120 (emphasis in original). The question before this court is whether Golden acted with knowledge of falsity, or reckless disregard of truth or falsity. A desire to succeed and advance, in the journalistic or any profession, does not pose an inherent conflict with the requirements of professional rigor. Even if Golden was, as the majority asserts, "an ambitious young reporter looking for his big break," id. at 120, that ambition seems to me completely irrelevant to the question of knowledge or reckless disregard of falsity; the majority's holding places any reporter who reveals personal ambition in a more vulnerable position. This is not "the breathing space that gives life to the First Amendment." Bose, supra, 104 S.Ct. at 1967.
 
 
 410
 (d) Piro. Piro's animosity toward the Tavoulareas family is clear. To the extent that the majority focuses solely in this factor on Piro's motivation, it is, of course, only relevant to the determination of Piro's actual malice. To the extent that the majority also means for this motivation to be relevant to the Post defendants' state of mind, the majority seeks to count Piro's motivation in its "cumulation" twice: as discussed below, the majority also counts it in its "reliance on sources" section, see text at 162 infra; maj. op. at 129.
 
 
 411
 2. The Post's editorial decisions. The majority continues its reliance on unsupported and impermissible factors when it offers two conclusions about the Post's editorial policy as indicia of actual malice--that the Post failed to include certain information available to it and that the Post consistently resolved ambiguities in the light most damaging to Tavoulareas. As Judge Gasch found, according these conclusions probative weight conflicts sharply with the record in this case and with controlling Supreme Court precedent.
 
 
 412
 (a) Failure to include certain information. The majority rejects Judge Gasch's conclusion that the supposed omission of certain information failed to "show that [Tyler] acted in reckless disregard of the truth," 567 F.Supp. at 659. See maj. op. at 125. But the majority misconstrues the holding below, for it writes as though the court had held that suppression of information is never relevant to an actual malice inquiry. See id. at 125-26. Judge Gasch explicitly recognized that "if the defendants possessed information that showed that some of the article was incorrect, ignoring it would constitute actual malice." 567 F.Supp. at 657. Judge Gasch carefully and properly examined the claimed omissions and determined that the disputed material had been substantially included; as a result, in this case, the claimed omissions were not probative of actual malice.
 
 
 413
 An independent review of the record confirms this conclusion. The majority maintains that three sets of facts were omitted: comments by Mobil outside director Lewis Lapham, information about the benefits of the SAMARCO-Atlas relationship, and internal Mobil memoranda. On the Lapham comments Judge Gasch found: "Despite the fact that the November 30 article did not contain this exact information, it did include at least three paragraphs that conveyed almost everything that Lapham had said." 567 F.Supp. at 658. The differences that the majority points to, maj. op. at 123-24, are hardly substantial enough to be indicative of knowledge of falsity or reckless disregard of truth or falsity. The differences largely amount to whether the Post should have included a board member's report of his belief in the Mobil chairman's assurances about the SAMARCO-Atlas relationship along with its report of the Mobil chairman's assurances. To hold such a difference probative of actual malice--even probative "cumulatively"--not only is illogical but thrusts this court far too deeply into the nuances of editorial discretion.
 
 
 414
 The majority's reliance on the other two claimed omissions is similarly misplaced. The absence of information on the benefits of the SAMARCO transaction lacks any probative weight as an indication of actual malice. "The November 30 article simply did not relate whether the establishment of Atlas was a good or bad business decision." 567 F.Supp. at 659. The majority emphasizes that the Post alluded to " 'millions of dollars in business' " and " 'exclusive, no-bid contracts,' " maj. op. at 124; both allusions were undeniably true. Similarly, the substance of the Mobil memoranda--the Mobil executive vice president's announcement of arm's length dealings with SAMARCO and Tavoulareas' statement that he would not be involved in SAMARCO-Atlas matters--were, as Judge Gasch found, "essentially summarize[d]" in the Post article. 567 F.Supp. at 659 n. 15. Instead of adding that the Mobil executive vice president wrote that dealings were arm's length, the Post said only that the Mobil chairman told the Board about the arrangements and Tavoulareas' non-involvement; instead of adding that Tavoulareas wrote the executive vice president to disassociate himself from SAMARCO-Atlas, it reported Tavoulareas' statement that he had disassociated himself. Such variations seem well within the editor's "inevitabl[e] * * * set of choices," Time, Inc. v. Pape, 401 U.S. 279, 286, 91 S.Ct. 633, 637, 28 L.Ed.2d 45 (1971), and it would greatly shrink the "constitutional zone of protection," id. at 291, 91 S.Ct. at 640, afforded by the New York Times principles to hold such judgments even partially probative of actual malice.
 
 
 415
 (b) Resolution of ambiguities. Similarly, the argument that the Post consistently resolved ambiguities in the light most damaging to the plaintiff and that this process was at least partially probative of actual malice is supported neither by the governing precedents and principles nor by an independent examination of the record.
 
 
 416
 The majority premises its discussion about the resolution of ambiguities on its view that, "to the extent that the facts known to the defendants * * * were susceptible of more than one possible interpretation, the numerous instances in which the defendants selected the most damaging--and most sensation--alternative is some evidence which a jury, and an appellate court on review, can evaluate in determining whether publication was made with reckless disregard of whether it was false or not." Maj. op. at 123 (emphasis in original).
 
 
 417
 It is a remarkable feat to reinterpret Time, Inc. v. Pape, supra, to establish that reasonable resolution of ambiguities may be probative of actual malice, so long as the resolution is not the sole piece of evidence. The majority accurately quotes the penultimate sentences from Pape, maj. op. at 122. Despite the majority's italicization of one word, however, Pape contains no hint that reasonable resolution of ambiguities should have some probative weight in establishing knowledge of falsity or reckless disregard of truth or falsity. The majority's reinterpretation undermines the central thrust of Pape --the deference to be accorded "possible rational interpretations" of a situation that "bristle[s] with ambiguities," 401 U.S. at 290, 91 S.Ct. at 639,[14] because of the "almost infinite variety of shadings" and "inevitabl[e] * * * set of choices" with confront publishers. Id. at 286, 91 S.Ct. at 637.
 
 
 418
 Nor does invocation of cumulation provide the support that Pape does not. Indeed, in Bose the Court specifically refused to give probative weight to a rational interpretation of an ambiguous situation even in conjunction with other pieces of evidence: "adoption of the language chosen was 'one of a number of possible rational interpretations' of an event 'that bristled with ambiguities' and descriptive challenges for the writer. * * * The choice of such language, though reflecting a misconception, does not place the speech beyond the outer limits of the First Amendment's broad protective umbrella." Bose, supra, 104 S.Ct. at 1966 (quoting Pape ). See also Ryan v. Brooks, supra, 634 F.2d at 733 (finding resolution of ambiguities in light most damaging to plaintiff not probative of actual malice even in conjunction with other pieces of evidence). Pape and Bose thus establish that rational interpretations of ambiguous situations do not contribute to a finding of actual malice.[15]
 
 
 419
 Whether or not the majority's view is accepted, however, it is at least clear that some sustained consideration of the relevant interpretations and the underlying events to which they refer is required to evaluate the resolution of ambiguities. The majority makes no such serious effort to evaluate the interpretations at issue; indeed, it does not even identify them. Rather, the majority is content to assert that there was a "consistent selection of the inferences most damaging to the Tavoulareases," maj. op. at 121 (emphasis in original), without specifying which inferences and what they were inferring. Such a blanket, unexplained assertion is far from the rigorous, independent evaluation of the record required by New York Times and subsequent decisions.[16]
 
 
 420
 3. The Checket conversation and the "dispatch" of Hoffmann. The majority cites a conflict between the Tyler and Checket accounts of the substance of their conversation as an indicium of actual malice. Maj. op. at 125-26. According to the majority, this conflict is probative of actual malice because the Checket conversation is the only source besides Piro for the article's statement that Tavoulareas "personally dispatched" Hoffmann to Atlas. The majority concludes, "[I]t is clearly possible that Tyler deliberately falsified his notes." Id. at 126. The majority thus rejects Judge Gasch's conclusion that "Tyler may * * * have been negligent in transcribing Checket's statement but plaintiff introduced no evidence that would show that Tyler deliberately falsified this document." 567 F.Supp. at 661 n. 18.
 
 
 421
 The majority's emphasis on the Checket conversation is misguided. For the undisputed evidence in the record reveals that the Checket conversation--under either version--was far from Tyler's sole source for the conclusion that Tavoulareas "personally dispatched" Hoffmann. As found by Judge Gasch, Tavoulareas "apparently participated to some extent in the discussions that led to Hoffmann's temporary assignment at Atlas." Id. at 661. The majority simply ignores this finding. Yet the evidence in the record fully supports Judge Gasch's determination. Wolfe wrote to Tyler that "Mr. Tavoulareas played a minor role * * * in the arrangements made when G. Comnas departed from Atlas. Since it was on Mobil's recommendation (including Mr. Tavoulareas'), because of long personal acquaintance with G. Comnas, that he negotiate with SAMARCO it was logical that Mr. Tavoulareas participate to the extent of assuring a settlement that was fair and equitable to both parties * * *. Since Mobil had originally recommended G. Comnas to SAMARCO, we felt an obligation to SAMARCO to maintain quality management of their operations. We made H. R. Hoffmann * * * available as an interim manager of Atlas." RE 2345.[17] In the face of this undisputed statement by Mobil --acknowledging that Tavoulareas played a role, albeit "minor," in Comnas' departure, and then shifting to "we" without distinguishing Tavoulareas--the majority's emphasis on the Checket conversation is plainly mistaken.[18]
 
 
 422
 4. Other indicia of actual malice. The majority cites three "other indicia of actual malice"--the Post's failure to retract, the lack of deadline pressure, and the knowledge of the harm the article would cause. All three are of questionable legal force; even if all three were valid indicia of actual malice, the evidence in the record does not support a finding that they were indicia of actual malice in this case.
 
 
 423
 In considering the Post's refusal to retract the majority argues that "[t]he correct view" is that " '[u]nder certain circumstances evidence [of a refusal by a publisher to retract a statement after it has been demonstrated to him to be both false and defamatory] ... might be relevant in showing recklessness at the time the statement was published.' " Maj. op. at 132 (brackets in original; citation omitted). The majority brushes aside the Supreme Court's view in New York Times that a refusal to retract was not probative of actual malice by arguing that the Court's use of the word "adequate" meant only that refusal to retract could not be the sole evidence. Id. The majority fails to mention, however, that the Court was considering the refusal to retract along with other claimed pieces of evidence. See New York Times, supra, 376 U.S. at 286-87, 84 S.Ct. at 729.[19] Similarly, the majority does not mention that, in Bose, the Court did not even consider the publisher's refusal to retract, which it had mentioned in its statement of facts, 104 S.Ct. at 1953, when it considered all of the possible facts which might lead to a determination of actual malice. Id. at 1965-67.
 
 
 424
 Even if the majority's view is accepted, however, there is no evidence in the record to support the view that there had been the necessary demonstration to the Post of falsity and defamation. The majority does not pause to explain when and how such a demonstration--essential, under the majority's formulation, if refusal to retract is to be considered an indicium of actual malice--was made. In addition, the Post reported Mobil's response in two articles (on December 1 and December 4) as well as additional facts provided by Mobil (on December 7). RE 2559, 2561, 2562.
 
 
 425
 The majority also argues that the absence of deadline pressure was "evidence that the jury could fairly consider" because "[t]he defendants had ample time to search for corroboration of Comnas' statements." Maj. op. at 131. Even if such a relationship between deadlines and constitutional principles were established,[20] the evidence in the record does not support a finding that the timing of this article was probative of actual malice. First, as will be discussed infra, Comnas' statements had largely been corroborated by other sources. Second, Tyler's investigative efforts over the course of the month that he spent researching this article establish considerable efforts to corroborate. Third, since Mobil gave no indication of further cooperation, it is difficult to see what further efforts Tyler should have undertaken. Fourth, despite the majority's comment about the "[a]bsence of time pressure," maj. op. at 131, undisputed evidence in the record suggests substantial time pressure--Tyler had learned both that a congressional committee would soon go public with the relevant information and that the New York Times was also investigating the story. RE 1100, 1126. Under the majority's own terms, then, the timing of publication in this case does not amount to evidence of actual malice.
 
 
 426
 Finally, the majority alludes to "[k]nowledge of the harm likely to follow publication" as an indication of actual malice. Maj. op. at 131. In contrast, in a series of cases in which serious harm was obvious the Supreme Court has not even mentioned knowledge of harm as a possible factor probative of actual malice. See, e.g., St. Amant v. Thompson, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968) (allegation of corruption); Time, Inc. v. Pape, supra, 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (allegation of police brutality). Furthermore, if knowledge of harm has any probative weight it must be slight, for an inquiry into knowledge of harm diverts from the central inquiry into knowledge of falsity.
 
 C. Potentially Probative Factors
 
 427
 The majority argues that we must consider the indicia of actual malice as cumulative circumstantial evidence, but since the indicia analyzed above are unsupported, either in the governing legal principles or in the record, cumulation of them is equally without weight. Our inquiry must focus, therefore, on the two potentially probative sources--the Peterson memorandum and the reliability of sources. These factors may be bricks, but they utterly fail to build the majority's wall: they fail to establish, by clear and convincing evidence, knowledge of falsity or reckless disregard of truth or falsity.
 
 
 428
 1. The Peterson memorandum. Judge Gasch considered the Peterson memo at length. The majority, however, misconstrues his analysis of the inferences that could reasonably be drawn from it. Undertaking the required review of the record, Judge Gasch concluded that "[t]here is no evidence whatsoever to show that Ms. Peterson had any 'inside' information about Tyler's sources or research that would enable her to know, or even suspect, that the story was inaccurate. She was merely expressing her uninformed opinion that she found the story hard to believe." 567 F.Supp. at 655 (emphasis added). The majority fails to offer a shred of evidence which contradicts this finding. Instead, it seeks to emphasize the jury's right to disbelieve Peterson's testimony. But even if Peterson's testimony is disbelieved, the rejection of her testimony clearly fails to provide affirmative evidence that her opinion was informed, rather than uninformed. See Bose, supra, 104 S.Ct. at 1966 ("discredited testimony is not considered a sufficient basis for drawing a contrary conclusion"); Moore v. Chesapeake & Ohio R. Co., 340 U.S. 573, 576, 71 S.Ct. 428, 429, 95 L.Ed. 547 (1951).
 
 
 429
 There is no evidence in the record to support the view that Peterson's opinion was informed. Indeed, the memo as a whole makes clear that Peterson had no knowledge of sources and research beyond what she had read in the article. RE 2486-2487. Furthermore, the undisputed evidence in the record does establish that Tyler produced a point-by-point rebuttal to the Peterson memo for Greider, the senior editor ultimately responsible for the article. RE 2487-2491. Under these circumstances the thrust of the trial court's analysis was eminently correct; the evidence in the record did not support the view that Peterson's memo proved the Post's knowledge of falsity, or reckless disregard of truth or falsity. At most, it shows that the editor with ultimate decisionmaking responsibility had before him two paragraphs raising doubts from an editor--in whatever role--who had no independent knowledge of the subject or sources and the lengthy rebuttal, as well as the article itself, from a reporter who had previously written about energy issues and who had spent a month of research on the subject and sources. The inference of actual malice--or even a substantial indication of actual malice--that the majority seeks to draw is unwarranted.
 
 
 430
 To be sure, the majority does not quite claim that the Peterson memo itself provides clear and convincing proof of knowing or reckless falsity. Plainly, the memo could not bear such interpretation. Instead, the majority seeks to impute some additional weight to the memo through the coloration of other pieces of evidence. Maj. op. at 116. But, as discussed, the majority's "other evidence," id., consists largely of totally impermissible and insubstantial considerations--a newspaper's reputation, a journalist's ambition, the reasonable resolution of ambiguity, and the like. These inappropriate factors cannot bolster the Peterson memo and give it some added force; the memo must be evaluated without the distortion of such unacceptable considerations.
 
 
 431
 Since the evidence in the record does not support a view that Peterson's opinion was informed, and since the evidence in the record establishes that Tyler and the Post editors engaged in far more extensive preparation and investigation than Peterson, the Peterson memo fails to assume the probative weight adopted by the majority and properly rejected below.
 
 
 432
 2. The reliability of sources. The majority correctly notes that "[r]eliance on the unsupported word of obviously biased sources for key allegations is evidence which a jury is entitled to consider in evaluating the existence of actual malice." Maj. op. at 131 (emphasis in original). The validity of this general proposition is clear. See St. Amant v. Thompson, supra, 390 U.S. at 732, 88 S.Ct. at 1326. But in this case the evidence in the record does not support the necessary finding that the defendant relied on "the unsupported word of obviously biased sources for key allegations." Id.
 
 
 433
 (a) Comnas. "[R]eliance upon George Comnas," Judge Gasch concluded, "* * * does not come close to approaching the level of recklessness required by the Supreme Court." 567 F.Supp. at 656. The majority rejects this conclusion.
 
 
 434
 The majority argues that the evidence in the record supports a finding that Tyler had reason to doubt Comnas' veracity. Relying primarily on Tyler's awareness of allegations that Comnas left Atlas because of dissatisfaction over his business performance, it thus rejects Judge Gasch's conclusion that such awareness did not necessarily constitute reliance on an obviously unreliable source. True to its method, the majority discards the evidence in the record mitigating the view that reliance on Comnas was an act of recklessness. As Tyler knew, Tavoulareas had told the SEC that "our people had every confidence in the world" in Comnas. RE 2446. Similarly, on Mobil's behalf Paul Wolfe wrote Tyler of Tavoulareas' "long personal acquaintance with G. Comnas" and "Mobil's recommendation" of Comnas. RE 2345. Tyler had also read Comnas' testimony to congressional investigators, which corresponded to his statements to Tyler. RE 2129-2131, 2467-2745. The majority maintains that Tyler must have known of rumors about Comnas being involved in scandals. However, except for Piro's statement the majority is unable to point to a shred of evidence suggesting Tyler's knowledge of these rumors. Instead, it asserts that Kousi must have told Tyler of rumors involving Comnas even though Kousi never offered such testimony. Maj. op. at 129. As Judge Gasch found, Tyler's knowledge of Comnas' background, placed in the context of the evidence in the record rather than the majority's skewed presentation, fails to assume the great probative weight that the majority seeks. Cf. St. Amant v. Thompson, supra, 390 U.S. at 733, 88 S.Ct. at 1326 (reliance on a dissident union member's comments about the union leadership did not amount to "evidence in the record of [the dissident's] reputation for veracity").
 
 
 435
 Critically, whatever Tyler's knowledge of Comnas' background, the majority finds an "absence of * * * corroboration" for Comnas' statements. Maj. op. at 129. However, as Judge Gasch found, "[M]uch of Comnas' information was independently verified by other sources whose credibility even the plaintiff does not now challenge." 567 F.Supp. at 656. For instance, the majority directs its attention to Comnas as the source of the Post statement that "Tavoulareas 'set up' Peter by 'personally urging' his inclusion in Atlas." Maj. op. at 129. Yet the evidence in the record is clear that former SAMARCO director Kousi, whose credibility has not been challenged, told Tyler that the hiring of Peter was a "nepotistic act." RE 1165, 1237, 1927-1928. The majority summarily and unjustifiably rejects this evidence because Kousi's deposition contained "no supporting facts" for this conclusion. Maj. op. at 129 n. 45. Given Kousi's position, knowledge, and undisputed veracity, his comment should be credited as corroboration of Comnas; it is at least a significant piece of evidence that compels greater attention and weight than the majority accords it. Furthermore, as noted, Comnas' statement was also at least partially corroborated by Tavoulareas' SEC testimony about his recruitment of Comnas and knowledge of Comnas' business relationship with his son. RE 2424-2425. On behalf of Mobil, Wolfe also confirmed that Tavoulareas had played a major role in establishing SAMARCO and Atlas and in recruiting Comnas. RE 2344-2345. The record thus shows that Tyler corroborated the major pieces of information provided by Comnas. The use of questionable sources does not contribute to a finding of actual malice when the writer "used nothing from it that was not also found in his other sources." Ryan v. Brooks, supra, 634 F.2d at 733.
 
 
 436
 (b) Piro. Judge Gasch found that Piro "was not a primary, or even a secondary, source for the November 30 article." 567 F.Supp. at 657. In contrast, the majority points to three statements for which it claims that Piro was an important source. The various sources for two of these statements--that Tavoulareas "personally dispatched" Hoffmann and that he "personally urged" Peter's inclusion as a partner--have been discussed at length. The third statement--that Tavoulareas expressed an interest in "giving Peter a little nudge to get him along"--was specifically attributed to Piro; Piro's estrangement from the family was clearly noted; and Tavoulareas' denial was fully reported. p 29. Moreover, the record is clear that Tyler chose not to use information provided by Piro which he could not corroborate from other sources. Under these circumstances, the quoting of Piro failed to establish a reliance on unreliable sources that carries significant probative weight in establishing actual malice by clear and convincing evidence.
 
 Summary
 
 437
 Tyler and the Post editors had various sources of information before them supporting a belief in each of the challenged statements. Most of the factors cited by the majority are insubstantial or inappropriate; the Peterson memo and the reliance on sources simply do not establish clear and convincing evidence of knowledge or reckless disregard of falsity. In short, the majority's "wall" is a house of cards that collapses under the rigorous scrutiny demanded by precedent and principle.
 
 
 438
 IV. TAVOULAREAS' STATUS AS A LIMITED PURPOSE PUBLIC FIGURE
 
 
 439
 The actual malice standard, of course, must be met only if Tavoulareas is a public figure, or for punitive damages if he is a private person. Gertz v. Robert Welch, Inc., 418 U.S. 323, 342, 350, 94 S.Ct. 2997, 3008, 3012, 41 L.Ed.2d 789 (1974). Gertz also established two types of public figures: general purpose, those of "general fame or notoriety in the community, and pervasive in the affairs of society," id. at 352, 94 S.Ct. at 3013, and limited purpose, those who "have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." Id. at 345, 94 S.Ct. at 3009.
 
 
 440
 Judge Gasch determined, on the basis of this circuit's controlling opinion in Waldbaum v. Fairchild Publications, Inc., 627 F.2d 1287 (D.C.Cir.1980), that Tavoulareas was a limited purpose public figure. Though the majority finds it unnecessary to reach the issue because of its conclusion that the defendants acted with actual malice, it expresses reservations about this determination. See maj. op. at 103 n. 12. I believe that Judge Gasch's analysis was eminently sound and fully supported by the evidence in the record.
 
 
 441
 Waldbaum sets forth the standards for determining public figure status. "[T]he general public figure is a rare creature," 627 F.2d at 1292, because general public figure status must be supported by " 'clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society.' " Id (quoting Gertz v. Robert Welch, Inc., supra, 418 U.S. at 352, 94 S.Ct. at 3013). Limited public figure status is determined by a three-prong test: (1) "the court must isolate a public controversy," id. at 1296, (2) "the court * * * must analyze the plaintiff's role in it," id. at 1297, and (3) "the alleged defamation must have been germane to the plaintiff's participation in the controversy." Id. at 1298.
 
 
 442
 Judge Gasch determined that all three prongs of the Waldbaum test were met. For the first prong--the public controversy requirement--he concluded, "[T]he Court is convinced that defendants have established the existence of a public controversy over Mobil's (and William Tavoulareas') business dealings in Saudi Arabia and also over Mobil's (and William Tavoulareas') role in SAMARCO and its business--through SAMARCO--with Atlas prior to the publication of The Post's two articles on the subject." Memorandum Opinion of District Court in Civil Action No. 80-3032 filed July 26, 1982 (Mem.Op.) at 7, RE 715 (emphasis in original). The evidence submitted by the defendant leaves no doubt that Tavoulareas eagerly sought and obtained the public spotlight to advocate views on relations with Saudi Arabia,[21] and to feature Mobil's efforts in Saudi Arabia, including the SAMARCO relationship.[22] This controversyMobil's dealings with Saudi Arabia in general and SAMARCO in particular--thus clearly met the Waldbaum standard for establishing a public controversy. "[T]he issue was being debated publicly and * * * it had foreseeable and substantial ramifications for non-participants," 627 F.2d at 1297--as Tavoulareas repeatedly stressed in his public remarks. "In coming forward to play a prominent role in a heated controversy he rendered himself a public figure--someone who might expect public commentary both admiring and, as is not uncommon when passions run high and substantial interests are at stake, of a hurtful and perhaps unfair nature." McBride v. Merrell Dow & Pharmaceuticals, Inc., supra, 717 F.2d at 1466.
 
 
 443
 The second and third prongs are sufficiently indisputable as to merit only brief discussion. The second prong concerns Tavoulareas' role in the public controversy: "William Tavoulareas undeniably played an important role at least in the conception of Samarco as a joint American-Saudi Arabian Shipping concern and in the formulation of the idea for an independent ship management company in the nature of Atlas. He also is the chief architect of Mobil's special relationship with the Saudi Arabians." Mem. Op. at 7, RE 715. Similarly, the third prong is also clearly satisfied: "[T]he alleged defamation unquestionably concerned one aspect of the overall Mobil-Saudi Arabian relationship or, more narrowly, of the specific Mobil-Atlas-Samarco relationship." Id.[23]
 
 
 444
 Furthermore, Tavoulareas' leadership on a broad range of public issues is at least noteworthy. He has taken great pride in the role of public advocate and has urged others to follow his, and Mobil's, lead.[24] This leadership role has been especially conspicuous on energy issues.[25] Such leadership is particularly significant because Tavoulareas commands media attention and space virtually at will. Indeed, Tavoulareas has relished Mobil's extensive publicity operation, including its ability to purchase response space in major newspapers. See RE 393. He thus has the capacity for "self-help" that the Supreme Court has recognized as an important attribute of a public figure. Gertz v. Robert Welch, Inc., supra, 418 U.S. at 344, 94 S.Ct. at 3009.
 
 
 445
 It is instructive to compare Tavoulareas and Mobil with the plaintiff and his company in Waldbaum. The court judge Waldbaum to be a limited purpose public figure because Waldbaum " 'did not become merely a boardroom president whose vision was limited to the balance sheet. He became an activist, projecting his own image and that of the cooperative far beyond the dollars and cents aspects of marketing.' " 627 F.2d at 1300 (quoting District Court). On a far broader scale and with far more success, Tavoulareas also became an activist and projected an image far beyond the dollars and cents of oil marketing.[26]
 
 V. GOLDEN
 
 446
 I concur in the judgment affirming the j.n.o.v. with respect to Golden. I concur, however, not only because I share the publication concerns raised in the majority opinion, but also because I am convinced that the record does not contain clear and convincing evidence of actual malice on Golden's part.
 
 VI. PIRO
 
 447
 Tavoulareas claims that three of Piro's statements are false and defamatory: (1) that William Tavoulareas set up his son as a partner in Atlas; (2) that William Tavoulareas arranged for Peter's first job with C.M. Lemos & Company; and (3) that Tavoulareas dispatched a senior executive to help run Atlas. Brief for appellant at 29.[27]
 
 
 448
 The majority again misconstrues Judge Gasch's opinion. Judge Gasch, while noting that Piro poses "a more difficult question of the existence of actual malice" than the Post defendants, Memorandum-Order of District Court in Civil Action No. 80-2387 filed May 29, 1983, at 2 n. 2, RE 766, properly emphasized the lack of clear and convincing evidence of knowledge or reckless disregard of falsity.
 
 
 449
 In stating that Tavoulareas set up his son, Piro knew that Peter Tavoulareas had received a lucrative job in a concern that was involved in a business relationship with Mobil, which William Tavoulareas headed. RE 907. The majority ignores this knowledge. As a result the majority misconceives the meaning of Piro's ignorance of the complexities of the Mobil-SAMARCO-Atlas transactions. For the point is not that statements made in ignorance are automatically protected; rather, the point is that the ignorance, in conjunction with his knowledge, did not provide evidence of knowledge or reckless disregard of falsity.
 
 
 450
 For the statement about Peter's job, Piro knew that Lemos was a friend of the Tavoulareas family and that Peter obtained a job at his firm. RE 899. Indeed, in his SEC testimony Tavoulareas testified that he played no role in Peter getting the job, but conceded that Lemos "was a personal friend" and "must have known he was my son." RE 2414. Though Piro did not know any further details, this ignorance, considered with his knowledge, does not provide the necessary affirmative evidence of actual malice.
 
 
 451
 Finally, the statement about dispatching an executive poses the hardest question, but it also fails to establish actual malice. Piro said that he overheard Tavoulareas telling Checket he had personally dispatched Hoffmann. RE 2089-2090. Checket testified that he did not recall this conversation. RE 1844. Yet even if Checket's testimony is believed and Piro's disbelieved, there is no affirmative evidence that Piro knew of or recklessly disregarded falsity. As Bose stresses, 104 S.Ct. at 1966, disbelieving Piro's testimony is not affirmative evidence of the contrary proposition. The record contains no clear and convincing evidence that Piro's statement about the Checket conversation was based on actual malice, rather than on any number of possible other explanations--such as a misunderstanding or a mistake. Thus the third statement also fails to meet the high standard for actual malice emphasized in Bose. Though it is a far closer case for Piro than for the Post defendants, Tavoulareas has failed to prove by clear and convincing evidence that Piro's statements were made with knowledge or reckless disregard of falsity.
 
 VII. CONCLUSION
 
 452
 The central question is whether the Constitution's guarantee of free speech protects the disputed statements published by the Post. Tyler knew that Tavoulareas personally recruited his son's business associate to run a Mobil-conceived company and that Tavoulareas' son ultimately landed a lucrative partnership at the company; he wrote that Tavoulareas "set up" his son. Tyler knew that Tavoulareas personally participated in the arrangements for a transition in leadership at the Mobil-conceived company; he wrote that Tavoulareas "personally dispatched" the Mobil executive who assumed command of the company. Tyler knew that the Mobil plans called for Mobil ships to be managed by the Mobil-conceived company after being leased to SAMARCO; he wrote that Mobil "provided" ships to the company. These statements emerged in the course of an extensively researched 85-paragraph story, fully a fourth of which recounted Mobil's version of the disputed events. I have no doubt that the Constitution protects these statements in the circumstances under which they were made.
 
 
 453
 This is an extremely important First Amendment case. If this excessive jury verdict on these mundane, flimsy facts is upheld, the effect on freedom of expression will be incalculable. The message to the media will be unmistakable--steer clear of unpleasant news stories and comments about interests like Mobil or pay the price. Thus we will have created a class of untouchables and abandoned our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." New York Times Co. v. Sullivan, supra, 376 U.S. at 270, 84 S.Ct. at 721.
 
 
 454
 I respectfully dissent.
 
 
 
 [1]
 "[S]ome 12 or 14 other [oil] companies [were] establishing similar organizations ..." (Tr. 1090). One of defendants' principal witnesses, a former director of the shipping concern of Fairfield-Maxwell Ltd., John Kousi, stated in his deposition testimony that such circuitous leasing, in contemplation of Saudi preference laws, "was a commonly understood business idea at the time," devised as a means to capitalize on an opportunity to make substantial profits by using surplus tankers laid up by the world-wide depression in oil (Tr. 3220-22, 3263, 3167), and that Atlas could operate ships at less cost than Mobil (Tr. 3246)
 
 
 [2]
 Mobil stated that it wanted an independent shipping operation to avoid a conflict of interest between the shipping interests of Mobil and those of Fairfield-Maxwell Ltd. (Tr. 3126)
 
 
 [3]
 In January, 1974, William Tavoulareas notified Mr. Warner, Chairman of Mobil's Board of Directors, that "there was a chance of [his son Peter] participating in some kind of a venture with George Comnas" (Tr. 4135). Shortly thereafter, the transaction was disclosed to George Birrell, Chairman of Mobil's Conflict of Interest Committee (Tr. 1515-18). Atlas was organized in July, 1974 (Tr. 4427). Peter joined Atlas in August 1974 (Tr. 1521, 1958). On August 2, 1974, William Tavoulareas wrote a letter stating, "I will not make decisions" (Tr. 4136). And on the same date Mr. Wolfe wrote a letter "notifying the people in the [Mobil] organization on a need to know basis of Peter's participation" (Tr. 4136)
 
 
 [4]
 Hoffmann's name was reported as Herman Hoffmann in the Post's November 30 article
 
 
 [5]
 "Seven Sisters" is a colloquial term for the seven largest oil companies, one of which is Mobil
 
 
 [6]
 A second article was published on December 1, 1979, but the jury found that it did not defame either of the plaintiffs
 
 
 [7]
 E.g., the statement in p 31 of the article that "the Mobil president's son was graduated from St. Johns University in New York, where his father sits on the board of trustees," and the following parenthetical aside in p 68, immediately succeeding quotation of Mobil's statement that "the overriding selection criteria for [ship management] operations is the prospect of good, safe performance": "(Atlas has lost one ship ... which exploded and burned last May.... The ship was sold for scrap in July.)."
 
 
 [8]
 See discussion at pp. 133-134 infra
 
 
 [9]
 The district court's charge to the jury similarly instructed that William Tavoulareas' complaint contended that the articles reasonably implied:
 That he breached his fiduciary duties to Mobil. That he wasted and misused assets of Mobil. That he wrongfully diverted such assets to Peter Tavoulareas for his benefit, and four, that he committed criminal acts.
 (Tr. 4550).
 
 
 [10]
 The Washington Post Co. is a large multimedia corporation which has substantial broadcast holdings and which publishes magazines and newspapers, including the Post
 
 
 [11]
 Also named in the complaint was Post president Katharine Graham, but the district court dismissed the case against her, and the plaintiffs do not contest this. Accordingly, she is not a party to this appeal
 
 
 [12]
 We note, however, that the public figure determination in this case would not be free from difficulty. The Supreme Court has defined two classes of public figures. "General public figures" are those who are always, for every purpose, to be considered public figures; the class is small and specifically limited to those who have "general fame or notoriety in the community." Gertz v. Robert Welch, Inc., 418 U.S. 323, 351-52, 94 S.Ct. 2997, 3013, 41 L.Ed.2d 789 (1974). The district court rejected the suggestion that William Tavoulareas was an all-purpose public figure; in the absence of any evidence that William Tavoulareas was a household word prior to the Post's accusations, that determination appears correct. More common than general public figures, however, are "limited public figures," i.e., those who are public figures only with regard to certain issues. They are those who have "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved." Id. at 345, 94 S.Ct. at 3009 (emphasis added). The district court found that William Tavoulareas was a limited public figure
 The framework for analyzing limited public figures was set forth by this court in Waldbaum v. Fairchild Publications, Inc., 627 F.2d 1287 (D.C.Cir.), cert. denied, 449 U.S. 898, 101 S.Ct. 266, 66 L.Ed.2d 128 (1980). The court must (1) define the precise controversy involved, (2) analyze the plaintiff's role in the controversy, and (3) determine if the defamatory material was germane to the plaintiff's participation in the controversy. Id. at 1296-98. The difficulty in this case is finding any "particular public controversy" regarding the Mobil-Atlas-Samarco arrangement which existed before Tyler's story was published. A defendant obviously cannot create a controversy by publishing defamatory falsehoods and then escape liability by pointing to the resulting furor as evidence of a public controversy. The Post in its brief has proffered several "controversies" to which its article might be "germane," but without deciding the issue we note that on this record these are either virtually non-existent (e.g., the alleged "pre-existing public controversy" over the Mobil-Samarco-Atlas arrangements) or apparently unrelated to the subject of nepotism within Mobil (e.g,, the "debate" between energy conservationists and those favoring increasing oil imports, or the alleged public controversy over Mobil continuing to obtain oil from Saudi Arabia). Our disposition of the case, however, makes it unnecessary to reach these issues.
 
 
 [13]
 The Washington Post Co. is being sued in its corporate capacity. As a corporation, it acts only through its employees or other agents. These employees include in this case not only reporter Tyler, but all those responsible for the November 30 article. It is the state of mind of these persons that connects liability to the Post. We note that the jury was properly instructed in this regard (Tr. 4559)
 
 
 [14]
 Even though the trial judge may form opinions about the credibility of witnesses during the course of a jury trial, credibility cannot be a factor in granting a motion for judgment n.o.v. Morelock v. NCR Corp., 586 F.2d 1096, 1104 (6th Cir.1978) ("the trial court may neither weigh the evidence, pass on the credibility of witnesses nor substitute its judgment for that of the jury"), cert. denied, 441 U.S. 906, 99 S.Ct. 1995, 60 L.Ed.2d 375 (1979); 5A J. Moore, Moore's Federal Practice p 50.07 (2d ed. 1984) ("the motion for judgment n.o.v. may be granted only when, without weighing the credibility of the evidence, there can be but one reasonable conclusion as to the proper judgment"). A judgment n.o.v. is particularly inappropriate where the case depends on witness credibility. Cf. Polehmus v. Water Island, Inc., 252 F.2d 924, 928 (3d Cir.1958). On review, an appellate court need not defer to any credibility findings used by the trial judge to support a grant of judgment n.o.v., but any such credibility findings could indeed be grounds for reversal
 
 
 [15]
 The Supreme Court noted:
 The factual portion of the District Court's opinion may fairly be read as including the following findings: (1) Seligson's [the defendant's engineer's] actual perception of the apparent movement of the sound source at the time the [speaker] was tested was "along the wall" rather than "about the room"; (2) ... neither the "average reader," nor any other intelligent person, would interpret the word "about" to mean "across"; (3) Seligson is an intelligent, well educated person; (4) the words "about the room" have the same meaning for Seligson as they do for the populace in general; and (5) although he was otherwise a credible witness, Seligson's testimony that (a) he did not "know what made me pick that particular choice of words" and (b) that the word "about" meant what he had drawn on the board, is not credible.
 Id., 104 S.Ct. at 1965-66.
 
 
 [16]
 The Court recently reaffirmed this point in Patton v. Yount, --- U.S. ----, ----, 104 S.Ct. 2885, 2892, 81 L.Ed.2d 847 (1984), where it noted that where the determination is one of credibility, it is largely one of demeanor. The Court acknowledged, "[a]s we have said on numerous occasions, the trial court's resolution of such questions is entitled, even on direct appeal, to 'special deference,' " citing Bose. Id. This court has implicitly recognized this principle in Laebron v. Washington Metro. Area Transit Auth., 749 F.2d 893, 897 (D.C.Cir.1984). Even the dissent confesses that the "[c]redibility of a witness may be the most compelling case for deferring to the factfinder." Dissent at 149. The factfinder here was the jury
 
 
 [17]
 It would not be valid to argue that the obfuscatory reading must be adopted or else the factfinder's credibility-based determination on the ultimate issue itself would have to be accepted, thus destroying the core holding of the case. It is possible for a credibility determination to conclude the ultimate issue for the defendant (which would not of course trigger any requirement of independent review) but not against him. Only the defendant can testify of his own knowledge as to his state of mind. Thus, the jury may choose to believe the defendant's assertion that he did not know the falsity of the statement; it would not be permitted to consider the conclusory statement of someone else that he did
 
 
 [18]
 As the dissent notes, see Dissent at 146, 148, the Supreme Court in Bose stated that judges must make "an independent assessment ... of the evidence germane to the actual malice determination." Bose, 104 S.Ct. at 1967 n. 31. But the Court was not announcing some novel rule. It noted expressly that the rule in Bose, which originally was used for defamation cases in New York Times v. Sullivan, had been applied "uncounted times before." Bose, at 1966. The Guam Federation-Alioto line of cases was decided in light of this standard. See Guam Federation, supra 492 F.2d at 442; Alioto, 519 F.2d at 780. The Bose court did not even mention these cases, much less cast any doubt upon their continued vitality. Absent some clear signal from the Court, we are reluctant to read Bose as overruling, sub silentio, such a well-reasoned and well-established line of authority
 
 
 [19]
 We make it clear that in no way will jury verdicts in libel cases be protected by indulging in unreasonable inferences on appeal. No set of inferences could transfigure an otherwise inadequate factual record into a clear and convincing finding of actual malice. The inferences drawn must be reasonable. Schneider v. Chrysler Motors Corp., 401 F.2d 549, 555 (8th Cir.1968) ("plaintiff ... is not entitled to the benefit of unreasonable inferences, or inferences at war with undisputed facts")
 Moreover, as our discussion indicates, in performing our constitutionally prescribed function we conduct our own independent review of the whole record under the mandate recently reaffirmed by the Supreme Court in Bose in conjunction with the established rule for awarding a judgment n.o.v. While fully embracing the independent review standard, the dissent ignores the important fact that we are reviewing a jury verdict set aside by a judgment n.o.v. This is revealed in the dissent's curious and frequent citations to the "findings" of the trial judge and the dissent's suggestions that those "findings" somehow control our review. See e.g., Dissent at 151, 152, 156, 157, 159, 160, 161-62. The dissent thus takes two wholly contradictory positions. It is precisely because this court is independently reviewing the whole record that it cannot be bound by any "findings" of the trial judge where, as in this case, the case was tried to a jury, not to the trial court. The trial judge reviewed the evidence once. Now this court must undertake anew that same review independently of the review already conducted by the district court judge. To be bound in the manner suggested by the dissent would "cabin" our review and render it meaningless, see Dissent at 146, requiring of this court the impossible task of independent review while still being bound by the district court's findings in support of the judgment n.o.v. Thus the standard of review the dissent proposes is impossible to follow: it contradicts not only Supreme Court precedent, but itself as well, and could not be followed without espousing the most blatant solecisms.
 
 
 [20]
 At trial William Tavoulareas presented evidence that his previous reputation for honesty, integrity, and fair dealing (Tr. 1510-13, 1947-48) was injured by the November 30 article by introducing additional defamatory publications spurred by its publication (Tr. 1977-84, 1995-2018, 2037, 2139-54)
 
 
 [21]
 Peterson interpreted the article to charge Atlas was "a $680,00 [sic]-a-year plaything for an indulged son" and in reacting to the article wrote that "[i]t's impossible to believe that [William] Tavoulareas alone could put together such a scheme for the sake of his son's business career" (J.A. 2486). Tyler's responsive memorandum stated:
 Our story does show that Mobil's decisions in this case were not made for the traditional business reasons, or for the reasons stated by Mobil.... It should not seem impossible that Mobil--which originally turned down a chance to join Samarco--changed its mind after it dawned on Mobil's president that such a partnership would justify the creation of a small management firm at a time when Tavoulareas' son was aspiring to such a career and was already at work with one of the Greek shippers.
 (J.A. 2489-90).
 
 
 [22]
 Discussion of falsity can be found, among other documents, principally in the following: Supplemental Memorandum of Points and Authorities in Support of Alternative Motions of Defendants Post and Tyler, Tavoulareas v. Washington Post Co., Civ. No. 80-3032, Doc. 367 (D.D.C. Oct. 1, 1982); Reply of Defendants Post and Tyler to Plaintiff's Opposition to Alternative Motions, id., Doc. 377 (Nov. 23, 1982); Supplemental Post-Argument Memorandum of Defendants Post and Tyler, id., Doc. 380 (Jan. 23, 1983); Points and Authorities in Support of Motion of Defendant Piro for Judgment n.o.v., Tavoulareas v. Piro, Civ. No. 80-2387, Doc. 348 (D.D.C. Aug. 4, 1982); Plaintiff's Memorandum of Points and Authorities in Opposition to Alternative Motions of The Washington Post and Tyler for (1) Judgment n.o.v., (2) New Trial, or (3) Reduction in the Amount of the Judgment, id., Doc. 372 (Nov. 1, 1982); Plaintiff's Memorandum of Points and Authorities in Opposition to Motion of Defendant Piro for Judgment n.o.v., id., Doc. 371 (Nov. 1, 1982); Hearing (Revised Transcript) 8-13, 62, 74-77, id. (Dec. 16, 1982)
 
 
 [23]
 See note 16 supra and accompanying text
 
 
 [24]
 William Tavoulareas testified that he told his superiors: "It's not a question of helping my son, it's now a question of not standing in his way. I have nothing to do with this thing. George Comnas is asking him [Peter]" (Tr. 1293-94)
 
 
 [25]
 Defendants also point to a memorandum prepared by the staff of the House Subcommittee on Energy and Power. That memorandum, however, summarizes Comnas' statements to subcommittee staff members made during an interview at Comnas' home (J.A. 2467, 2471). Thus, its sole source of truthfulness is Comnas
 
 
 [26]
 Comnas' motivation to offer Peter a position in Atlas may not have been that William had urged it, as appellees assert occurred, but could easily have been that Comnas hoped by doing so he would curry favor with Peter's father, as appellant argues. This is a reasonable inference which the jury was entitled to draw from the evidence
 
 
 [27]
 Questioning of Paul Wolfe included the following:
 Q. Mr. Wolfe, if anyone dispatched Harmon Hoffmann to London to help with Atlas, who did it?
 A. I did.
 (Tr. 1098).
 
 
 [28]
 Tavoulareas does not deny that Mobil, qua Mobil, sent Hoffmann to Atlas. Given the theme of the article that William Tavoulareas personally "set up" his son, the distinction between whether Mobil or Tavoulareas personally sent Hoffmann achieves crucial importance
 
 
 [29]
 Contrary to any hints by the dissent, our conclusion as to falsity does not "ignore" any evidence presented at trial. For example, regarding the statements made to Tyler by Wolfe and Kousi, and Tavoulareas' own SEC testimony, as explained here and as amplified infra in the actual malice discussion, Wolfe merely confirmed that when Mobil began to form an independent shipping company Tavoulareas was involved in recruiting Comnas, and Kousi had no personal knowledge to support his statement that the hiring of Peter Tavoulareas by Comnas was a "nepotistic act." The jury was entitled to find that such circumstantial evidence was clearly outweighed by William Tavoulareas' SEC testimony, which--far from providing evidence that he "set up" his son--denied any role in setting up Peter, and by the testimony of the plaintiffs and other Mobil officers
 
 
 [30]
 The fact that a witness is an employee of a litigant is in itself reason for discounting his evidence. As the Supreme Court explained:
 If the evidence is possible of contradiction in the circumstances; if its truthfulness, or accuracy, is open to a reasonable doubt upon the facts of the case, and the interest of the witness furnishes a proper ground for hesitating to accept his statements, it is a necessary and just rule that the jury should pass upon it.
 Chesapeake & Ohio Ry. v. Martin, 283 U.S. 209, 218, 51 S.Ct. 453, 456-57, 75 L.Ed. 983 (1931) (employee of party as interested witness).
 
 
 [31]
 Peterson described her job as "copy editor" as "basically edit[ing] a story for style, punctuation, grammar, check[ing] what facts can be checked, with source material at hand, things like the population of the State of Utah or the area of Lake Superior, that sort of thing." 567 F.Supp. at 654. (In weighing Peterson's credibility, the jury doubtless realized that the Post defendants and their employee, Peterson, would have an obvious motive to downplay the importance of her job.)
 
 
 [32]
 This is particularly true since the net result of minimizing Peterson's role is so obviously favorable to the defendants. She was the only editor who recorded doubts about the article's accuracy; it is thus plainly in the defendants' interest to show her as isolated as possible from editorial responsibility
 
 
 [33]
 Such serious doubt evidences actual malice:
 [R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice.
 St. Amant v. Thompson, supra, 390 U.S. at 731, 88 S.Ct. at 1325.
 
 
 [34]
 The dissent rejects the idea that motive can be evidence of actual malice when it is not an element of the tort. Dissent at 153 n. 11. The distinction, however, is akin to that between motive to kill (e.g., greed or hatred) and intent to kill in a murder prosecution. They are not the same thing. The second is an element of the crime of murder; the first is evidence admissible to prove that element
 
 
 [35]
 Piro's happy laughter at the thought of William Tavoulareas getting fired--recorded on one of the Golden tapes--exemplifies his ill will toward his former father-in-law. See note 37 infra
 
 
 [36]
 The story by Tyler and Neumann in the Post stated:
 While American motorists were waiting in gasoline lines earlier this year, U.S. oil firms were importing 9 percent more crude oil than they did in 1978.
 ....
 None of the company officials offered an explanation of how this summer's gasoline shortage was touched off in the face of fast-growing imports.
 "We at Mobil don't make or create gasoline lines, that's an industry phenomenon," said Bonner Templeton, a vice-president for supply and distribution.
 Washington Post, Aug. 29, 1979, at 1. The story thus implies that Templeton could offer no explanation for the perceived phenomenon. Templeton wrote, rather angrily, to the Post:
 I was astounded to read ... that "none of the company officials [interviewed] offered an explanation of how this summer's gasoline shortage was touched off in the face of fast-growing imports." I was astounded because I was one of the officials interviewed, and spent an hour and a quarter answering all of the reporters' questions and attempting to explain what they saw as a discrepancy....
 Apparently, Messrs. Tyler and Neumann did not 1) agree with or 2) understand my explanation. For whatever reason, they did not deem it important enough to include in the story. But to go a step further and contend that I did not even offer one is outrageous.
 ....
 The petroleum business is a complex one, and we don't expect everyone to understand it. But we do expect more responsible reporting than the assertion that we were at a loss to explain something we had explained in detail.
 Washington Post, Sept. 26, 1979, at A-24 (letter to the editor of Bonner Templeton).
 
 
 [37]
 GOLDEN: Why are you convinced that [Warner] doesn't know [about the Tavoulareas-Atlas connection]?
 PIRO: Uh, because he strikes me as such an honest guy; a guy who's really above suspicion, you know? And he's not a greedy guy at all, you know? He's nice guy.
 GOLDEN: What do you think's gonna happen if in fact he doesn't know?
 ....
 PIRO: I don't know; that's pure speculation. But I know that if I was in his position I probably wouldn't be very happy. (Laughs.)
 GOLDEN: Yeah.
 PIRO: What do you think Sandy?
 GOLDEN: Oh, I think he's gonna have to ... get rid of your father-in-law.
 PIRO: (Laughs.)
 GOLDEN: I think he's gonna have to worry about the ... stock market, too.
 Ex. 308-034801 (Side 1).
 
 
 [38]
 It seems likely that to most hearers, this phrase would refer to the kind of high-profile expose pieces that shock and startle readers, i.e., might make them exclaim involuntarily. Woodward explained that he actually used the phrase to describe stories that were merely "[u]nusual, and perhaps surprising, and relevant and of consequence" (J.A. 2178)--i.e., as a virtual synonym for "newsworthy." To an ordinary observer, however, the phrase would connote an article with more extreme charges than the ordinary run of front-page fare. The jury, which was able to observe Woodward's demeanor throughout his testimony, was not required to believe his explanation of what he meant by using a particular phrase--particularly when that explanation is not the most likely inference
 
 
 [39]
 We obviously are not suggesting that there is something wrong with aggressive investigative reporting, especially where public corporations or public officials are involved. The exposure of wrongdoing by individuals, and especially by public individuals, is one of the highest functions of the press in our society. Newspapers provide a vital service by acting as watchdog for the public. This interest is protected by The New York Times actual malice standard. It is not further protected by requiring the jury to blind itself to evidence of editorial pressure for sensationalistic stories
 
 
 [40]
 The Post argues in a footnote that Rebozo, if it applies at all, must be limited strictly to summary judgment motions, not judgments n.o.v. Brief of Post at 63 n. 52. The two motions are of course, distinguishable. But the Post offers no rational explanation for why this evidence (when alleged) is relevant to whether the parties must go to trial, but (when proved) is irrelevant to whether the case can go to the jury. If the evidence when proved would be irrelevant, it would be equally irrelevant on a motion for summary judgment. The converse is also true
 
 
 [41]
 The dissent does not question that the selective omission of certain facts can create a false and defamatory meaning. Indeed, in the opinion-fact context my dissenting colleague joined in a dissenting opinion that stated:
 The author's recountal of some background facts normally creates the inference that there are no other facts pertinent to the opinion expressed; absent some contrary indication, recipients of the communication would naturally derive that understanding.... [I]t incorporates a falsehood by inference. The communication is really a false and defamatory representation that, squarely on the basis of such facts as were disclosed, the subject of the comment is guilty of the defamatory behavior charged.
 Ollman v. Evans, 750 F.2d 970, 1027 (D.C.Cir.1984) (en banc) (Robinson C.J., dissenting, joined by Wright, J.) (footnote omitted).
 
 
 [42]
 Wolfe's written statement to Tyler said only that William Tavoulareas "played a minor role" in the departure of Comnas, and that Mobil had made Hoffmann available to act as interim manager of Atlas. The allegation that Tavoulareas "personally dispatched" Hoffmann is dependent entirely upon Piro and the questionable notes on Tyler's conversation with Checket--which Checket's testimony categorically denies
 The dissent claims that Tyler's third source--Wolfe's confirmation--supports the "personally dispatched" statement. Dissent at 159 n. 18. But far from providing the support that the dissent would like to accord it, Tyler's testimony states only that "Paul Wolfe had confirmed that Mr. Hoffmann had spent a period of time at Atlas in 1975 after Mr. Comnas had departed" (Tr. 3720).
 
 
 [43]
 The defendants thus presumably would have us infer that the phrase "a source close to the Tavoulareas family" was inserted simply to add an illusion of extra veracity by falsely implying that the information was obtained from multiple sources
 
 
 [44]
 Woodward and Greider concurred. Woodward testified that Comnas was the Post's "key witness" and that "[s]o much of this seems to hinge on George Comnas" (J.A. 2181, 2193). Greider testified that Comnas was a "very important source" and the "principal source" for the story (J.A. 1895, 1904)
 
 
 [45]
 The defendants rely heavily on John Kousi's opinion, quoted in the story, that Peter's involvement in Atlas was a "nepotistic act." But while Kousi's deposition (used at trial) acknowledges his use of that phrase, it contains no supporting facts to demonstrate the basis for Kousi's statement that William Tavoulareas was involved in setting up Peter in Atlas, and provides no support for the assertion that William personally urged Comnas to bring Peter in as a partner. It is clear from his deposition that he had no particular knowledge of how Peter originally came to be involved in Atlas, and he did not purport to offer more than his opinions on the subject. Those opinions, while possibly relevant, provided no evidentiary foundation for Comnas' assertion that William "personally urged" that his son be included in Atlas
 
 
 [46]
 The "scandal in Italy" apparently involved solicitation of bribes and involvement in illegal payments while working for Exxon in Italy
 
 
 [47]
 There was further evidence, introduced through Kousi's deposition, that Comnas was unable to get along with the Saudi partners in Samarco, that he had denigrated the educability of Saudis, and that none of the Saudi partners considered Comnas capable of running Atlas adequately (J.A. 1991-94)
 
 
 [48]
 Again, as with most circumstantial evidence, reliance on the unsupported testimony of biased witnesses is not sufficient in and of itself to prove actual malice, but must be considered with the totality of the other evidence
 
 
 [49]
 Indeed, Golden and Piro speculated on the telephone that the revelations might cause Tavoulareas to be dismissed from his position as president of Mobil
 
 
 [50]
 The dissent asserts that the defendants were under substantial time pressure to produce the story because a congressional committee would soon release some information and there was a possibility that the rival New York Times might come out with the story. Dissent at 160. But this sort of self-generated time pressure--the fear that someone else will preempt the "scoop"--almost always exists. To hold that it was exculpatory would exalt the time pressure excuse into an absolute defense in every case. It would also reward the least responsible journalists, permitting them regularly to scoop their more careful colleagues, making the scoop itself the justification for their recklessness and generally debasing the journalistic coinage
 
 
 [51]
 It is likewise true that refusal to retract may, in certain circumstances, be evidence that there was no actual malice: the refusal may show that the publisher believed and still believes that the falsehood was true. That a particular piece of evidence may point both ways, however, does not mean that it is not evidence. The reasonableness of the refusal (e.g., how strong was the showing of falsity?) might be some indication of which inference was more likely. When a given fact is susceptible of two reasonable inferences, it is for the jury to determine which one it will adopt. See Time, Inc. v. Hill, 385 U.S. 374, 394 n. 11, 87 S.Ct. 534, 545 n. 11, 17 L.Ed.2d 456 (1967). The jury here made that determination adverse to defendants
 
 
 [52]
 In light of Tyler's perceived mischaracterization of statements by Mobil officials in a previous article, see note 36 supra, the insistence of Mobil officials on giving written responses to written questions, which they did, does not appear to be wholly unreasonable
 
 
 [53]
 The falsity and defamatory character of these slanders has been discussed in section III supra. Suffice it to say that when these accusations are viewed in their entirety, as they must be, they essentially charge that William had breached his trust to Mobil's shareholders by using Mobil's assets for his son's benefit
 
 
 [54]
 The district court found: "He [Piro] was totally unaware of the financing arrangements for the various companies, and had never heard of Samarco or the Alireza family" (J.A. 767; Tr. 2899-2912)
 
 
 [55]
 In Varnish, the Second Circuit noted that the "[e]vidence of recklessness consist[ed] largely of the author's testimony ... that he had no basis" for key statements in a defamatory article. 405 F.2d at 612. A jury verdict for the plaintiff was affirmed. In Manale v. City of New Orleans, 673 F.2d 122, 124 (5th Cir.1982), the court found malice in the fact that the defendant had no basis for asserting that a police officer was a homosexual. (It is not clear from the opinion whether the actual malice test of New York Times was applied.)
 
 
 [56]
 In reinstating the verdict for William Tavoulareas against defendant Piro, we note an issue not raised by the parties--namely, the issue of "republication liability." William Tavoulareas had sued Dr. Piro not only for slander, but for republication libel as well (the Post's printing of the slanders Piro uttered to the Post reporters). The jury returned a general verdict in favor of William Tavoulareas. Should the verdict be based in part on a finding of republication libel, it poses no problem on our review. The maker of a slanderous statement may be held accountable for its republication if such republication was reasonably foreseeable. L. Eldredge, The Law of Defamation Sec. 46 (1978); Restatement (Second) of Torts Sec. 576 (1977), cited in Ingber v. Ross, 479 A.2d 1256, 1269 (D.C.App.1984) (dictum). Here, Piro conveyed his slanders to Golden and Tyler, whom he knew to be newspaper reporters. Under the circumstances here it was reasonably foreseeable that as reporters they might republish the statements in a news story. Accordingly, there is no need to require proof that Piro knowingly participated in the Post's republication. As our following discussion of the liability of reporter Golden suggests, we distinguish, for purposes of republication liability, between the liability of the maker of the statement and the liability of one who republishes those statements, here to a reporter for possible use in a story that will presumably be investigated further
 
 
 [1]
 The majority's conclusions on the use of summary judgment in First Amendment cases, maj. op. at 104, represent dicta extraneous to the appeal before us. I note only that the majority's interpretation may well conflict with the clear law of this circuit, see McBride v. Merrell Dow & Pharmaceuticals, Inc., 717 F.2d 1460, 1467 (D.C.Cir.1983); Washington Post Co. v. Keogh, 365 F.2d 965, 968 (D.C.Cir.1966), cert. denied, 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548 (1967), but that question is for another day when the issue emerges in the case before the court
 
 
 [2]
 See, e.g., Cox v. Louisiana, 379 U.S. 536, 546-548 & n. 7, 85 S.Ct. 453, 459-460 & n. 7, 13 L.Ed.2d 471 (1965) (review of record leads Court to independent inferences about ambiguous events); Haynes v. Washington, 373 U.S. 503, 515-516, 83 S.Ct. 1336, 1344, 10 L.Ed.2d 513 (1963) ("we cannot avoid our responsibilities by permitting ourselves to be 'completely bound by state court determination of any issue essential to decision of a claim of federal right, else federal law could be frustrated by distorted fact finding' ") (quoting Stein v. New York, 346 U.S. 156, 181, 73 S.Ct. 1077, 1091, 97 L.Ed.2d 1522 (1953)); Moore v. Michigan, 355 U.S. 155, 164, 78 S.Ct. 191, 196, 2 L.Ed.2d 167 (1957) (review of record leads to different "inference of fact"); Pierre v. Louisiana, 306 U.S. 354, 358, 59 S.Ct. 536, 538, 83 L.Ed. 757 (1939) (in race discrimination cases Court has "solemn duty to make independent inquiry and determination of the disputed facts"); Herndon v. Lowry, 301 U.S. 242, 249, 57 S.Ct. 732, 735, 81 L.Ed. 1066 (1937) (Court rejects "inference" that might save trial court verdict); Norris v. Alabama, 294 U.S. 587, 590, 55 S.Ct. 579, 580, 79 L.Ed. 1074 (1935) ("whenever a conclusion of law of a state court as to a federal right and findings of fact are so intermingled that the latter control the former, it is incumbent upon us to analyze the facts in order that the appropriate enforcement of the federal right may be assured"); Fiske v. Kansas, 274 U.S. 380, 385-386, 47 S.Ct. 655, 656-657, 71 L.Ed. 1108 (1927) (Court reaches own "inference" about IWW preamble; Court must review state fact-finding "where a conclusion of law as to a Federal right and a finding of fact are so intermingled as to make it necessary, in order to pass upon the Federal question, to analyze the facts")
 That many of these decisions arose in review of state court decisions is irrelevant to the principles of appellate review they enunciate: "surely it would pervert the concept of federalism for this Court to lay claim to a broader power of review over state court judgments than it exercises in reviewing the judgments of intermediate federal courts." Bose Corp. v. Consumers Union of United States, Inc., --- U.S. ----, 104 S.Ct. 1949, 1959, 80 L.Ed.2d 502 (1984).
 
 
 [3]
 In Bose the Court rejected the notion that a different standard might apply to a jury trial. 104 S.Ct. at 1964, n. 27. Notably, two of the three Bose dissenters emphasized that their dissent was from the Court's conclusion about a bench trial. They conceded that a jury verdict of actual malice--as in the instant case--would compel independent appellate review. See id. at 1969 n. 2 (Rehnquist, J., dissenting) ("The fact-finding process engaged in by a jury rendering a general verdict is much less evidence to the naked eye and thus more suspect than the fact-finding process engaged in by a trial judge who makes written findings * * *.")
 Appellant's argument that the j.n.o.v. violates the Seventh Amendment is meritless. The constitutionality of j.n.o.v. determinations has long been settled. See Neely v. Martin K. Eby Construction Co., 386 U.S. 317, 322, 87 S.Ct. 1072, 1076, 18 L.Ed.2d 75 (1967); Baltimore & Carolina Line v. Redman, 295 U.S. 654, 660, 55 S.Ct. 890, 893, 79 L.Ed.2d 1636 (1935).
 
 
 [4]
 Bose repeatedly stressed the wide berth that must be accorded the actual malice inquiry in drawing the line between fact and mixed questions of fact and law. The Court emphasized that libel, like fighting words, incitement, obscenity, and child pornography, is an area in which "the limits of the unprotected category, as well as the unprotected character of particular communications, have been determined by the judicial evaluation of special facts that have been deemed to be of constitutional significance." 104 S.Ct. at 1962. See also id. at 1964 n. 27 (" 'the simple fact is that First Amendment questions of "constitutional fact" compel this Court's de novo review' ") (quoting Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 54, 91 S.Ct. 1811, 1825, 29 L.Ed.2d 296 (1971) (Brennan, J., plurality opinion))
 
 
 [5]
 In contrast to the apparent ease of the majority's distinction between the "manner" and "standard" of evaluating evidence, the Bose Court recognized the "vexing nature" of the necessary distinction between questions of fact and mixed questions of fact and law. 104 S.Ct. at 1960. See also Pullman-Standard v. Swint, 456 U.S. 273, 288, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982) (commenting on the absence of "any * * * rule or principle that will unerringly distinguish a factual finding from a legal conclusion"); Baumgartner v. United States, 322 U.S. 665, 671, 64 S.Ct. 1240, 1243, 88 L.Ed. 1525 (1944) (observing that the "recognized scope of appellate review is usually differentiated from review of ordinary questions of fact by being called review of a question of law, but that is often not an illuminating test and is never self-executing")
 
 
 [6]
 Despite the majority's assertion to the contrary, I do not assume that the District Court's conclusions and findings "somehow control our review." Maj. op. at 109 n. 19. The references to Judge Gasch's conclusions and findings are, of course, references to them as findings of law. Unquestionably, we undertake an independent review, just as Judge Gasch did. The references to Judge Gasch's analysis are useful only because of the logic, force, and acuity of his insights
 
 
 [7]
 Even if Bose did not impose a special responsibility of independent review in this case, I might find that the majority's approach violates long-standing principles for construing and evaluating inferences. "Inference is capable of bridging many gaps," Galloway v. United States, 319 U.S. 372, 386, 63 S.Ct. 1077, 1085, 87 L.Ed. 1458 (1943), but the inference must be reasonable and supported in the record. Id. See also Bechtel v. United States, 101 U.S. (11 Otto) 597, 600, 25 L.Ed. 1019 (1879) ("It would be a long stride in dialectics, and one we are not prepared to take, from this fact to the inference * * *."). In relying on inference "[s]peculation cannot take over where the proofs fail." In Re Sawyer, 360 U.S. 622, 628, 79 S.Ct. 1376, 1379, 3 L.Ed.2d 1473 (1959) (Brennan, J., plurality opinion). In "cumulating" inferences, moreover, a court should be especially vigilant in determining whether the inferences are supported by the record. Cf. People v. Galbo, 218 N.Y. 283, 294, 112 N.E. 1041 (1916) (Cardozo, J.) ("We may multiply inferences at times, but, in multiplying them, we must not refine and rarefy them beyond measure.")
 
 
 [8]
 As the majority notes, Tavoulareas also points to securities law allusions as false and defamatory, but, since those allusions were not specifically pleaded, they are not before the court as possibly libellous statements. See maj. op. at 127; see also note 16 infra
 
 
 [9]
 The majority, of course, necessarily discusses and decides falsity as well as actual malice. In doing so, it "assume[s] without deciding" that falsity, like the other elements of the constitutional inquiry, must be shown by clear and convincing proof. Maj. op. at 112. The majority's reticence is puzzling. Like actual malice, falsity must be shown by clear and convincing evidence. See Franklin & Bussell, The Plaintiff's Burden in Defamation: Awareness and Falsity, 25 WM. & MARY L.REV. 825, 864 (1984)
 
 
 [10]
 I emphasize again that Judge Gasch's opinion is instructive, not because of a legal principle of deference, but because of its analytical insight and clarity. See note 6 supra
 
 
 [11]
 Indeed, Justice Brennan, the author of the "actual malice" standard in New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), once suggested that jury instructions be framed strictly in terms of "knowing or reckless falsity" to avoid confusion of "actual malice" in the First Amendment sense with common law malice. Rosenbloom v. Metromedia, Inc., supra note 4, 403 U.S. at 52 n. 18, 91 S.Ct. at 1824 n. 18 (Brennan, J., plurality)
 The majority's contention that the question is analogous to the distinction between motive and intent in a murder prosecution, maj. op. at 118 n. 34, utterly misses the point. For the point in excluding ill will as an element of proof in actual malice is the Garrison principle that the admission of such proof chills free speech. It thus rests on important First Amendment concerns. No such principle bears in the murder analogy.
 As authority the majority cites two decisions from other circuits, two state cases, and a commentator. Maj. op. at 117-118. One of the decisions from another circuit--Bose Corp. v. Consumers Union of United States, Inc., 692 F.2d 189, 196 (1st Cir.1982), aff'd, --- U.S. ----, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984)--did not concern any allegation of ill will. To the extent that the decisions, and the commentary that recites them, conflict with the reading of Garrison set out above, I necessarily disagree with their interpretation and agree with Ryan v. Brooks, 634 F.2d 726 (4th Cir.1980). Furthermore, one of the most cited opinions of this circuit on actual malice emphasized the difference between common law malice and the requisite New York Times knowledge of falsity or reckless disregard of truth or falsity. "Malice, under the pre-Times practice, was equated with hostility, vindictiveness or negligent disregard of reputation. Under the Times test false statements made with these motives alone are not actionable; malic[e] may be shown only through knowledge of falsity or reckless disregard of truth or falsity." Washington Post Co. v. Keogh, 365 F.2d 965, 967 (D.C.Cir.1966), cert. denied, 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548 (1967). Nothing in Keogh suggested that pre-Times malice should be considered probative of actual malice under Times.
 The majority also cites Curtis Publishing Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). Butts relates to the muckraking point, which is discussed in detail in text at 153-55 infra.
 
 
 [12]
 See S. MORRISON, THE OXFORD HISTORY OF THE AMERICAN PEOPLE 814 (1965) ("Stephens and his fellow writers (such as Ida Tarbell who showed up Standard Oil, Upton Sinclair of The Jungle fame, and Ray Stannard Baker) * * * muckraked to good purpose, exposing the evils of city and state governments, unions, business, the drug trade, and whatever was curably wrong in divers segments of American life.")
 
 
 [13]
 Chief Justice Warren's comment provides little support for several reasons. First, the Chief Justice was quoting the magazine's self-description rather than setting forth a standard for evaluating probativeness of actual malice. Second, in reciting the Saturday Evening Post's self-definition he did not explicitly find such a policy probative of actual malice, and he subsequently recounted other evidence clearly probative of actual malice. Third, whatever the meaning of his reference, it is unclear how many Justices shared his view. No other Justice joined that part of his opinion. Justice Harlan's plurality opinion mentioned "sophisticated muckraking," 388 U.S. at 158, 87 S.Ct. at 1993, but that analysis is structured by a standard of reasonable care, rather than actual malice. Justices Brennan and White agreed that Chief Justice Warren's opinion presented evidence supporting a judgment of actual malice, but their agreement was in very general terms. Id. at 172, 87 S.Ct. at 2000 (Brennan, J., concurring in result)
 
 
 [14]
 Pape refers to a document that bristles with ambiguity, but Bose makes clear that Pape applies to ambiguous situations and events as well. 104 S.Ct. at 1966
 
 
 [15]
 The majority's reliance on Rebozo v. Washington Post Co., 637 F.2d 375 (5th Cir.1981), is misplaced. Rebozo is ill-conceived, contrary to Pape and Bose, and of weak precedential value. In concluding that resolution of ambiguities may be probative of actual malice, Rebozo did not even cite, much less consider, Pape, the governing Supreme Court decision on the subject. Instead, it offered cites to pages in New York Times Co. v. Sullivan, supra note 11, and St. Amant v. Thompson, 390 U.S. 727, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968), that merely recite the actual malice standard, 637 F.2d at 382
 
 
 [16]
 The only interpretation to which the majority specifically alludes is the reference to securities laws. Maj. op. at 126-27. The majority apparently attaches some weight to this reference, but declines to elaborate on the significance this reference is supposed to assume within the majority's grand scheme of "cumulation." Clearly, the reference adds nothing to a finding of knowing or reckless falsity. Virtually all of the sentences are completely accurate. The parties dispute whether the relevant securities regulation would have applied to Tavoulareas. It is undisputed, however, that a congressional hearing specifically addressing this question of securities law resulted in a debate between top SEC officials about whether full disclosure requirements would have attached even without the son living in the same household. See Securities Law and Corporate Disclosure Regulations, 1982: Hearings Before the Subcommittee on Oversight and Investigations of the House Committee on Energy and Commerce, 97th Cong., 2d Sess. 261-62 (1982). It is also undisputed that the Post reported Mobil's claim that it had fully compiled with securities law. p 11. The Post's description of a point of securities law so murky that top SEC officials could not agree on it hardly amounts to the significant role the majority seeks--evidence that contributes to a finding of clear and convincing proof of actual malice
 
 
 [17]
 At trial Wolfe also testified that Tavoulareas was present during the discussion about Comnas' departure. RE 1385. Wolfe was ambiguous about whether Tavoulareas had actually participated in the decision to dispatch Hoffmann. RE 1390-1394
 
 
 [18]
 The majority claims that Tyler testified that Piro and Checket were his only sources for the "personally dispatched" allegation. Maj. op. at 125. Yet Tyler specifically pointed to Paul Wolfe's confirmation as well. RE 2089. Furthermore, Mobil's response to Tyler is indisputably part of the record that is within the scope of our review, and the Post article itself reported much of the statement. paragraphs 79, 84
 
 
 [19]
 Indeed, New York Times specifically left open the question whether a failure to retract might ever be probative of actual malice, and limited its holding to determining that a failure to retract under the circumstances of the case clearly was not probative of actual malice. 376 U.S. at 286-88, 84 S.Ct. at 729-30
 
 
 [20]
 Cf. R. SACK, LIBEL, SLANDER, AND RELATED PROBLEMS 216 n. 175 (1980) ("Whether or not a communication is 'hot news' ought not to be overemphasized.")
 
 
 [21]
 See, e.g., RE 268, 271 (Tavoulareas' remarks to National Society of Security Analysts, Nov. 24, 1975: "Now, I'd like to talk about Saudi Arabia. You may have wondered why Mobil is giving so much attention to that country. * * * Saudi Arabia is where the oil is."); RE 288, 300 (Tavoulareas' remarks to Nomads Luncheon, Nov. 12, 1979: "All consuming governments should demonstrate appreciation to those moderate OPEC governments--particularly Saudi Arabia--that consistently play a restraining role in OPEC deliberations. This appreciation should take the form of public statements and preferential mutual-assistance programs."); RE 304, 309 (Tavoulareas' testimony before Subcommittee on Multinationals, Senate Foreign Relations Committee, June 16, 1974: "A government negotiated arrangement is vulnerable to a weakness which is not present with private negotiations. * * * Aramco has been able to continue operating in Saudi Arabia during the period when exports from Saudi Arabia to the United States were totally embargoed."); RE 326, 334 (Tavoulareas' testimony before Energy Subcommittee, Joint Economic Committee, June 2, 1976: "Generally, the Saudis have adopted more moderate positions on price than other OPEC members. * * * It is of vital importance to the interests of the United States and the rest of the free world that Saudi Arabia continue to feel justified in increasing production, even though it will thereby also continue to amass dollar surpluses."); RE 427, 429 (Tavoulareas quoted in Mobil press release, June 29, 1977: "[B]y providing services to the Saudis through participation in their projects, we expect to secure long-term access to additional crude and products.")
 
 
 [22]
 See, e.g., RE 274, 275-276 (Tavoulareas' remarks to Security Analysts Seminar, Sept. 28, 1977: "Mobil has taken a broad range of steps to improve its access to [Saudi Arabia's] vast reserves of hydrocarbons. * * * Mobil is a 45% partner with private Saudi interests in SAMARCO, a shipping company that transports crude and products under the Saudi flag."); RE 382, 386 (Tavoulareas' article in COLUMBIA JOURNAL OF WORLD BUSINESS, Summer 1977: "Mobil has shown a long-standing interest and commitment to Saudi Arabia through its involvement in Aramco and SAMARCO [and other projects]. Responding positively to Saudi Arabia's development plans and objectives, Mobil is working on a variety of projects that will benefit both Saudi Arabia and Mobil as well as the free world. * * * [SAMARCO and another marine venture] respond to Saudi Arabia's desire to develop its own shipping industry."); RE 430, 433 (Tavoulareas quoted in Mobil press release, Sept. 28, 1977: "Our Saudi Arabian ventures are economically attractive, besides strengthening our identity in that country.")
 
 
 [23]
 Having decided "not [to] reach the issue," maj. op. at 103, the majority cannot resist offering, in wholly conclusory terms, an assumption that flies in the face of precedent and logic. The majority's apparent view is that the third prong of Waldbaum is probably not satisfied because the controversy over SAMARCO is not germane to Tavoulareas' prominent public role as an outspoken advocate of Mobil's special relationship with Saudi Arabia. Id. at 103 n.12. This is akin to arguing that a vigorous public advocate of, for instance, night flights into National Airport would not be a public figure for purposes of a controversy involving a particular night flight for which the advocate bore substantial responsibility. Clearly, in this case and in the night flights example, the specific incident bears a sufficient relationship to the particular controversy to satisfy the Waldbaum germaneness prong
 
 
 [24]
 See, e.g., RE 288, 302 (Tavoulareas' remarks to Nomads Luncheon, Nov. 12, 1979: "I'd like to ask you to join us in an effort we have been making throughout the '70's to overcome the obstacles created by our government and special-interest groups. As you know, Mobil has gotten the reputation of being probably the most outspoken company on public issues, through our newspaper advocacy advertising and other public statements. It's not always comfortable being in the limelight, particularly when the president of the U.S. calls us perhaps the most irresponsible company in the country. But we think the effort has been worth making and we're going to go on with it."); RE 391, 393 (Tavoulareas' article in ST. JOHN'S ALUMNI QUARTERLY, Spring 1979: "[W]e've come to rely on print ads to make our points, though we also try everything we can (like sending our executives out around the country). Still, it's hard to make ourselves believed, or even heard. * * * After all our years of talking, there is finally evidence that, at last, somebody is listening. We're cautiously encouraged because newspaper and broadcast editorials have begun to see merit in our arguments. * * * Washington may not be heeding the expert yet, but we're hopeful." (emphasis in original))
 
 
 [25]
 See, e.g., Re 488-582 passim (articles reporting Tavoulareas' views on oil price decontrol)
 
 
 [26]
 In Waldbaum this court noted that, although "[b]eing an executive within a prominent and influential company does not by itself make one a public figure[,] * * * [s]ometimes position alone can make one a public figure." 627 F.2d at 1299 & n. 36. The court elaborated:
 The position itself may be so prominent that any occupant unavoidably enters the limelight and thus becomes generally known in the community--a general public figure. Similarly, the responsibilities of a position may include decisionmaking that affects significantly one or more public controversies, in which case the occupant becomes a limited public figure for those controversies. Courts should avoid generalizing, however, for labelling certain positions as always being public is tantamount to making subject-matter classifications, forbidden under the case law. * * *
 Id. at 1299-1230 n. 36 (emphasis added).
 An analysis of this particular case suggests that Tavoulareas' position--president of one of the world's largest corporations whose decisions play a major role in national energy policy--is precisely one of such public power and prominence that the position itself confers at least limited public figure status with respect to energy issues. Given the public controversy about Mobil's efforts in Saudi Arabia, including SAMARCO, such a determination is unnecessary to this case.
 
 
 [27]
 As the majority points out, maj. op. at 135, Tavoulareas' complaint included a fourth Piro statement--the "little nudge" comment. Since Tavoulareas does not pursue this comment in his appeal, brief for appellant at 29, and since the context for this comment is similar to the context of the "set up" comment, I do not address the "little nudge" comment separately